**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| VALERIA M. RAMUNDO ORLANDO ) | |
| 432 Binnewater Road ) | |
| Kingston, New York  12401 ) | |
| ) | |
|      Plaintiff, ) | |
| ) | |
|        v. ) | |
| ) | |
| RARE ) | Civil Action No. _____ |
| 1310 N. Courthouse Road, Suite 110 ) | |
| Arlington, Virginia 22201 ) | |
| ) | |
| Serve:  Brett Jenks, CEO ) | |
|         1310 N. Courthouse Road, Suite 110 ) | |
|         Arlington, Virginia 22201 ) | |
|         Registered Agent ) | |
| ) | |
|      Defendant. ) | |

## COMPLAINT

COMES NOW THE PLAINTIFF, VALERIA M. RAMUNDO ORLANDO, by counsel, and moves this Court for entry of judgment in her favor, and against the Defendant, RARE, and support of such motion alleges and avers as follows:

## NATURE OF ACTION

1.     This action states claims for gender discrimination and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., and retaliation, in violation Title VII of the Civil Rights Act of 1964 after Plaintiff complained about the discrimination and hostile work environment, and asked that action be taken to protect her.

2.     This action states a federal claim against the Defendant under the Equal Pay Act, 29 U.S.C. § 206(d), and a common law claim for negligent retention of employee.

## PARTIES

3.      Plaintiff Valeria M. Ramundo Orlando  ("Ms. Ramundo Orlando ") was, at all times relevant hereto, a resident and citizen of Arlington County in the Commonwealth of Virginia and at all times relevant hereto, was employed by the Defendant in this judicial district.

4.      Ms. Ramundo Orlando was an "employee" of Rare within the meaning of 42 U.S.C. § 2000e(f).

5.      Rare is an "employer" within the meaning of 42 U.S.C. §2000e(b).

6.      Rare is headquartered in Arlington County, in this judicial district.

7.      Rare is an active, non-stock corporation registered and in good standing with the Virginia State Corporation Commission, and which maintains an agent for the service of process in the Commonwealth of Virginia.

8.      Rare is an international conservation organization whose stated mission is to help communities adopt sustainable behaviors toward the environment and natural resources.

9.      Rare is engaged in an industry affecting commerce and had over 15 employees in each of twenty or more calendar weeks in the current or preceding year, within the meaning of 42 U.S.C. § 2000e(b).

## JURISDICTION AND VENUE

10.     The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

11.     The causes of action alleged in this action arose in this judicial district, in Arlington County, in the Commonwealth of Virginia.

12.     Ms. Ramundo Orlando was, at all times relevant hereto, a resident and citizen of this judicial district and at all times relevant hereto, was employed by the Defendant in this judicial district.

13.     Defendant is present in and conducts business in this judicial district, and the acts complained of herein occurred in this judicial district.  Therefore, the Defendant is subject to the personal jurisdiction of this Court.

14.     The unlawful employment practices in this case were committed in this judicial district, and Ms. Ramundo Orlando would still be employed in this judicial district, continuing to work for the Defendant, but for the Defendant's unlawful practices.

15.     This Court has jurisdiction over Ms. Ramundo Orlando's claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., and pursuant to 29 U.S.C. § 206(d).

16.     Defendant is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2) and (3).

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1331 and 1343(4).

18.     Jurisdiction and venue are proper in this Court.

**PROCEDURAL STATUS**

19.     Ms. Ramundo Orlando  timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on January 28, 2020.

20.     The EEOC issued a Right to Sue on August 31, 2020.

21.     This action is timely filed.

**BACKGROUND**

22.     Prior to Ms. Ramundo Orlando's employment with Rare, she had a distinguished career in finance spanning almost twenty-five years, and most recently served at NATO before taking a significant drop in pay and title in order to join Rare as Vice President of Blended

Finance in April 2018.  Ms. Ramundo Orlando's direct supervisor was Dale Galvin ("Mr. Galvin"), Managing Director of Sustainable Markets.

23.     At the time of Ms. Ramundo Orlando's final in person interview (which took place in Zurich, Switzerland), Ms. Ramundo Orlando was very clear with Mr. Galvin about her salary requirements and the fact that she would be taking a cut in pay to join Rare.  After much back and forth, Ms. Ramundo Orlando was promised a sign on bonus, and an increase by year end.

24.     Ms. Ramundo Orlando subsequently learned that her male colleagues in similar positions were being paid more than she was, and that other VPs (most of whom were male) had received increases in pay upon joining Rare.

25.     At Rare, Ms. Ramundo Orlando grew her team, established a Blended Finance (BF) strategy to position Rare as a thought leader in the Blue Economy (the investment and preservation of the marine environment/ecosystem), designed unique, replicable and scalable BF vehicles, engaged governments and development banks with MOUs and LOIs creating strong partnerships for the development of BF mechanisms at the national and sub-national level, and positioned Rare as an innovator within international forums as OECD, ASEAN, WEF and WOC.  Ms. Ramundo Orlando went above and beyond her duties as a VP at Rare.

26.     In her position as Vice President, Ms. Ramundo Orlando witnessed numerous instances of gender discrimination and hostile work environment by Mr. Galvin, aimed at her, her team, and other female colleagues.  When Ms. Ramundo Orlando complained about Mr. Galvin, who is a close, personal friend of Rare's CEO Brett Jenks ("Mr. Jenks"), she was subjected to a continuing course of retaliation.

27.     Mr. Galvin bullied Ms. Ramundo Orlando in front of Mr. Jenks and accused her of putting too much pressure on her team.  He did not treat male VPs of high performing teams in the same manner.

28.     Ms. Ramundo Orlando reported Mr. Galvin's actions and the tone of his emails to Caryn Perrelli ("Ms. Perrelli") (VP of Talent) and over the course of several months, Ms. Ramundo Orlando met with Ms. Perrelli to try to find solutions to protect her and her team from Mr. Galvin's conduct.

29.     Following Ms. Orlando Ramundo's complaints about Mr. Galvin, starting in or around the Spring of 2019 Mr. Jenks subjected Ms. Ramundo Orlando to weekly meetings where all her work was monitored and reviewed by him and two other male members of the Executive Team, Steve Box and Mr. Galvin.  Ms. Ramundo Orlando was forced to present to them weekly regardless of her schedule, time of day/night or where she was located for work (often in Indonesia or traveling), and she was subjected to a grading system, whereby she would be exposed to humiliation, and at times given a failing grade.  Mr. Galvin used the meetings as an opportunity to belittle her in front of Mr. Jenks or blame her for issues out of her control.  There was no reason for these meetings and no one else had to endure such undue scrutiny of their work.  Significantly, just one month prior to the start of these meetings, Ms. Ramundo Orlando received a stellar review and a bonus for her performance and work that she had done.

30.     In July and August 2019, Ms. Ramundo Orlando had multiple conversations with Ms. Perrelli, and with Tracey Nugent (Director of Recruitment), reporting that she felt bullied, harassed, and intimidated, to the point that she was uncomfortable sitting at her own desk (which was an open work space).  In response, Ms. Ramundo Orlando was told they would look into alternative solutions rather than taking any formal action.

5

31.     Multiple times, Ms. Perrelli stated that the best course of action would be that Mr. Galvin would take a six-month sabbatical, admitting that she was aware of the negative environment for which he was responsible.

32.     When hiring a male fund manager, Mr. Galvin commented that he would best be located in Manila, where the presence of Filipino women would ensure he would stay and not leave, rather than in Jakarta where he would have a hard time finding a girlfriend.

33.     Ms. Ramundo Orlando was offended by Mr. Galvin's comment, and immediately reported it to Ms. Perrelli and to another colleague.

34.     Ms. Ramundo Orlando also discussed feeling bullied by Mr. Galvin with Paula Caballero, a Managing Director, and had numerous discussions with three colleagues who have also worked with Mr. Galvin for years, all of whom warned Ms. Ramundo Orlando that she would be "blacklisted" by Mr. Jenks and treated differently if she persisted in complaining about Mr. Galvin, his personal friend.

35.     Paula Caballero, one of the most senior women at Rare was often described as Mr. Jenks' "trophy wife" by members of the Executive Team over private mail and Skype or in person.  The members in question never apologized for referring to Ms. Caballero as Mr. Jenks' "trophy wife" and instead, attempted to offer an explanation to justify the discriminatory and sexually degrading reference.  When Ms. Ramundo Orlando interjected that Ms. Caballero had incredible qualifications and was well known in the industry, the members would use her statement to support the "trophy wife" moniker – that Ms. Caballero was hired based on her name and reputation, and not her capacity to run a program.

36.     Significantly, in August 2019, during the course of Ms. Ramundo Orlando's conversations with Ms. Perrelli, she was warned that raising a formal complaint in writing

concerning Mr. Galvin would have a negative impact on her relationship with Mr. Jenks (CEO), and Ms. Ramundo Orlando was discouraged from taking formal action and submitting the written complaint she had prepared.  Ms. Ramundo Orlando was told to find a more "proactive" way to "get along" with Mr. Galvin.

37.     Starting on September 30, 2018, per doctor's orders, Ms. Ramundo Orlando was absent from work (quarantined) for 17 days with the chicken pox.  On 12 of those days, Ms. Ramundo Orlando worked remotely, from home, to prepare for an upcoming event during the World Bank meetings.

38.     While Ms. Ramundo Orlando was on leave, she was contacted by members of her team on several occasions in writing, who reported that the working environment was challenging and that many were going to start looking for new employment due to the time consuming demands of Mr. Galvin, which were not related to their team's work.

39.     On October 1, 2019, while Ms. Ramundo Orlando was out on sick leave with the chicken pox, she sent a written complaint via email to Ms. Perrelli stating, "I think I am starting to feel that Rare might not actually be the organization I thought it was when I joined.  I am constantly worried for my team being bullied, even now as I have a high fever, because they call me, they are stressed and concerned.  It has to stop . . . . I am very concerned about what is going on and the fact that my team is suffering from this unjustified behavior of an executive leader."

40.     Ms. Schweigart, Ms. Ramundo Orlando's deputy and director of blended finance, had informed her via email, messages and Skype how stressful the situation was and kept asking Ms. Ramundo Orlando to do all she could to have the team placed with Mr. Box, and out from under Mr. Galvin.  On a few occasions, Ms. Ramundo Orlando allowed Ms. Schweigart leave for the day due to her distress over the treatment she was experiencing by Mr. Galvin.  Notably,

when Ms. Schweigart was selected for the position, Mr. Galvin referred to her as "wonky" and "characterless," and stated his belief that Ms. Schweigart was "very emotional" and would not be able to withstand the pressure.  Mr. Galvin described Ms. Schweigart as "very emotional" and unable to handle the pressure because she is female.

41.     On October 2, 2019, Ms. Perrelli responded by email, stating that she had discussed Ms. Ramundo Orlando's concerns with Mr. Jenks and Niels Crone (COO), and that Mr. Jenks wanted to meet with Ms. Ramundo Orlando upon her return to the office in order to address her concerns.

42.     On Saturday, October 5, 2019, Mr. Galvin forwarded Ms. Ramundo Orlando an email that he received from *his* assistant, Jenny Miller, on September 11, which had not been shared with Ms. Ramundo Orlando, or with Talent (HR), previously.  The email, which he likely encouraged his assistant to write – accused Ms. Ramundo Orlando of, among other things, creating a toxic environment for her team.

43.     Notably, this email was never brought to Ms. Ramundo Orlando's attention, or the attention of HR, having been sent to only Mr. Jenks, until *after* she had complained about Mr. Galvin – for doing the very thing the September email was accusing Ms. Ramundo Orlando of doing.

44.     In the September email which was not shared with Ms. Ramundo Orlando or HR until after Ms. Ramundo Orlando complained about gender discrimination by Mr. Galvin, Ms. Miller also falsely accused Ms. Ramundo Orlando of gender bias after she hired a Kenyan woman as a senior Financial Analyst, over the male candidate Ms. Miller had recommended. Ms. Miller based her accusation on Ms. Ramundo Orlando's comment that she was pleased that

the most qualified candidate turned out to be a female since women in finance were underrepresented.

45.     On October 18, 2019, Ms. Ramundo Orlando received an email from Ms. Perrelli stating, "We recognize that we have had some workplace tensions on the team over the last few months.  We believe the best course of action at this time is to engage outside assistance to help us look into these matters and provide you the opportunity to discuss the facts and circumstances."  Jeff Loreck ("Mr. Loreck"), an attorney consultant from Orrick, Herrington & Sutcliffe ("Orrick") was engaged, and Ms. Ramundo Orlando was instructed to meet with him that day.

46.     Ms. Ramundo Orlando was treated differently than Mr. Galvin in how RARE responded.  Her complaints were never investigated by an outside attorney.  Yet, no one bothered to discuss the September email accusing Ms. Ramundo Orlando of creating a toxic environment with her before initiating an investigation.

47.     Notably, while Ms. Ramundo Orlando had complained for months about Mr. Galvin's harassing conduct while no action was taken (and, in fact, Ms. Ramundo Orlando was discouraged from making a formal reporting and told that alternative solutions would be explored), a formal internal investigation was launched within a week of Mr. Galvin's October 5 email providing the September complaint by Jenny Miller against Ms. Ramundo Orlando.

48.     Ms. Ramundo Orlando returned to the office from sick leave on October 16, 2019, to attend a luncheon meeting with Rare's Indonesian government partners (as well as Mr. Galvin, Mr. Box and Mr. Jenks) to discuss the way forward on the blended finance mechanism that the team had designed and the Indonesian government had agreed to implement.

49.     Ms. Ramundo Orlando officially returned to the office on October 24.  On October 25, 2019, Ms. Ramundo Orlando was interviewed by Mr. Loreck, who started off by telling her that he only had an hour, and was "doing this" *pro bono*.  Ms. Ramundo Orlando's team members had been interviewed the previous week.

50.     On November 4, 2019, Ms. Ramundo Orlando wrote an email to Mr. Jenks explaining her side of the story and what had led to her coming forward with her concerns about the continuous gender discrimination and harassment from Mr. Galvin towards Ms. Ramundo Orlando and other women, since she had started working for Rare.

51.     Ms. Ramundo Orlando provided Mr. Jenks with examples of what Mr. Galvin had said to other women in her presence, or to Ms. Ramundo Orlando.  Ms. Ramundo Orlando asked Mr. Jenks that her team be permitted to temporarily report to another division (and not Mr. Galvin) so they could focus on their deliverables to their government partners while the investigation was ongoing.

52.     On November 12, 2019, Ms. Ramundo Orlando met with Mr. Jenks to go over the findings of the investigation and to receive feedback for the path forward.

53.     Mr. Jenks said that the purpose of the meeting was to provide Ms. Ramundo Orlando with the findings and conclusion of the investigation, and that Ms. Ramundo Orlando was the subject of investigation because of concerns from "a number of people."  He also mentioned that it Rare's policy, after an email such as the one from Jenny Miller is received, to take action.  Mr. Jenks did not respond when Ms. Ramundo Orlando pointed out that she had been engaged in discussions with HR since July regarding harassment by Mr. Galvin, had sent an email detailing her complaints of gender discrimination and harassment on October 1, 2019, but

that her written complaint about Mr. Galvin had not been afforded adherence to the same policy as Ms. Miller's complaint about Ms. Ramundo Orlando.

54.     Mr. Jenks said he reviewed the email Ms. Ramundo Orlando sent him on November 4 and provided it to Orrick, and that the investigation did not reveal any evidence of gender discrimination.  Ms. Ramundo Orlando told Mr. Jenks that she had not been asked any questions regarding gender discrimination – that the interview had been focused solely on the investigation into Ms. Ramundo Orlando and the allegations made by Jenny Miller.

55.     Mr. Jenks said that up to this point, Ms. Ramundo Orlando had not received performance reviews and feedback as she should have, and that Ms. Ramundo Orlando needed to show "commitment to personal growth," and he planned to recommend that she work with a coach.

56.     Mr. Jenks further stated that Ms. Ramundo Orlando needed to feel comfortable with recognizing that she is not perfect, accept the feedback, not to blame others, and "to own" as much of the results of the investigation report as she can before she responds.

57.     Ms. Ramundo Orlando was not given a chance to respond – to the contrary, Mr. Jenks said it was not a meeting where Ms. Ramundo Orlando was being invited to express her opinion and that Ms. Ramundo Orlando should listen and reflect on what she had done and find a way to improve.

58.     Mr. Jenks referred to the investigation and the meeting with Ms. Ramundo Orlando as an "intervention" to "help [her] personally and professionally to move forward."  Ms. Ramundo Orlando's complaints about the harassment, discrimination, and unlawful conduct by Mr. Galvin were not addressed.

59.     Instead of taking any action to protect Ms. Ramundo Orlando or her team from Mr. Galvin's conduct, Ms. Ramundo Orlando was instructed to prepare a written "reflection" on the feedback about her (and no one else), including whether she could "own" her part in the problem, recognize she had work to do to fix it, and accept the feedback she received to make her a "better manager" and a "better person."

60.     Ms. Ramundo Orlando was completely shocked that her complaints, which she had been voicing for months, and about which she had submitted a formal, written complaint, were completely ignored, and that the investigation was completely focused on Ms. Ramundo Orlando, as a result of Jenny Miller's email to Mr. Galvin back in September, which Mr. Galvin did not even share with HR or Ms. Ramundo Orlando, or make an issue out of, until after Ms. Ramundo Orlando formally complained about him.

61.     Ms. Ramundo Orlando was also instructed to work with a mediator to come to a "working agreement" with Mr. Galvin to move forward together, and Mr. Jenks condescendingly suggested Ms. Ramundo Orlando read the book "Getting to Yes" and "learn from the negotiation of peace in the middle east."

62.     Ms. Ramundo Orlando was placed on a 90-day plan with an executive coach which would culminate in a 360 review.  Orrick's independent investigators interviewed a number of people besides Ms. Ramundo Orlando, all of whom were selected by Rare, with no input from Mr. Ramundo Orlando:  VP of Talent, Caryn Perrelli; COO of Rare, Niels Crone; Assistant to Dale Galvin, Jenni Miller; Dale Galvin; Director of Global Development, Lisa Pharaoh (who worked with the Blended Finance  20% of the time); Molly Bradke, Ms. Ramundo Orlando's assistant; Blended Finance Director, Kate Schweigart; Ms. Ramundo Orlando's Deputy; and Senior Director for the Meloy Found, Manuel Bueno Vera.

63.     The investigators found no evidence to support any of Jenny Miller's accusations against Ms. Ramundo Orlando.  There was no evidence to support Ms. Miller's accusations that Ms. Ramundo Orlando created a toxic or unlawful work environment, or that Ms. Ramundo Orlando engaged in discriminatory practices when she hired a woman for the finance role.

64.     The investigators also found no evidence of gender discrimination by Mr. Galvin, despite the fact that: 1) they had never done any investigation of her claims;  2) Ms. Ramundo Orlando had recently shared her concerns about Mr. Galvin with Niels Crone, and Mr. Crone was aware that Ms. Ramundo Orlando had asked for her team to be moved away from Mr. Galvin's area; and 3) Lisa Pharaoh expressed that she feared retaliation because she reported concerns about gender discrimination by Mr. Galvin to the Orrick investigator (and she also followed up with Talent (HR)).

65.     Despite the investigators finding no evidence to support the allegations against Ms. Ramundo Orlando, Mr. Jenks stated that that Ms. Ramundo Orlando was in violation of Rare's values and policies.  Ms. Ramundo Orlando was accused of berating a colleague (although the colleague was never questioned about it), using inappropriate and disrespectful language to and about other colleagues who were not present, engaging in an interview process that is not in line with proper procedure, not being forthcoming about the status of projects (despite outperforming  all of our goals and delivered on time); being a difficult manager, and sometimes creating a difficult work environment.  He countered this by stating that Ms. Ramundo Orlando brought a lot to Rare and "this qualifies for success."  He suggested Ms. Ramundo Orlando "double down," and be more concerned about how she is perceived as a manager and a colleague.

66.     Mr. Galvin, on the other hand, was not treated similarly, and was not found in to be in violation of Rare's values and policies, despite his discriminatory and retaliatory conduct towards Ms. Ramundo Orlando, and his harassment of Ms. Ramundo Orlando and her team.

67.     Mr. Jenks stated that Orrick concluded there were "irreconcilable differences" and tension between Ms. Ramundo Orlando and Mr. Galvin, for which they were both at fault, but Mr. Jenks said it was due to Ms. Ramundo Orlando's behavior and actions (and not Mr. Galvin's) which created a very difficult environment.  Mr. Jenks placed the blame on Mr. Ramundo Orlando, completely ignoring the fact that members of Ms. Ramundo Orlando's team said they would leave if the team continued to report to Mr. Galvin.

68.     Mr. Jenks also said that given the number of times Ms. Ramundo Orlando denied the accusations against her, that her truthfulness was in question, and she should accept the fact that she was lying.  This was completely opposite from how Mr. Galvin was treated.

69.     Mr.  Jenks said he would create a chart of how Ms. Ramundo Orlando could be successful, including a list of behaviors she should never repeat again.  Mr. Galvin was not subjected to this same consequence.

70.     Mr. Jenks refused to authorize Ms. Ramundo Orlando's request for her team to report to a managing director other than Mr. Galvin, and instructed Ms. Ramundo Orlando not to communicate with any other senior manager, or discuss any part of this process with her team.

71.     Mr. Jenks stated that Ms. Ramundo Orlando should no longer share any information with Steve Box (who had been very supportive of her position, and had also spoken out on behalf of the team) or else she would be terminated.  This made it difficult for Ms. Ramundo Orlando to effectively do her job, since Mr. Box and Ms. Ramundo Orlando worked

together on the projects for which he was the Managing Director, and their work relied on his inputs and coordination with him and his team.

72.     Mr. Jenks repeated that he wanted to see "remorse and ownership" of Ms. Ramundo Orlando's "faults" in her written reflection.  He also added that he expected Ms. Ramundo Orlando to "repent" for her actions.

73.     When Ms. Ramundo Orlando told Mr. Jenks that she intended to report to him any continuing acts of gender discrimination by Mr. Galvin, he said that any further reporting needed to go through HR.  Ms. Ramundo Orlando replied that HR had not taken any action in response to her previous reports in July and August, and to the contrary, had discouraged her from making a statement in writing.  Ms. Ramundo Orlando said he needed to do something about it.

74.     When Ms. Ramundo Orlando pointed out that these actions constituted retaliation, she was told she would be separated from the company.

75.     Mr. Jenks asked if Ms. Ramundo Orlando wished to be re-interviewed by Orrick to address her complaints of gender discrimination, but stated he would not re-interview anyone else regarding gender discrimination.

76.     On November 13, Ms. Ramundo Orlando started receiving a number of emails from Mr. Jenks, requesting her to deliver the self-reflection, and he stopped by Ms. Ramundo Orlando's desk to make sure she was writing it, specifically adding (again) that he wanted to see her "repent" for her actions.

77.     On November 15 at 7.21a.m., shaken from the recent events, Ms. Ramundo Orlando texted Ms. Perrelli and asked to speak with her.  During their call Ms. Ramundo Orlando told Ms. Perrelli that the emails from Mr. Jenks had left her shaking.  Ms. Ramundo

Orlando told Ms. Perrelli she truly cared for Rare and only wanted to have the opportunity to deliver for their partners.

78.     Ms. Ramundo Orlando asked for the intimidation to stop and for the situation to be handled in a professional manner -- not to make it personal.  Ms. Perrelli followed up about an hour later asking when the emails that had caused "concern" from Mr. Jenks had been sent.  On November 16, 2019, Ms. Ramundo Orlando sent an email to Talent (HR), and the following day, November 17, while at the airport on her way out town for a work trip, Ms. Ramundo Orlando received two emails from Mr. Jenks which were intimidating in nature and left her shaking.

79.     During a trip to Europe where Ms. Ramundo Orlando was representing Rare at the World Ocean Council meetings, prior to returning to D.C., Ms. Ramundo Orlando was informed by a colleague that she had been terminated.  This colleague, and Ms. Ramundo Orlando's deputy, had been called into separate meetings with Mr. Jenks and informed that Ms. Ramundo Orlando was going to be separated from Rare.

80.     Ms. Ramundo Orlando had not received any information from either Mr. Jenks or Talent/HR regarding her termination.  Ms. Ramundo Orlando had finished her work and was preparing to take a week of leave during the Thanksgiving holiday.

81.     When Ms. Ramundo Orlando mentioned to Mr. Box that she had just been told by a colleague that she had been terminated, Mr. Box said that Mr. Jenks told Mr. Box that he (Mr. Jenks) would be sending Ms. Ramundo Orlando an email.

82.     The email received by Ms. Ramundo Orlando from Mr. Jenks did not mention termination, but stated that Ms. Ramundo Orlando was being placed on paid Administrative leave effective December 1, 2019 (since Ms. Ramundo Orlando had already scheduled personal leave for Monday, November 25 through Wednesday, November 27, and Rare was closed for the

16

Thanksgiving holiday on November 28 and 29), and instructed her to cancel any upcoming work trips.

83.     Ms. Ramundo Orlando's access to her work email was disabled as of November 22, while she was still on a work duty trip. This caused significant hardship as Ms. Ramundo Orlando no longer had access to her travel (TSA) and health insurance passwords while she was in a foreign country.

84.     Ms. Ramundo Orlando informed her counterparts and proceeded to cancel her upcoming meetings, stating that she was postponing trips due to personal reasons.  In the ensuing weeks, Ms. Ramundo Orlando's team members were not instructed on what to say to their partners about Ms. Ramundo Orlando's absence, so they stated Ms. Ramundo Orlando was on leave and most likely would not be returning to Rare.

85.     Rare continued to engage with people Ms. Ramundo Orlando had set up meetings with without informing them in advance that Ms. Ramundo Orlando would not be attending. Many of the individuals that they met with were part of Ms. Ramundo Orlando's network prior to her joining Rare.  This was damaging to Ms. Ramundo Orlando's reputation and was a further act of retaliation.

86.     During the time Ms. Ramundo Orlando was on administrative leave, without any ability to access her email and without being able notify the people she had worked with for years that she was on leave, Ms. Ramundo Orlando learned that her colleagues were intimidated from connecting with her, and that management sent emails to senior executives advising them not to ask questions about Ms. Ramundo Orlando or contact her.

87.     When Ms. Ramundo Orlando asked if she could have access to her business cards, Ms. Ramundo Orlando's assistant was instructed not to give them to her.

88.     Mr. Jenks and Ms. Perrelli went above and beyond to discredit and harm Ms. Ramundo Orlando's professional reputation.  Mr. Jenks used Ms. Ramundo Orlando as an example of what happens to those who do not acquiesce to his demands, or dare to speak out against discrimination and insist that Rare take action to protect them and prevent further discrimination, and retaliation.  Other women at Rare have expressed fear of retaliation if they report any wrong-doing.

89.     Ms. Ramundo Orlando is aware of several other female employees who were subjected to gender discrimination by Mr. Galvin.  A female colleague told Ms. Ramundo Orlando she discussed the issue of gender discrimination by Mr. Galvin during her Orrick interview, and that she was afraid of retaliation.  She said she was concerned about what she said since the investigator mentioned he was working for Mr. Jenks, and Mr. Jenks and Mr. Galvin are very close friends.

90.     Another female colleague reported issues related to gender discrimination by Mr. Galvin during her exit interview in late October or early November, and cited Mr. Galvin's treatment of her as a factor in her decision to leave.

91.     Ms. Ramundo Orlando has since learned of a number of other instances of gender discrimination and harassment.  As one of the most senior women in the organization Ms. Ramundo Orlando was told that other women feared for their jobs if they spoke up.  While she was on leave, two of the remaining women on Ms. Ramundo Orlando's team were directed not to talk to Ms. Ramundo Orlando or communicate with her in any manner.  Ms. Ramundo Orlando learned that these women were promised promotions in exchange for disassociating themselves from her.

92.     Ms. Ramundo Orlando's assistant sent a message to a colleague expressing her hope that Ms. Ramundo Orlando would "understand" that she had no choice other than to cease communicating with Ramundo Orlando, or else she feared retaliation.

93.     On December 28, 2019 a colleague from the European office reached out to Ms. Ramundo Orlando after learning that Ms. Ramundo Orlando was put on administrative leave and expressed concerned on issues of gender discrimination.  He mentioned that one of their colleagues had asked to be promoted to the position vacated by her supervisor and was told she was unfit due to her current divorce and her status as a single mom.

94.     Another colleague that expressed concerns regarding repeated intimidatory language and "men's club behavior" by Mr. Jenks left Rare in early 2020, as well as a colleague who Mr. Jenks outed as gay in Indonesia (where homosexuality is illegal) during a work trip, in the presence of government officials.

95.     Another female colleague, Shirin Wertime, raised issues related to gender harassment to Ms. Perrelli in 2020, and she told her story to many other colleagues.  She was asked to leave and offered three months severance

96.     Two other female colleagues approached Ms. Ramundo Orlando  and informed her of their intent to file an EEOC claim due to harassment, intimidation, and discrimination based on race and immigration status, and pay inequity based on gender and race.

97.     A number of women were intimidated to the point of leaving Rare or being asked to leave after raising concerns of gender discrimination and race.

98.     In January 2020, Ms. Ramundo Orlando attempted (unsuccessfully) to come to agreement with Rare for an amicable separation.  During this time, Ms. Ramundo Orlando informed Rare that she was planning to attend the annual meetings hosted by the OECD on

Sustainable Finance.  Rare agreed in writing that Ms. Ramundo Orlando could attend the meetings as long as she did not attend to represent Rare.  Therefore, Ms. Ramundo Orlando, in writing, informed all the committee heads, the blended finance team of the OECD, and members of each working group she was planning to attend and that she no longer represented Rare.  She registered for the three day event under a new company name, which was reflected on her badge, her online information and her email address.  At no point did she ever suggest or imply that she was representing Rare.

99.     Nevertheless, Ms. Schweigart, who had not been informed that Ms. Ramundo Orlando would be attending the event independently, falsely informed Mr. Box and Mr. Jenks that Ms. Ramundo Orlando was in a meeting representing Rare.

100.     Ms. Ramundo Orlando only learned of this false statement when she returned to her hotel and learned she was being terminated on January 31, 2020, allegedly for "misrepresenting" the company in Paris after being notified she was not allowed to do so.

101.     After that, in order to avoid any further misperceptions, Ms. Ramundo Orlando recused herself from participating on a panel, and later found out from members of the OECD that Rare had communicated with them that Ms. Ramundo Orlando would not be participating and that Ms. Schweigart was replacing her as a speaker. Ms. Ramundo Orlando was never notified of the change.

102.     Upon Ms. Ramundo Orlando's termination, in agreement to sever any contact with her, Ms. Schweigart and Ms. Bradke received promotions in title and pay.  Ms. Schweigart had not yet been at Rare one year.

103.     In March 2020, Rare opposed Ms. Ramundo Orlando's claim for unemployment compensation, stating that she did not comply with the CEO's demands.

20

104.    Ms. Ramundo Orlando was discriminated against and subjected to a hostile work environment because of her gender (female), and retaliated against for reporting and opposing the discrimination and harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended.

## COUNT ONE
## DISCRIMINATION AND HOSTILE WORK ENVIRONMENT DURING THE COURSE OF EMPLOYMENT IN VIOLATION OF TITLE VII

105.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

106.    Defendant discriminated against Ms. Ramundo Orlando, treated Ms. Ramundo Orlando in a disparate manner, and subjected Ms. Ramundo Orlando to a hostile work environment because of her gender (female).

107.    Acts of discrimination included:

- Not paying her the same amount as her male colleagues;

- Mr. Galvin bullying Ms. Ramundo Orlando in the presence of Mr. Jenks and accusing her of putting too much pressure on her team, while not treating male VPs of high performing teams in the same manner;

- Punishing her after a complaint orchestrated by Mr. Galvin (including telling her she had to repent, placing on the blame on her and only requiring her to repent), while he was not treated the same way following her complaints.

108.    Ms. Ramundo Orlando reported Mr. Galvin's actions and the tone of his emails to Ms. Perrelli; and discussed her complaints with Ms. Perrelli and Ms. Nugent in July and August 2019, only to be told that they would look into "alternative solutions" rather than taking any formal action.  Ms. Ramundo Orlando was warned that raising a formal complaint in writing concerning Mr. Galvin would have a negative impact on her relationship with Mr. Jenks (CEO), and Ms. Ramundo Orlando was discouraged from taking formal action and submitting the

written complaint she had prepared.  Ms. Ramundo Orlando was told to find a more "proactive" way to "get along" with Mr. Galvin.

109.    Instead of taking any action to address Ms. Ramundo Orlando's complaint, or to otherwise investigate, Rare placed the burden on the victim – Ms. Ramundo Orlando – to find a "proactive" way to "get along" with Mr. Galvin.  Ms. Perrelli even suggested that the best course of action would be for Mr. Galvin to take a six-month sabbatical, admitting that she was aware of the negative environment for which he was responsible.

110.    Despite being warned about, and discouraged from, taking formal action against Mr. Galvin, on October 1, 2019, while Ms. Ramundo Orlando was out on sick leave, she sent a written, formal complaint via email to Ms. Perrelli.  Still, nothing was done and she continued to be targeted in the workplace due to her gender.

111.    Rare was on notice of Mr. Galvin's and Mr. Jenks' propensity to discriminate against women.  Ms. Ramundo Orlando is aware of several other female employees who were subjected to gender discrimination by Mr. Galvin.  Lisa Pharaoh told Ms. Ramundo Orland she discussed the issue of gender discrimination by Mr. Galvin during her Orrick interview, and that she was afraid of retaliation.

112.    Anna Marie Laura reported issues related to gender discrimination by Mr. Galvin during her exit interview in late October or early November, and cited Mr. Galvin's treatment of her as a factor in her decision to leave.

113.    Male employees were not subjected to similar treatment.

114.    Defendant's discriminatory treatment of Ms. Ramundo Orlando violated Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

115.     In discriminating against Ms. Ramundo Orlando in violation of federal law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Ramundo Orlando .

116.     As a direct and proximate result of Defendant's actions, Ms. Ramundo Orlando has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, insomnia, headaches, exhaustion, anxiety, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

117.     Due to the conscious disregard for Ms. Ramundo Orlando's federally protected rights, and the severity of Defendant's conduct, Ms. Ramundo Orlando is also entitled to punitive damages.

**COUNT TWO –**
**RETALIATION AND CONSTRUCTIVE DISCHARGE IN VIOLATION OF TITLE VII**

118.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

119.     Ms. Ramundo Orlando was vocal in her objections to the discriminatory treatment to which she was subjected based on her gender, including making verbal complaints to Mr. Perrelli and Ms. Nugent on multiple occasions, and a formal, written complaint to Ms. Perrelli in Talent (HR).  Mr. Jenks (CEO) and Mr. Crone (COO) were also informed of Ms. Ramundo Orlando's complaints by Ms. Perrelli.

120.     Thereafter, Ms. Ramundo Orlando was subjected to a continuing course of retaliation for her complaints about the discriminatory and hostile treatment to which she was subjected.

121.     Acts of retaliation included:

- Mr. Galvin suddenly informing Ms. Ramundo Orlando (and HR), for the first time – only *after* she had submitted her complaint about Mr. Galvin - that Jenny Miller had submitted a complaint about Ms. Ramundo Orlando almost a month prior, accusing Ms. Ramundo Orlando of, among other things, creating a toxic environment for her team – notably the very same thing Ms. Ramundo Orlando had complained Mr. Galvin of doing, and (conveniently, so as to serve as a counterpoint to Ms. Ramundo Orlando's claims of gender discrimination) of engaging in gender bias after she hired a Kenyan woman as a senior Financial Analyst, over the male candidate Ms. Miller had recommended, based on Ms. Ramundo Orlando's comment that she was pleased that the most qualified candidate turned out to be a female since women in finance were underrepresented;

- Failing to discuss Ms. Miller's complaint with Ms. Ramundo Orlando before initiating an formal investigation into Ms. Ramundo Orlando's alleged conduct;

- Launching a formal investigation within a week of Mr. Galvin's October 5 email providing the September complaint by Jenny Miller against Ms. Ramundo Orlando, while Ms. Ramundo Orlando had complained for months about Mr. Galvin's harassing conduct while no action was taken (and, in fact, Ms. Ramundo Orlando was discouraged from making a formal reporting and told that alternative solutions would be explored);

- Mr. Jenks denying Ms. Ramundo Orlando's request for her team to report to another division (and not Mr. Galvin) so the team could focus on their deliverables while the investigation was ongoing;

- Providing Ms. Ramundo Orlando with "feedback" of the "investigation" and telling her she had been the subject of the investigation because of concerns from "a number of people" (about which, aside from Jenny Miller, she not been informed);

- Informing Ms. Ramundo Orlando that it is "policy" to "take action" after receiving a complaint such as Jenny Miller's, but not applying that "policy" to Ms. Ramundo Orlando's complaints;

- Mr. Jenks telling Ms. Ramundo Orlando that the investigation did not reveal any evidence of gender discrimination, despite Ms. Ramundo Orlando not being asked any questions about gender discrimination during the course of the investigation;

- Informing Ms. Ramundo Orlando she had not received proper feedback previously (prior to her complaint) and that (now, after she had complained), she needed to show "commitment to personal growth;"

- Requiring Ms. Ramundo Orland to work with a coach as a result of the "investigation;"

- Mr. Jenks telling Ms. Ramundo Orlando to accept the blame for the results of the investigation;

- Not allowing Ms. Ramundo Orlando a chance to respond by saying was not a meeting where Ms. Ramundo Orlando was being invited to express her opinion and that Ms. Ramundo Orlando had to listen and reflect on what she had done and find a way to improve;

- Failing to take any action to protect Ms. Ramundo Orlando or her team from Mr. Galvin's conduct;

- Instructing Ms. Ramundo Orlando to prepare a written "reflection" on the feedback about herself (and no one else), including whether she could "own" her part in the problem, recognize she had work to do to fix it, and accept the feedback she received to make her a "better manager" and a "better person."

- Instructing Ms. Ramundo Orlando to work with a mediator to come to a "working agreement" with Mr. Galvin to move forward together, and Mr. Jenks suggesting Ms. Ramundo Orlando read the book "Getting to Yes" and "learn from the negotiation of peace in the middle east" – again, placing the burden on Mr. Ramundo Orlando to address and remedy her complaints of discrimination, and taking no action to protect her;

- Placing Ms. Ramundo Orlando on a 90-day plan with an executive coach which would culminate in a 360 review by individuals all of Rare's choosing, with no input from Mr. Ramundo Orlando;

- Mr. Jenks instructing Ms. Ramundo Orlando not to share any information with Steve Box (or else she would be terminated), making it difficult for Ms. Ramundo Orlando to effectively do her job;

- Mr. Jenks telling Ms. Ramundo Orlando that she needed to "repent" for her actions;

25

- Determining that Ms. Ramundo Orlando was in violation of Rare's values and policies, despite the investigators finding no evidence to support the allegations against Ms. Ramundo Orlando while *not* making a similar finding against Mr. Galvin despite his discriminatory and retaliatory conduct towards Ms. Ramundo Orlando, and his harassment of Ms. Ramundo Orlando and her team;

- Concluding there were "irreconcilable differences" and tension between Ms. Ramundo Orlando and Mr. Galvin, for which they were both at fault, but determining it was due to Ms. Ramundo Orlando's behavior and actions (and not Mr. Galvin's) which created the very difficult environment;

- Mr. Jenks accusing Ms. Ramundo Orlando of lying when she denied the accusations against her (again, opposite of how Mr. Galvin was treated); and

- Mr. Jenks creating a chart of behaviors Ms. Ramundo Orlando should never to repeat again, while not subjecting Mr. Galvin to this same consequence;

122.    When Ms. Ramundo Orlando told Mr. Jenks that she intended to report to him any continuing acts of gender discrimination by Mr. Galvin, he said that any further reporting needed to go through HR.  Ms. Ramundo Orlando replied that HR had not taken any action in response to her previous reports in  July and August, and to the contrary, had discouraged her from making a statement in writing.  Ms. Ramundo Orlando said he needed to do something about it.

123.    When Ms. Ramundo Orlando pointed out that these actions constituted retaliation, she was told she would be separated from the Company.

124.    As a further act of retaliation, Ms. Ramundo Orlando learned from a colleague, while she was out of the country representing Rare at the World Ocean Council meetings, that she had been terminated.  After that, Mr. Ramundo Orlando received an email from Mr. Jenks placing her on paid Administrative leave, and her work email was disabled as of November 22, while she was still overseas, causing significant hardship as Ms. Ramundo Orlando no longer had access to her travel (TSA) and health insurance passwords while she was in a foreign country.

125.    After placing her on leave, as further retaliation, Rare continued to engage with people Ms. Ramundo Orlando had set up meetings with without informing them in advance that Ms. Ramundo Orlando would not be attending, which was damaging to Ms. Ramundo Orlando's reputation.

126.    During the time Ms. Ramundo Orlando was on administrative leave, Ms. Ramundo Orlando learned that her colleagues were intimidated from connecting with her, and that management sent emails to senior executives advising them not to ask questions about Ms. Ramundo Orlando or contact her.

127.    When Ms. Ramundo Orlando asked if she could have access to her business cards, Ms. Ramundo Orlando's assistant was instructed not to give them to her, even though they were not Rare's property.

128.    Ms. Ramundo Orlando was terminated on January 31, 2020, allegedly for "misrepresenting" the company in Paris after being notified she was not allowed to do so.

129.    Rare's retaliation is in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*.

130.    This conduct by Defendant was actuated by malice, spite, and ill-will; was willful and wanton, and evinced conscious disregard for the rights of Ms. Ramundo Orlando .

131.    As a direct and proximate result of Defendant's actions, Ms. Ramundo Orlando has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, insomnia, headaches, exhaustion, anxiety, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of

income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

132.     Due to the severity of Defendant's conduct, Ms. Ramundo Orlando is also entitled to punitive damages.

## COUNT THREE –
## VIOLATION OF THE EQUAL PAY ACT

133.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

134.     Rare paid male VPs with similar duties more than Ms. Ramundo Orlando was paid.  At the time of Ms. Ramundo Orlando's final in person interview, she was very clear with Mr. Galvin about her salary requirements and the fact that she would be taking a cut in pay to join Rare.  Ms. Ramundo Orlando was promised a sign on bonus, and an increase by year end.

135.     Ms. Ramundo Orlando subsequently learned that her male colleagues in similar positions were being paid more than she was, and that other (male) VPs had received increases in pay upon joining Rare.

136.     The lower compensation paid to Ms. Ramundo Orlando was on account of her gender (female), and not due to a seniority system, a merit system, a system which measured earnings by quantity or quality of production, or a differential based on any factor other than gender.

137.     Rare's failure to provide Ms. Ramundo Orlando with equal pay was willful and persisted throughout her tenure with Rare.

138.     As a direct and proximate result of the unequal pay, and Rare's specific illegal acts, Ms. Ramundo Orlando has suffered and will suffer in the future great damages, including loss of income, litigation expenses including attorneys' fees, and other past pecuniary losses.

139.     Because Rare's conduct was willful, Ms. Ramundo Orlando is entitled to the full amount of damages recoverable under the Equal Pay Act, 29 U.S.C. § 206, *et seq*., including, but not limited to compensatory damages, liquidated damages in an amount equal to the compensatory damages and attorney fees and costs as described in 29 U.S.C. § 216(b).

## COUNT FOUR –
## NEGLIGENT RETENTION OF EMPLOYEE (BRETT JENKS)

140.     The allegations of the foregoing paragraphs are incorporated in this count as if re-alleged here in full.

141.     Rare had a duty to its employees, including Ms. Ramundo Orlando, not to retain or appoint employees whom it knew or should have known were likely to harm its employees and/or to violate laws designed to protect the public.

142.     Ms. Ramundo Orlando reported Mr. Galvin's bullying conduct towards her, and the actions and the tone of his emails to Caryn Perrelli, VP of Talent.  Over the course of several months, Ms. Ramundo Orlando met with Ms. Perrelli to try to find solutions to protect her and her team from Mr. Galvin's conduct.  However, after complaining about Mr. Galvin, and despite having received a stellar performance review just one month prior, Ms. Ramundo Orlando was subjected to retaliation for her complaints, including being humiliated and subjected to weekly meetings with Mr. Galvin to review her work with other male executives, subjected to a humiliating "grading system" that others were not subjected to, blaming her for issues out of her control, and belittling her in the presence of Mr. Jenks.

143.     Still, Ms. Ramundo Orlando continued to have multiple conversations with Ms. Perrelli reporting that she felt bullied, harassed, and intimidated, to the point that she was uncomfortable sitting at her own desk (which was an open work space).  In response, Ms.

Ramundo Orlando was told they would look into alternative solutions rather than taking any formal action.

144.    During these conversations, as Ms. Ramundo Orlando persisted in her complaints and insistence that action be taken to protect her, Ms. Perrelli warned Ms. Ramundo Orlando that raising a formal complaint in writing concerning Mr. Galvin would have a negative impact on her relationship with Mr. Jenks (CEO), and Ms. Perrelli discouraged Ms. Ramundo Orlando from taking formal action and submitting the written complaint she had prepared.  Ms. Ramundo Orlando was told to find a more "proactive" way to "get along" with Mr. Galvin, and no action was taken.

145.    Other employees and colleagues also warned Ms. Ramundo Orlando that she would be "blacklisted" by Mr. Jenks and treated differently if she persisted in complaining about Mr. Galvin, his personal friend.

146.    Rare had actual and constructive knowledge that Ms. Ramundo Orlando was being subjected to discriminatory, hostile, retaliatory, inappropriate, unprofessional and illegal behavior in the workplace, yet warned her not to continue with her complaints and insistence that the illegal conduct towards her stop, because of how Mr. Jenks would react, and what he would do to protect his friend, Mr. Galvin, instead of taking steps to protect Ms. Ramundo Orlando.

147.    Despite this knowledge, Rare retained Mr. Jenks and took no action to address Ms. Ramundo Orlando's complaints, put the burden on Ms. Ramundo Orlando to find a more "proactive" way to "get along" with Mr. Galvin (instead of complaining about the illegal conduct, since that would anger Mr. Jenks), discouraged her from submitting the formal, written complaint she had prepared since it would anger Mr. Jenks and result in even worse treatment of

Ms. Ramundo Orlando, and failed to take any action whatsoever to protect Ms. Ramundo Orlando.

148.     Rare retained Mr. Jenks in a position from which he encouraged, condoned, participated in, and allowed Mr. Galvin to discriminate against, retaliate against, and otherwise treat Ms. Ramundo Orlando in a hostile manner, including threatening Ms. Ramundo Orlando's employment, and by doing so, Rare allowed Mr. Jenks to harm Ms. Ramundo Orlando and the public.  Rare permitted Mr. Jenks to continue to engage in illegal and threatening behavior towards Ms. Ramundo Orlando and others by taking no action in response to Ms. Ramundo Orlando's complaints about Mr. Galvin, discouraging her from complaining about Mr. Galvin since it would anger Mr. Jenks, and continuing to allow Ms. Ramundo Orlando to be subjected to hostile, discriminatory, retaliatory, inappropriate, unprofessional and illegal behavior.

149.     Rare, through Ms. Perrelli, warned Ms. Ramundo Orlando that raising a formal complaint in writing concerning Mr. Galvin would have a negative impact on her relationship with Mr. Jenks (CEO), and Ms. Perrelli discouraged Ms. Ramundo Orlando from taking formal action and submitting the written complaint she had prepared.  Ms. Perrelli, in essence, told Ms. Ramundo Orlando to just accept and tolerate the behavior when she placed the burden on Ms. Ramundo Orlando to find a "proactive" way to "get along."

150.     Rare was aware of Mr. Jenks' conduct, since Ms. Perrelli warned Ms. Ramundo Orlando that submitting a formal complaint against Mr. Galvin would negatively impact her relationship with Mr. Jenks, and because other employees and colleagues also warned Ms. Ramundo Orlando that she would be "blacklisted" by Mr. Jenks and treated differently if she persisted in complaining about Mr. Galvin, yet Rare continued to retain Mr. Jenks as a supervisory employee over Ms. Ramundo Orlando in a position to direct and influence her

livelihood and her work environment, while Ms. Ramundo Orlando's complaints about Mr. Galvin's illegal, unprofessional, inappropriate and hostile conduct towards her, as well as her requests that Rare protect her from Mr. Galvin's illegal behavior, and from his escalating retaliation towards her were ignored, because he was a personal friend of Mr. Jenks, who protected him.

151.    After Ms. Ramundo Orlando complained about Mr. Galvin, during a business event in Europe, Ms. Ramundo Orlando was informed by a colleague that she had been terminated.  This was extremely humiliating for Ms. Ramundo Orlando, who had not received any information from either Mr. Jenks or Talent/HR regarding her termination.

152.    Ms. Ramundo Orlando's access to her work email was disabled as of November 22, while she was still on a work duty trip. This caused significant hardship as Ms. Ramundo Orlando no longer had access to her travel (TSA) and health insurance passwords while she was in a foreign country.

153.    In the ensuing weeks, in order to humiliate and punish Ms. Ramundo Orlando further for her complaints, Ms. Ramundo Orlando's team members were not instructed on what to say to their partners about Ms. Ramundo Orlando's absence, so they stated Ms. Ramundo Orlando was on leave and most likely would not be returning to Rare.  In addition, Rare continued to engage with people Ms. Ramundo Orlando had set up meetings with without informing them in advance that Ms. Ramundo Orlando would not be attending. Many of the individuals that they met with were part of Ms. Ramundo Orlando's network prior to her joining Rare.  This was damaging to Ms. Ramundo Orlando's reputation and was a further act of retaliation designed to harm Ms. Ramundo Orlando, condoned and encouraged by Mr. Jenks, in response to Ms. Ramundo Orlando's complaints about Mr. Galvin.

154.   Rare was negligent in retaining Mr. Jenks after it learned, or should have learned, that he was using his position of authority over Ms. Ramundo Orlando to harm her, and to protect his friend, Mr. Galvin, who was engaging in discriminatory, hostile and retaliatory conduct towards Ms. Ramundo Orlando (and others, including her team), and treating them in an illegal, unprofessional, and inappropriate manner.

155.   Ms. Ramundo Orlando was warned by multiple employees and collogues, including Ms. Perrelli, VP of Talent, that complaining about Mr. Galvin would make it worse, and negatively impact her job and relationship with Mr. Jenks.  As a result, Rare took no action to protect Ms. Ramundo Orlando, ultimately terminated her employment in a humiliation manner, while retaining Mr. Jenks and allowing him to protect Mr. Galvin instead of Ms. Ramundo Orlando.

156.   Rare knew or should have known that Mr. Jenks had the propensity to treat Ms. Ramundo Orlando and others in an illegal, unprofessional, inappropriate, hostile, and retaliatory manner since Ms. Perrelli and other employees and colleagues warned Ms. Ramundo Orlando that complaining about Mr. Jenks' friend, Mr. Galvin, would have a negative impact, have her "blackballed" and result in her being treated differently by Mr. Jenks.

157.   When Ms. Ramundo Orlando persisted in insisting that action be taken to address Mr. Galvin's treatment of her and her team, Mr. Jenks terminated Ms. Ramundo Orlando's employment in a humiliating manner – allowing Mr. Ramundo Orlando to learn about her termination from colleagues while on a work trip in Europe, and then cutting off her access to her work email while she was still in Europe, so that she did not have access to the her TSA password.

158.    Had Rare promptly and properly removed Mr. Jenks from the workplace, he would not have had the opportunity to continue to engage in this conduct, or to harm Ms. Ramundo Orlando and others.  Instead, Rare took no action and shifted the burden to Ms. Ramundo Orlando to find a "proactive" way to get along with Mr. Galvin, rather than allowing her to formally report the illegal and harmful conduct, which would anger  Mr. Jenks.

159.    This conduct by Rare was actuated by malice, spite, and ill will; was willful and wanton; and evinced conscious disregard for the rights of Ms. Ramundo Orlando.

160.    Ms. Ramundo Orlando suffered harm as a result of Rare's negligent retention of Mr. Jenks, including loss of advancement and career opportunities and the attendant employment benefits.

161.    Rare's retention of Mr. Jenks, in the face of knowledge of his illegal conduct, constituted gross negligence and evinced a conscious disregard for the rights of Ms. Ramundo Orlando.

162.    Rare's retention of Mr. Jenks as an employee, and its failure to protect Ms. Ramundo Orlando from Mr. Jenks, was willful and wanton in that it exhibited a conscious disregard for the rights of Ms. Ramundo Orlando.  Rare was aware of the propensity of Mr. Jenks to engage in illegal conduct that would harm Ms. Ramundo Orlando and the public, including based on Ms. Perrelli's warning not to report Mr. Galvin, and on warnings from Ms. Ramundo Orlando's co-workers and colleagues that Mr. Jenks would "blackball" her or treat her poorly if she complained about his friend, Mr. Galvin.

163.    Rare exhibited a reckless indifference in its failure to protect Ms. Ramundo Orlando and the public and in retaining Mr. Jenks.  Rare was aware from the existing circumstances that its failure to act to protect Ms. Ramundo Orlando and the public (by

terminating Mr. Jenks and discontinuing his illegal conduct) would likely result in harm to Ms. Ramundo Orlando and the public.

164.    Rare ratified and condoned the conduct of Mr. Jenks by refusing to take any action to prevent him from taking further action against Ms. Ramundo Orlando.  Rare refused to take action despite awareness that Mr. Jenks' threatened Ms. Ramundo Orlando's job, and knowing he had engaged in similar conduct with other employees previously.

165.    Rare also ratified and condoned the conduct of Mr. Jenks by leaving him in Ms. Ramundo Orlando's chain of command and continuing to allow him to be in a position of authority over her, whereby he was in a position to terminate her employment, which he did.

166.    Rare further ratified and condoned the conduct of Mr. Jenks by continuing to employ him despite receiving notice of his behavior from Ms. Ramundo Orlando, and from the other employees who warned Ms. Ramundo Orlando not to complain about Mr. Galvin because of how Mr. Jenks would behave.

167.    Rare is further responsible for the actions of Mr. Jenks because he was acting in the scope of his employment, and with the express authority over Ms. Ramundo Orlando that was granted to him as Rare's agent.

168.    As a direct and proximate result of Defendant's actions, Ms. Ramundo Orlando has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, insomnia, headaches, exhaustion, anxiety, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non pecuniary losses.

169.     Due to the character and severity of Rare's conduct, Ms. Ramundo Orlando is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff VALERIA M. RAMUNDO ORLANDO requests that this Court enter judgment in her favor, and against Defendant RARE on the above stated Counts; and further:

(a)     Award Ms. Ramundo Orlando compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on the above-stated Counts One through Four; and in addition

(b)     Award Ms. Ramundo Orlando punitive damages on Counts One, Two and Four per the statutory cap; and in addition

(c)     Award Ms. Ramundo Orlando liquidated damages on Count Three; and in addition

(d)     Award Ms. Ramundo Orlando attorneys' fees and the costs of this action; and in addition

(e)     Award injunctive relief consisting of an order prohibiting the Defendant from engaging in further employment practices that create or tolerate a discriminatory work environment; and in addition

(f)     Award Ms. Ramundo Orlando  such other and further relief as may be appropriate under the circumstances.

**<u>JURY DEMAND</u>**

PLAINTIFF VALERIA M. RAMUNDO ORLANDO DEMANDS A TRIAL BY JURY.

November 4, 2020                     Respectfully submitted,

*<u>/S/ CARLA D. BROWN</u>*
Carla D. Brown
Virginia Bar No. 44803
cbrown@cbcblaw.com
CHARLSON BREDEHOFT
  COHEN &  BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile
*Counsel for Plaintiff, Valeria M. Ramundo Orlando*