**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| VALERIA M. RAMUNDO ORLANDO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20cv01323-TSE-JFA |
| | ) | |
| RARE, | ) | |
| | ) | |
| Defendant | ) | |

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

Defendant Rare, by counsel and pursuant to Rule 56 of the Federal Rules of Procedure and the Local Rules of this Court, hereby submits this Memorandum in Support of its Motion for Summary Judgment as follows:

**INTRODUCTION**

This case is about irreconcilable personal differences between Plaintiff and her immediate supervisor – not gender discrimination or hostile work environment based on her gender. At its core, this case is about Plaintiff's unspecified complaints of "bullying" by her supervisor. Notably, it is also about a female employee who complained that <u>Plaintiff</u> created a "toxic work environment for her team," and the ensuing outside investigation which found no evidence to support the allegations against Plaintiff; and, also found no evidence of gender discrimination by Plaintiff's supervisor. The investigation concluded that there were "irreconcilable differences" between Plaintiff and her supervisor, for which they were both at fault. In the end, this case is about Plaintiff's refusal to accept her role in the "irreconcilable differences" between her and her supervisor; and her failure to comply with Rare's instructions to resolve the differences.

1

Plaintiff's Amended Complaint ("Am. Compl.") asserts three counts as follows:  Count One: Discrimination and Hostile Work Environment in violation of Title VII; Count Two: Retaliation and Discharge in violation of Title VII; and Count Three: Violation of the Equal Pay Act.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SOF")

1.      Brett Jenks has been the President and CEO of Rare since 2000.  Transcript of Brett Jenks ("Jenks Tr."), December 22, 2021, p. 58:4-8.

2.      Dale Galvin began working at Rare in 2004 as the Vice President of Finance and Operations.  Transcript of Dale Galvin ("Galvin Tr."), January 5, 2022, pp. 74:11-75:1.  In 2017, Mr. Galvin became the Managing Director of Sustainable Markets.  *Id.*

3.      Caryn Perrelli has been the Vice President of Talent for Rare since 2017.  Transcript of Caryn Perrelli ("Perrelli Tr."), December 22, 2021, p. 35:4-10.  In that role, Ms. Perrelli manages the overall human resources function for Rare.  Affidavit of Caryn Perrelli ("Perrelli Aff."), ¶ 2.

**There Was No Equal Pay Act Violation**

4.      Rare hired Plaintiff as the Vice President, Blended Finance, on April 1, 2018.  Perrelli Aff., ¶ 3.

5.      The Vice President, Blended Finance position was newly created, and Plaintiff was the first to serve in that role. Perrelli Aff., ¶ 4.

6.      As the Vice President of Blended Finance, Plaintiff was responsible for leading Rare's new Blended Finance initiative, to design, test, scale blended finance solutions for sustainable fisheries in the countries in which Rare operated.  In this capacity, she was responsible for strategy, partnership development, fundraising, day to day program management,

2

implementation and serving as the liaison between Rare and key external stakeholders including foreign governments, development finance institutions, multi-lateral organizations, and NGO's. Perrelli Aff., ¶ 5.

7.      Plaintiff accepted a starting salary of $160,000 per year with a sign on bonus of $5,000. Perrelli Aff., ¶ 6.

8.      In the Fall of 2018, Quatt Associates, an outside consulting firm engaged by Rare created a Salary Range System for each job family within Rare.  Perrelli Aff., ¶ 7, Ex. 1.

9.      Rare used the Salary Range System as a guide in adjusting Vice President salaries in October of 2018, the beginning of fiscal year 2019 (October 1, 2018 to September 30, 2019). Perrelli Aff., ¶ 8.

10.     In reliance on the Salary Range System, on October 1, 2018, Rare increased Plaintiff's annual salary to $176,000. Perrelli Aff., ¶ 9.

11.     As of October 1, 2018, Rare employed five Vice Presidents in its United States operations as follows in order of salary: (1) Caryn Perrelli, Vice President, Talent - $201,200; (2) Brian Ullmann, Vice President, Marketing and Communications - $178,500; (3) Plaintiff, Vice President, Blended Finance - $176,000; (4) Anna Bartlett, Vice President, Chief of Staff, Executive Office - $170,000; and (5) Esteban Chavarria Fernandez, Vice President, Finance and Accounting - $167,000. Perrelli Aff., ¶ 11, Ex. 2.

12.     In fiscal year 2018 (October 1, 2017 to September 30, 2018), Plaintiff managed one employee and she had an approved a budget of $299,182 for her group.  Perrelli Aff., ¶ 12. At the time she was hired, Plaintiff did not have any staff working for her.  Transcript of Valeria Ramundo Orlando ("Pltf. Tr."), December 21, 2021, p. 25:1-3.

13.     In fiscal year 2019 (October 1, 2018 to September 30, 2019), Plaintiff managed two to three employees and was the budget owner of a budget of $572,894. Perrelli Aff., ¶ 13.

14.     A budget owner is the executive who is responsible for the budget, approves spending against the budget, and has to provide finance with a monthly forecast of spending against the budget.  Perrelli Aff., ¶ 14.

15.     As the Vice President, Marketing and Communications, Brian Ullmann was responsible for the leadership and management of the marketing, communications, public and media relations, brand management, social media, event programming and institutional website design, and development functions globally for all ten countries in which Rare operated.  Mr. Ullmann was in the Communications job group.  Perrelli Aff., ¶ 15.

16.     In fiscal year 2018 (October 1, 2017 to September 30, 2018), Brian Ullmann managed a staff of seven employees and contractors and was the budget owner for a budget of $855,645.  Perrelli Aff., ¶ 16.

17.     In fiscal year 2019 (October 1, 2018 to September 30, 2019), Brian Ullmann managed a staff of five employees and contractors and was the budget owner for a budget of $970,141.  Mr. Ullmann left employment with Rare in June 2019.  Perrelli Aff., ¶ 17.

18.     As the Vice President, Finance and Accounting, Esteban Chavarria was responsible for the leadership and management of the accounting, finance, grants management and budgeting functions globally for all ten countries in which Rare operated.  In this capacity, he provided strategic guidance and leadership to Rare's Executive Team and Board of Trustees to establish the policies, processes, and systems necessary to effectively manage the institution's financial operations. Mr. Chavarria Fernandez is in the Finance job group.  Perrelli Aff., ¶ 18.

19.     In fiscal year 2018 (October 1, 2017 to September 30, 2018), Esteban Chavarria managed a staff of eight employees and was the budget owner for a budget of $1,620.186. Perrelli Aff., ¶ 19.

20.     In fiscal year 2019 (October 1, 2018 to September 30, 2019), Esteban Chavarria managed a staff of nine employees and was the budget owner for a budget of $1,879,788. Perrelli Aff., ¶ 20.

21.     As of October 1, 2019, Rare employed six Vice Presidents in its United States operations as follows in order of salary:  (1) Caryn Perrelli, Vice President, Talent - $215,000; (2) Brooke Betts, Vice President, Campaigns - $200,000; (3) Esteban Chavarria Fernandez, Vice President, Finance and Accounting - $180,000; (4) Anna Bartlett, Vice President, Individual Giving & Board Relations - $178,000; (5) Plaintiff, Vice President, Blended Finance - $176,000; and (6) Kevin Green, Vice President, Behavior Center - $142,000.  Perrelli Aff., ¶ 21, Ex. 2.  Mr. Chavarria Fernandez's salary was adjusted this year based on a Salary Range analysis performed by Quatt Associates.  Perrelli Aff., ¶ 22.

22.     During Plaintiff's tenure at Rare, Steve Box was Senior Vice President.  Steve Box was above Plaintiff in the hierarchy at Rare. Pltf. Tr., p. 136:8-11.  Mr. Box managed the biggest program for Rare, the Fish Forever Program, which was the largest funded program at Rare.  Pltf. Tr., p. 71:1-18.

23.     Manuel Bueno Vera was a Senior Director employed by Rare.  Perrelli Aff., ¶ 23.

24.     David Webb was not an employee of Rare.  He was engaged as contractor from June 2018 to August 2018 to serve as a Fund Manager for the Meloy Fund.  Perrelli Aff., ¶ 24.

25.     Gerald Miles was a Vice President for the Global Development team.  He lived and worked in Australia.  He was not a Rare employee.  He was engaged through a Professional

Employer Organization.  Individuals who were not United States employees were all paid in local currency and pay was aligned with the cost of living and economic factors in that country. Perrelli Aff., ¶ 25.

**Failure to Exhaust Title VII Administrative Remedies on Pay Discrimination Claim**

26.     The document labelled PL-00183 – PL-00191, attached hereto as Exhibit A, was produced by Plaintiff in discovery and is a copy of the Charge of Discrimination ("Charge") filed by Plaintiff with the Equal Employment Opportunity Commission ("EEOC").

27.     The document labelled PL-00195 – PL-00196, attached hereto as Exhibit B, was produced by Plaintiff in discovery and is a copy of an e-mail between the EEOC investigator and counsel's office for Plaintiff.

**There Was No Gender Discrimination**

28.     Mr. Galvin had a day-long interview with Plaintiff in Zurich.  Pltf. Tr., p. 14:19-21. Mr. Galvin was eager to meet with Plaintiff in person.  Pltf. Tr., pp. 19:16-20:13.

29.     At the time of the interview, Plaintiff had the impression that Mr. Galvin wanted to hire her.  Pltf. Tr., pp. 21:16-22:6.

30.     The document labelled Rare_000052-Rare_000056 is a true and accurate copy of the FY 18 Year-End Review provided to Plaintiff by Mr. Galvin. Perrelli Aff., ¶ 26, Ex. 3. The review was positive.

31.     The document labelled Rare_000057-Rare_000059 is a true and accurate copy of the FY 19 Mid-Year Review provided to Plaintiff by Mr. Galvin. Perrelli Aff., ¶ 27, Ex. 4. The review was positive.  Plaintiff was rated "on track" for all goals.

**There Was No Harassment**

32.     When Plaintiff references "harassment" by Mr. Galvin against her and her team she is not referring to "sexual harassment where he sought sexual favors or did anything inappropriate sexually."  Pltf. Tr., p. 203:12-20.

33.     Plaintiff did not observe Mr. Galvin make any inappropriate sexual comments to her or any other women.  Pltf. Tr., p. 204:8-12.

34.     According to Plaintiff, Mr. Galvin made inappropriate jokes, but she can't recall any of them; and it was not something that she considered harassment. Pltf. Tr., p. 204:13-205:5.

35.     According to Plaintiff, she considered "harassment" by Mr. Galvin to be "[b]elittling, demeaning, harassing. Meaning harassing, constantly demanding and asking and retaliating using language as, 'I am disappointed. I expected more,' and only exclusively to women.  That's gender discrimination."  Pltf. Tr., p. 205:6-13.

36.     According to Plaintiff, the October 5, 2019 e-mail to her from Mr. Galvin which forwarded Jenny Miller's September 11, 2019 e-mail was "so low and horrible" by Mr. Galvin. Pltf. Tr., pp. 172:11-173:5.

37.     According to Plaintiff, the October 5, 2019 e-mail was not the worst thing she claimed Mr. Galvin did to her, but when asked to provide details of each and every incident, she could only relay the following alleged incidents:

- In December 2018, during a workshop that Plaintiff was leading for the Rare Leadership team, Mr. Galvin "did not try to protect the team," but instead emphasized that Plaintiff was not providing Brett Jenks with the right marketing statements.  Mr. Galvin gave Mr. Jenks the idea that Plaintiff could not be trusted.
- During another meeting Mr. Galvin "threw [Plaintiff] under the bus" when he started asking Plaintiff questions that he should have asked before the meeting; and ganged up on her with Mr. Jenks.
- Mr. Galvin undermined Plaintiff's relationship with Mr. Jenks.
- In August 2019, Mr. Galvin called Plaintiff and said she was a terrible person; and Plaintiff does not recall why he called her.
- Regarding the engagement of David Webb in the Philippines, Mr. Galvin said that it would be easy for him to get a girlfriend there.

- Mr. Galvin told Plaintiff that she dressed appropriately in the office, and that the other women dressed too casual or were too granola.

Pltf. Tr., pp. 173:6-180:17.

38.     Plaintiff's Blended Finance team only had one male who worked part-time and he was located in the Philippines.  Pltf. Tr., p. 205:14-22.  The female members of the Blended Finance team in 2019 included Molly Bradtke, who was hired in January 2019, Kate Schweigart, who was hired in Spring 2019, and Laura Barasa.  Pltf. Tr., pp. 55:17-56:3; 58:3-12.

39.     Plaintiff was out of the Rare offices on travel approximately 85% of the time she worked for Rare.  Pltf. Tr., p. 67:1-9; 145:11-13.

40.     Plaintiff believes that Ms. Schweigart felt harassed by Mr. Galvin, but she cannot describe how Ms. Schweigart felt harassed – according to Plaintiff that is a question for Ms. Schweigart to answer.  Pltf. Tr., pp. 85:19-86:7; 119:10-120:7; 122:5-7.

41.     Ms. Schweigart never told Plaintiff that she felt that Mr. Galvin had bullied her or harassed her because of her gender. Affidavit of Kate Schweigart ("Schweigart Aff."), ¶ 6.

42.     Ms. Schweigart reported to the investigator that she "has never observed Mr. Galvin treat any employees in an unfair or discriminatory manner. While he certainly does 'not sugar coat things' and does not say 'please and thank you,' his behavior does not concern her from a maltreatment or bullying standpoint." Schweigart Aff., ¶ 5; Rare_000149-Rare_000184, which was marked as Exhibit 5 to Mr. Jenks' deposition.

43.     In 2019, Ms. Bradtke had very little contact with Mr. Galvin. Affidavit of Molly Bradtke ("Bradtke Aff."), ¶ 5.

44.     In 2019, Plaintiff approved that Ms. Bradtke could work remotely most of the time, in part because of her commute, and in part because she frequently worked outside of

8

typical work hours in order to assist Plaintiff who travelled internationally on a regular basis. This remote working arrangement had nothing to do with Mr. Galvin.  Bradtke Aff., ¶¶ 6 and 7.

45.     Ms. Bradtke did not tell Plaintiff that Mr. Galvin had ever bullied her or harassed her.  Mr. Galvin had not bullied or harassed Ms. Bradtke.  Bradtke Aff., ¶ 8.

46.     In October 2019, Ms. Bradtke was interviewed as part of an investigation by an outside investigator.  She was asked by the investigator about Mr. Galvin.  She responded that at times she was frustrated with him because he asked for things that caused her to spend time and energy on something that seemed to be a conflicting priority.  She stated that Mr. Galvin did not explain the rationale behind why he asked for things.  She described him as inflexible and unyielding.  She also stated that his conduct was nothing like harassment or discrimination. Bradtke Aff., ¶ 9.

47.     Ms. Miller observed the interactions between Mr. Galvin and Plaintiff and stated generally they "had a decent working relationship" and that "some days it was positive, other days it was challenging because the nature of the conversation tended to focus on continually requesting Valeria to get work done that had been requested of her that had not been delivered yet."  Transcript of Jenny Miller ("Miller Tr."), January 6, 2022, pp. 17:13-18:5.

48.     Plaintiff has no knowledge whether Mr. Galvin ever threatened to discipline or terminate any of her team members if they did not do the tasks that he asked.  Pltf. Tr., pp. 134:22-135:3.

49.     According to Plaintiff, her team felt "they were being bullied, because he [Mr. Galvin] would say that he would be disappointed in them." Pltf. Tr., p. 134:13-21.

50.     On September 27, 2019, Mr. Galvin sent an e-mail to the Sustainable Markets group, which included Plaintiff's Blended Finance team, advising that they had received a "red"

circle during a board meeting.  The document labelled Rare_002487-002488, which was marked as Exhibit 9 to Plaintiff's deposition, is a true and accurate copy of the e-mail and Plaintiff's response.  Pltf. Tr., 90:2-95:14.  Plaintiff responded to Mr. Galvin by e-mail stating in part, "Why did BF get a red???," and "We should not have any red, This is not ok."  *Id.*

51.     Plaintiff felt that the Blended Finance team was marked red because Mr. Galvin was underperforming on his work in the Meloy Fund, and that resulted in her team being "bullied."  Pltf. Tr., pp. 132:21-134:2.

52.     On October 2, 2019, Plaintiff sent an e-mail to Ms. Perrelli complaining "my team is being bullied."  The document labelled Rare_001259-Rare_1260, which was marked as Exhibit 10 to Plaintiff's deposition, is a true and accurate copy of the e-mail.  In the e-mail Plaintiff states that "Dale's tone has become more arrogant and insensitive. He is pushing his agenda . . ."  *Id.*  According to Plaintiff, the "agenda" referenced in the e-mail "referred to the fact that he did not want to lose the blended financing, and he had probably been told that we were asking to be moved to somebody else."  Pltf. Tr., p. 128:12-17.

53.     Plaintiff was seeking to have her Blended Finance team transferred under the Fish Forever program, which was managed by Steve Box.  Pltf. Tr., pp. 83:7-13; 89:17-90:1.

**Investigation of Jenny Miller Complaint and Dale Galvin**

54.     On September 11, 2019, Jenny Miller sent an e-mail to Mr. Galvin complaining about the "toxic work environment" created by Plaintiff, including allegations that Plaintiff engaged in gender and ethnicity discrimination as well as "sexual harassment."  The document labelled Rare_000146-Rare_000147, which was marked as Exhibit 1 to Miller's deposition, is a true and accurate copy of the e-mail. Miller Tr., pp. 23:13-21.

55.     Ms. Miller's September 11th e-mail accurately described the incidents that she had observed.  Miller Tr., p. 40:3-11.

56.     Mr. Galvin did not forward the complaint to Talent, instead he believed he could resolve the issues between Ms. Miller and Plaintiff informally. He had been working on trying to help improve the same complaints about Plaintiff for many months.  Galvin Tr., p. 94:5-21.

57.     On October 3, 2019, Mr. Galvin forwarded the September 11th Jenny Miller e-mail to Ms. Perrelli, but redacted the source of the e-mail and the date it was received.  The document labelled Rare_001070-Rare_001071, which was marked as Exhibit 11 to Perrelli's Deposition, is a true and accurate copy of the e-mail. Perrelli Tr., p. 117:5-118:1; Galvin Tr., pp. 87:12-89:10, Exhibit 1 to Galvin Depo.

58.     On October 5, 2019, Mr. Galvin inadvertently forwarded the Jenny Miller e-mail to Plaintiff when he had intended to send it to Ms. Perrelli.  Affidavit of Dale Galvin (Galvin Aff.), ¶¶ 2 and 3.

59.     After receiving the Miller complaint, Mr. Jenks and Ms. Perrelli decided to engage counsel, Jeff Lorek with Orrick, to investigate the issues pertaining to Plaintiff and Mr. Galvin.  The allegations raised by Ms. Miller led to the decision to conduct the investigation. The conduct of Mr. Galvin was also investigated.  Jenks Tr., p. 75:13-77:3; 78:11-13; Perrelli Tr., pp. 52:14-53:7, 54:20-55:5.

60.     On October 7, 2019, Ms. Perrelli sent an e-mail to Plaintiff advising her that Rare was engaging a third party to investigate the issues raised in Ms. Miller's September 11th complaint, and for Plaintiff to "have the opportunity to express [her] perspective and concerns." Perrelli Aff., ¶ 28.

61.     The document labelled Rare_000149-Rare_000184, which was marked as Exhibit 5 to Mr. Jenks' deposition, is a true and accurate copy of the October 28, 2019, report of the investigation provided to Rare. Jenks Tr., pp. 100:6-101:6.

62.     During the investigation, Ms. Miller provided copies of her notes from the May 2019 time period to the investigator.  The document labelled Rare_000169-Rare_000173, which was marked as Exhibit 3 to Jenny Miller's deposition, is a true and accurate copy of the notes. Miller Tr., pp. 29:18-30:10.  The notes accurately described the incidents that Ms. Miller observed. Miller Tr., p. 40:7-11.

63.     During the investigation, Plaintiff provided a copy of a draft e-mail to Ms. Perrelli from August 25, 2019, that she provided to Manuel Bueno to review, which referred to a recent meeting with Ms. Perrelli where she complained about bullying and being intimidated, but not based on gender.  The document labelled Rare_001127, which was marked as Exhibit 15 to Plaintiff's deposition, is a true and accurate copy of the draft e-mail.  Pltf. Tr., pp. 19:18-20. Plaintiff did not send the e-mail to Ms. Perrelli.  *Id.*

64.     Early in the morning on November 4, 2019, Mr. Jenks had completed his review of the report of the investigation and sent an e-mail at 8:02 a.m. to Ms. Perrelli sharing his initial conclusions which included transitioning Plaintiff because of "hearing her call colleagues a 'piece of shit,' hearing her berate an intern, knowing that she would repeatedly lie to a lawyer about behavior that multiple people witnessed – I would fire her on the spot."  Affidavit of Brett Jenks ("Jenks Aff."), ¶ 2.

65.     On November 4, 2019, at 3:05 p.m., Plaintiff sent Mr. Jenks an e-mail with the subject line of "My side of the events."  Jenks Tr., p. 81:3-21, Exhibit 2 to Jenks Deposition.

This was the first time that Plaintiff had complained about gender discrimination.  Jenks Tr., p. 88:13-22; Perrelli Tr., pp. 54:13-19; 62:14-63:16.

66.     After receiving the November 4, 2019 e-mail from Plaintiff, Mr. Jenks, Ms. Perrelli, and the Orrick team discussed the issues raised and determined that the investigation that had been done was comprehensive, and that the course of action put into place in response to the investigation was the appropriate next step.  Perrelli Tr., pp. 66:18-67:19, 69:10-70:9; Jenks Tr., pp. 88:13-89:9; 90:21-91:3.

67.     After further considering the report of the investigation, it was decided that both Plaintiff and Dale Galvin would (1) be required to provide Mr. Jenks with a written reflection discussing their respective roles in the issues addressed in the report; (2) participate in mediation sessions with each other moderated by a third-party outside mediator to work to address the issues that created the conflict between them; and (3) separately work with outside coaches to further address the issues identified in the report.  Jenks Aff., ¶ 3.

**Plaintiff Was Placed on Paid Administrative Leave and Terminated for Legitimate/Non-retaliatory Reasons**

68.     On November 12, 2019, Mr. Jenks met separately with both Plaintiff and Mr. Galvin and explained the results of the investigation and the steps that each were required to take moving forward.  Mr. Jenks advised both Plaintiff and Mr. Galvin that their written reflections were due to him by Noon on November 13, 2019.  *Id.,* ¶ 4.

69.     During Plaintiff's meeting with Mr. Jenks on November 12, 2019, Mr. Jenks asked that she take notes during the meeting.  The document labelled PL-00177-PL00182, which was attached as Exhibit 16 to Plaintiff's Deposition, is a true and accurate copy of Plaintiff's notes.  Pltf. Tr., pp. 220:21-221:15.

70.     During the interview, Mr. Jenks asked Plaintiff whether she wanted to be re-interviewed by the investigator in response to the issues she raised in her November 4, 2019, e-mail; and according to Plaintiff there was no discussion by her about being re-interviewed.  Pltf. Tr., pp. 234:11-235:7.

71.     Plaintiff had no issue with working with Mr. Galvin and a mediator as required by Mr. Jenks.  Pltf. Tr., pp. 232:7-233.

72.     Plaintiff's notes confirmed that Mr. Jenks required Plaintiff to write a reflection on the feedback he provided during the meeting and that it was due to him by Noon on November 13, 2019.  Pltf. Tr., pp. 227:19-228:6.

73.     Plaintiff did not provide the reflection as requested by Mr. Jenks.  Pltf. Tr., pp. 228:21-229:1.

74.     Mr. Galvin did provide the written reflection by Noon on November 13, 2019, as required by Mr. Jenks. Jenks Aff., ¶ 5.

75.     For his role in the issues addressed in the report of the investigation, Mr. Jenks provided Mr. Galvin with a highly critical performance review which rated him as unsatisfactory in the first goal to "[d]emonstrate a commitment to living Rare's values in the execution of day to day responsibilities, in working relationships with colleagues and in collaborating cross functionally."  *Id.,* ¶ 6.

76.     Mr. Galvin's performance review mentioned that he would not receive his full bonus for the year, which was reduced by Mr. Jenks by 24% compared to the previous year  *Id.,* ¶ 7.

77.     After not receiving Plaintiff's written reflection on November 13th, Mr. Jenks sent an e-mail to her on November 14, 2019, inquiring about the status of her reflection and giving her until midday to deliver it.  *Id.,* ¶ 8.

78.     By November 17, 2019, Mr. Jenks had still not received the written reflection from Plaintiff; and Mr. Jenks sent another e-mail to her emphasizing the need for her to comply. The document labelled as Rare_00123-Rare_125, attached as Exhibit 8 to the Jenks Deposition, is a true and accurate copy of the e-mail.  Jenks Tr., pp. 111:18-112:12.  In the e-mail, Mr. Jenks wrote in part:

> I am sharing this information with you in writing as I need you to understand my absolute expectation that you accept responsibility for these actions/perceptions before we continue with this process.  I asked that you write me a letter of personal reflection, the same way I asked Dale to do the same: to give an opportunity to demonstrate that you really heard the report's findings, that you recognize the impact these behaviors might cause, that you take accountability for these action, and that you are truly committed to improving. . . . Feel free to explain this to your lawyer, but also know that I fully expect you to complete this requirement by close of business Wednesday November 20 . . .

*Id.*

79.     In the e-mail, Mr. Jenks also advised Plaintiff that she would no longer be reporting to Mr. Galvin, but would be temporarily reporting to Steve Box.  *Id.*

80.     Instead of providing the written reflection on November 20, 2019, Plaintiff sent Mr. Jenks an e-mail from Paris where she was attending a conference and asked for more time to prepare the document.  Mr. Jenks was frustrated by the request, as Mr. Galvin had provided his written reflection in 24 hours as requested, and Plaintiff appeared to be stalling.  He consulted separately with Ms. Perrelli and Mr. Box and both agreed that Rare should move to separate Plaintiff from Rare.  Jenks Aff., ¶ 9.

81.     On November 22, 2019, Mr. Jenks sent an e-mail to Plaintiff advising her that she was being placed on paid administrative leave beginning December 1, 2019 "to find an amicable

path to [her] separation from Rare," because she failed to provide the written reflection as required by Mr. Jenks.  The document labelled as Rare_000217, attached as Exhibit 9 to the Jenks Deposition, is a true and accurate copy of the e-mail. Jenks Tr., pp. 116:12-117:21; Perrelli Tr., p. 91:13-21.

82.     On January 28, 2020, Ms. Schweigart, sent an e-mail to Mr. Jenks, Mr. Box, and Mr. Perrelli advising them that Plaintiff was at a conference she was attending; and that Plaintiff had registered as Rare.  The document labelled as Rare_000220-Rare_000229, attached as Exhibit 7 to the Perrelli Deposition, is a true and accurate copy of the e-mail. Perrelli Tr., pp. 98:18-99:15.

83.     Plaintiff was advised that she could attend the conference while on administrative leave but could not attend as a representative of Rare.  Pltf. Tr., p. 260:3-16.

84.     On January 30, 2020, Ms. Schweigart sent an e-mail to Caryn Perrelli and Steve Box advising them that the conference organizers confirmed that Plaintiff has registered as a Rare representative; and that she had observed Plaintiff wearing a Rare badge.  Perrelli Aff., ¶ 29.

85.     Rare terminated Plaintiff's administrative leave and separated her employment from Rare based on the information that she had violated the directive and attended the conference as a representative of Rare.  Perrelli Tr., pp. 96:22-97:12; Jenks Tr., p. 121:6:15.

## ARGUMENT

### I.     STANDARD OF REVIEW

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn*

*v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013).  When making this determination, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with ... [any] affidavits" filed by the parties.  *Celotex*, 477 U.S. at 322.  Whether a fact is material depends on the relevant substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted).

## II.     NO EQUAL PAY ACT VIOLATION (COUNT THREE)

Count Three of the Amended Complaint asserts that Rare paid male Vice Presidents ("VP") more than Plaintiff was paid in violation of the Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA")[1]. The Act prohibits discrimination in rates of pay on the basis of gender "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).

The undisputed record shows that Rare did not discriminate against female VP's, including Plaintiff, in its pay practices.  In October 2018, the highest paid VP was a woman, who was paid an annual salary of $201,000.  SOF, ¶ 11.  At the same time, the lowest paid VP was a man who was paid an annual salary of $167,000.  *Id.*  At that time, Plaintiff was paid an annual salary of $176,000.  *Id.* When Plaintiff was hired in April 2018, she was offered and accepted a starting salary of $160,000, with a sign on bonus of $5,000.  SOF, ¶ 7.  Plaintiff's position as the Vice President, Blended Finance, was a new position and she was the first to serve in that role. SOF, ¶ 5.  In the Fall of 2018, Rare engaged an outside compensation consulting firm that

---

[1] By Minute Order dated April 9, 2021, the Court dismissed the portions of Count Three that related to directors and senior directors.  ECF No. 25.

created a salary range system for each job family within Rare. SOF, ¶ 8.  Rare used the salary range system as a guide to adjust VP salaries in October of 2018.  SOF, ¶ 9.  As a result, Plaintiff's salary was increased to $176,000 annually.  SOF, ¶ 10.

In October 2019, the two highest paid VP's were women, who were paid $215,000 and $200,000 annually.  SOF, ¶ 21.  The lowest paid VP was a man who was paid $142,000.  Plaintiff was paid an annual salary of $176,000.  *Id.*

In 2018, one male VP, Brian Ullmann was paid $178,500 ($2,500 more than Plaintiff). SOF, ¶ 11.  In 2019, one male VP, Estaban Chavarria Fernandez was paid $180,000 ($4,000 more than Plaintiff).  SOF, ¶ 21. The undisputed record demonstrates that Plaintiff was not "performing work substantially equal in skill, effort, and responsibility under similar working conditions" of either Mr. Ullmann or Mr. Chavarria Fernandez.  *Strag v. Bd. of Trs.*, 55 F.3d 943, 948 (4th Cir. 1995). "Equal" means that "the jobs involved should be virtually identical, that is, they would be very much alike or closely related to each other." *Jacobs v. College of William & Mary*, 517 F. Supp. 791, 798 (E.D. Va. 1980) (quoting *Brennan v. City Stores, Inc.*, 479 F.2d 235, 239 (5th Cir. 1973)). "Skill includes consideration of such factors as experience, training, education, and ability." 29 C.F.R. § 1620.15(a).

Mr. Ullman was the VP, Marketing and Communications, and was responsible for the leadership and management of all marketing and communication efforts of Rare.  SOF, ¶ 15.  He managed a staff of seven employees and contractors and was the budget owner for a budget of $855,645. SOF, ¶ 16.  Contrast that to Plaintiff who was in a newly created position, was responsible for blended finance solutions, and who in 2018 managed only one employee and had an approved budget of only $299,182 for her group.  SOF, ¶¶ 5, 6 and 12.  These differences are more than sufficient to explain a $2,500 difference in salary.

Mr. Chavarria Fernandez, was the VP, Finance and Accounting, and was responsible for the leadership and management of the accounting, finance, grants management and budgeting functions globally for all ten countries in which Rare operated, and he provided guidance and leadership to the Rare Executive Team and Board of Trustees. SOF, ¶ 18. In 2019, he managed a staff of nine employees and was the budget owner for a budget of $1,879,788. SOF, ¶ 20. In addition to the significantly different job responsibilities, in 2019 Plaintiff only managed a staff of between two to three employees; and was the budget owner for a budget of $572,894. SOF, ¶ 13. Again, these differences are more than sufficient to explain a $4,000 difference in salary.

Moreover, neither of these male counterparts worked in the same job group as Plaintiff. Mr. Ullmann was in the Communications job group, Mr. Chavarria Fernandez was in the Finance job group, and Plaintiff was in the Sustainable Markets Group. SOF, ¶¶ 5, 15, 18; *see Wheatley v. Wicomico Cty., Maryland*, 390 F.3d 328, 333–34 (4th Cir. 2004) (affirming summary judgment in favor of defendant because plaintiff failed to produce a comparator within her department and noting that different departments "perform completely different functions" and that not all departments "have budgets and workforces of equal size").

Summary judgment is also warranted because any differential in pay by Rare was based on factors other than sex. *See U.S. Equal Emp. Opportunity Comm'n v. Maryland Ins. Admin.*, 879 F.3d 114, 120–21 (4th Cir. 2018). Rare uses a Salary Range System, created by an outside consulting firm, which includes salary ranges for each job family within Rare. SOF at ¶¶ 8-10 and 21. The Fourth Circuit has recognized that the use of programs similar to Rare's Salary Range System qualify as factors other than sex. *See Equal Emp. Opportunity Comm'n v. Aetna Ins. Co.*, 616 F.2d 719, 726 (4th Cir. 1980) (finding differential in pay was based on factors other

than sex where employer used two distinct salary programs which included a salary scale based on job classification grades).

III.     **NO GENDER DISCRIMINATION OR HARASSMENT (COUNT ONE)**

Count One is based a collection of allegations of unconnected "incidents" that amount to nothing more than personality conflicts and at the worst "bullying," but not gender discrimination or prohibited harassment.

A.     **There Was No Gender Discrimination**

To establish a prima facie case of gender discrimination, Plaintiff must establish: "(1) that [she] is a member of a protected class, (2) that [her] job performance was satisfactory, (3) that [she] was subject to an adverse employment action by [her] employer and (4) that similarly situated employees outside of [her] protected class received more favorable treatment." *Smith v. Virginia Hous. Dev. Auth.*, 437 F. Supp. 3d 486, 507 (E.D. Va. 2020). An "adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). Here, Plaintiff has failed to show how any of the alleged acts by her supervisor, Dale Galvin, resulted in an adverse employment action against her.

In interrogatories propounded to Plaintiff, she was asked to describe in as much detail as she can all "instances of gender discrimination and hostile work environment by Mr. Galvin. . . ."  See Exhibit C hereto.  Much like the allegations in the Amended Complaint, Plaintiff responded with a series of unconnected stories, most of which do not even directly involve Plaintiff.  *Id.,* Interrogatory No. 4.   Significantly, none of the stories involve any adverse employment action experienced by Plaintiff.  *Id.,* pp. 14-18.

Similarly, allegations that Plaintiff was for example, "bullied," accused of "putting too much pressure on her own team," and told that she could not be trusted (Am. Compl., ¶ 107) do not amount to adverse actions.  It is well settled that "simple teasing, offhand comments, and isolated incidents . . . will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotations omitted).  Further, "[r]eferring to educated women in the office as trophy wives" did not affect any term, condition, or benefit of Plaintiff's employment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (The "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).   Nor was it an adverse employment action to require Plaintiff to provide weekly reports.  *See, e.g.*, *Prince–Garrison v. Maryland Dep't of Health & Mental Hygiene*, 317 Fed. Appx. 351, 353 (4th Cir. 2009) (affirming dismissal pursuant to Rule 12(b)(6) because "reprimands for insubordination, meetings with supervisors, and directions to attend counseling, do not constitute adverse employment actions"); *Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 819 (E.D. Va. 2016) (finding that neither oral nor written reprimands rose to the level of an adverse employment action in the absence of collateral consequences); *Pauling v. Gates*, No. 1:10CV1196, 2011 WL 1790137, at *7 (E.D. Va. May 6, 2011) (requiring plaintiff to provide daily and weekly reports was not adverse employment action).  Plaintiff's claim of gender discrimination fails because there is no showing of an adverse action against her.

The only potential adverse action alleged is that Rare did not "pay her as much as males in the same sustainable market team with lower titles such as Director. . . ." Am. Compl., ¶ 107. Putting aside the fact that there is no evidence in the record of a Director in the sustainable

market team being paid more than Plaintiff, she did not exhaust her administrative remedies under Title VII to preserve this claim.  Plaintiff did not raise this claim in her formal administrative EEOC charge of discrimination.  *See* Exhibit A attached hereto.  She has accordingly failed to exhaust her administrative remedies with respect to wage discrimination and cannot bring it now.  *See Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir.2000) (failure to exhaust administrative remedies, therefore, precludes a plaintiff from pursuing her claim in court); *Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 132 (4th Cir. 2002) (same).  An aggrieved employee's filing with the EEOC defines the scope of her subsequent right to institute a civil suit, and the claims she may raise in a subsequent civil action are limited to those that are "reasonably related to his or her [EEOC] charge and can be expected to follow from a reasonable administrative investigation." *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).  As Plaintiff's eight-page submission to the EEOC did not make any allegation that she was paid less than her male counterparts, her claim of wage discrimination cannot be construed as "reasonably related to" or "expected to follow from" an investigation into gender discrimination.  *See Bryant*, 288 F.3d at 133. Accordingly, the issue of wage discrimination in violation of Title VII is not properly before this Court and should be dismissed.

**B.**     **There Was No Hostile Work Environment**

To state a hostile work environment claim, Plaintiff must establish that: "(1) she experienced unwelcome harassment; (2) the harassment was based on her [protected class]; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). The burden for establishing a hostile work environment is "sufficiently demanding to ensure that

Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Here, Plaintiff has failed to meet this demanding standard.

Plaintiff does not claim that Mr. Galvin engaged in sexual harassment, involving any inappropriate sexual comments, requests for sexual favors or that he did anything inappropriate sexually. SOF, ¶¶ 32-33. Instead, Plaintiff's complaint of "harassment" is limited to general claims of belittling and demeaning, by using such language as "I am disappointed, I expected more," only to women. SOF, ¶ 35. An example of "low and horrible" behavior by Mr. Galvin was when on October 5, 2019, he forwarded an e-mail he had received from one of his employees, Jenny Miller, in which Ms. Miller complained about <u>Plaintiff</u> creating a "toxic work environment." SOF, ¶¶ 36, 54. Although Plaintiff attributes bad motives to Mr. Galvin in forwarding the e-mail to her, the undisputed record is clear that Mr. Galvin sent it by accident. SOF, ¶ 58. According to Plaintiff, worse examples of harassment include (1) Mr. Galvin not protecting Plaintiff's team; (2) "throwing Plaintiff under the bus" during a meeting by questioning her; (3) undermining Plaintiff's relationship with Mr. Jenks; (4) on one occasion in 2019 calling Plaintiff a terrible person; (4) saying that it would be easy for a Rare contractor to find a girlfriend in the Philippines; and (5) telling Plaintiff that she dressed "appropriately," and that the other women in the office dressed too casual. SOF, ¶ 37.

The story that Plaintiff tells is that Mr. Galvin harassed her team because they were women and that she had to protect them by reporting to Rare that they felt "bullied." SOF, ¶52. In her reports, Plaintiff described Mr. Galvin's tone towards her team as "arrogant and insensitive." *Id.* However, that is not how Plaintiff's team viewed Mr. Galvin's conduct. Although Plaintiff believes that Kate Schweigart felt harassed by Mr. Galvin, she cannot actually describe how Ms. Schweigart felt. SOF, ¶ 40. Ms. Schweigart never told Plaintiff that she felt

23

harassed by Mr. Galvin.  SOF, ¶ 41.  Significantly, during the investigation of Plaintiff and Mr. Galvin, Ms. Schweigart told the investigator that Mr. Galvin's "behavior does not concern her from a maltreatment or bullying standpoint."  SOF, ¶ 42.  The other female team member, Molly Bradtke, had very little contact with Mr. Galvin, and she too never told Plaintiff that Mr. Galvin had ever bullied or harassed her.  SOF, ¶¶ 44 and 45.  According to Ms. Bradtke, Mr. Galvin never bulled or harassed her; and she told the investigator that his conduct "was nothing like harassment or discrimination."  SOF, ¶¶ 45 and 46.  Like, Ms. Bradtke, in reality Plaintiff had little contact with Mr. Galvin as he was out of the office 85% of the time on business for Rare. SOF, ¶ 39.

Plaintiff's general allegations of bullying and being harassed, are at worst are nothing more than examples of general callous behavior, a routine difference of opinion, or personality conflicts – none of which are actionable under Title VII. *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 75 (1998) (". . . Title VII is directed at discrimination because of sex, not merely conduct tinged with offensive sexual connotations . . . the statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same, and the opposite, sex[.]"); *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 459 (4th Cir. 2002) ("[Title VII] is not designed to purge the workplace of vulgarity." (citations omitted)); *Cox v. Rumsfeld*, 369 F. Supp. 2d 748, 757 (E.D. Va. 2005), *aff'd*, 190 F. App'x 329 (4th Cir. 2006) (finding that although the behavior, as described by plaintiff, may have been boorish and at times inappropriate, the alleged actions are not sufficient to make out a prima facie case of gender-based hostile work environment).  Nor, has Plaintiff provided any evidence that the conduct was severe or pervasive

Accordingly, the undisputed records fails to establish a hostile working environment in violation of Title VII; and summary judgment should be entered in favor of Rare.

## IV.     THERE WAS NO RETALIATION/DISCRIMINATION (COUNT TWO)

At the center of Plaintiff's retaliation claim is the September 11, 2019, e-mail from Jenny Miller to Dale Galvin, in which Ms. Miller raised multiple serious complaints about the behavior of Plaintiff, including that she created a "toxic work environment" and engaged in gender and ethnicity discrimination.  SOF, ¶ 54.  Upon learning of Ms. Miller's complaint, Mr. Jenks and Ms. Perrelli made the decision to engage outside counsel to investigate the issues raised by Ms. Miller; and, also to investigate complaints made by Plaintiff against Mr. Galvin.  SOF, ¶ 59.  The October 28, 2019, report of the investigation, is critical in establishing that Rare did not retaliate against Plaintiff.  SOF, ¶ 61.

To establish a prima facie case of retaliation, Plaintiff must prove: (1) that she "engaged in a protected activity"; (2) that "the employer took a materially adverse action against" her; and (3) a causal link "between the protected activity and the adverse action." *Mascone v. Am. Physical Soc'y, Inc.*, 404 Fed.Appx. 762, 765 (4th Cir. 2010).

Starting with the first element, Plaintiff alleges that she engaged in protected activity throughout 2019 when she purportedly reported Mr. Galvin's gender discrimination and harassment to Talent[2].  However, as evidenced by the record, Plaintiff did not complain about discrimination until November 4, 2019, <u>after</u> the investigation had been completed. SOF, ¶ 65.  Prior to that time, Plaintiff's complaints consisted of generally accusing Mr. Galvin of bullying her team or being "arrogant and insensitive."  SOF, ¶ 52.  Notably, a draft e-mail by Plaintiff from August 25, 2019, discussing a report she made to Ms. Perrelli, referenced "bullying" and

---

[2] "Talent" is the Rare equivalent of the Human Resources department.

being intimidated, but not on the basis of gender.  SOF, ¶ 63.  Plaintiff's general complaints of

bullying – which make no mention of conduct being related to gender – are not protected

activities under Title VII. *See Conyers v. Virginia Hous. Dev. Auth.*, 927 F. Supp. 2d 285, 295

(E.D. Va.), *aff'd*, 533 F. App'x 342 (4th Cir. 2013) ("[T]he employee must complain about

activity that constitutes unlawful discrimination under Title VII, rather than about unfair

treatment generally."); *see also Monk v. Potte*r, 723 F.Supp.2d 860, 880 (E.D. Va. 2010) ("Title

VII does not prohibit retaliation against employees who do not allege unlawful discrimination").

Nor was it objectively reasonable for Plaintiff to believe that her "complaints" prior to

November 4, 2019, constituted protected activity.  *See Strothers v. City of Laurel, Maryland*, 895

F.3d 317, 328 (4th Cir. 2018) ("To warrant protection, the employee's perception of a violation

must be 'objectively reasonable' under the circumstances known to her.").  As discussed above,

none of Plaintiff's female team members complained to her about Mr. Galvin's behavior, or

considered his behavior to be harassing or discriminatory.  SOF, ¶¶ 40-46.

Regarding the second element, the Amended Complaint alleges approximately thirty acts

of retaliation – most of which are alleged to have occurred before November 4, 2019, and nearly

all of which fail to meet the materially adverse standard. Am. Compl. at ¶ 121.  In the context of

a retaliation claim, materially adverse actions are those that "might have dissuaded a reasonable

worker from making or supporting a charge of discrimination." *Supinger v. Virginia*, 167 F.

Supp. 3d 795, 809 (W.D. Va. 2016) (quoting *Wells v. Gates*, 336 Fed.Appx. 378, 383 (4th

Cir.2009)). This materiality requirement does not protect from all retaliation but only from

retaliation that produces an "injury or harm" and "eliminates 'petty slights, minor annoyances,

and simple lack of good manners' as actionable events." *Valerino v. Holder*, 2013 WL

12432290, at *12 (E.D. Va. Feb. 20, 2013), *aff'd*, 539 F. App'x 256 (4th Cir. 2013).  Only two

undisputed events potentially fit into the category of materially adverse:  (1) Plaintiff's paid administrative leave on December 1, 2019; and (2) her termination in January 2020.  SOF, ¶¶ 81 and 85.

Turning to the third element, Plaintiff is unable to establish a causal link between Plaintiff's paid administrative leave and/or termination and her November 4, 2019, report of discrimination.  Plaintiff is further unable to establish that Rare's reasons for the actions were pretextual.

Although the report of the investigation found no evidence of discrimination by either Plaintiff or Mr. Galvin, or that either of them created an unlawful hostile work environment, the report was critical of Plaintiff's and Mr. Galvin's leadership; and concluded that there was, "an irreconcilable conflict between the two leaders."  SOF, 61, Exhibit 5, pp. 12-14.  Additionally, the report of the investigation concluded that Plaintiff (1) had berated colleagues; (2) uses inappropriate or disrespectful language about or to colleagues; (3) gossips about colleagues; (4) lies about conversations, meetings, work progress, and the status of projects, and that denials made by Plaintiff during the investigation which were contradicted by other interviewees, "casts doubt on her truthfulness about this and other topics."  *Id.,* p. 14.

Early on the morning of November 4, 2019, Mr. Jenks completed his review of the report of the investigation and considered transitioning Plaintiff out of Rare based on the report's conclusions concerning Plaintiff's specific conduct.  SOF, ¶ 64.  It is of no consequence that Plaintiff may disagree with the investigation findings.  It is "the perception of the decisionmaker which is relevant not the self-assessment of the plaintiff."  *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).  Later that day, Mr. Jenks received an e-mail, in which Plaintiff complained, for the first time, about gender discrimination.  SOF, ¶ 65.  After receiving

Plaintiff's e-mail, Mr. Jenks met with Caryn Perrelli and the attorney who investigated the initial complaints and determined that the investigation that had been done was comprehensive, and that the plan moving forward was the next appropriate step.  SOF, ¶ 66.  It was decided that both Plaintiff and Mr. Galvin would (1) be required to provide Mr. Jenks with a written reflection discussing their respective roles in the issues addressed in the report; (2) they would participate in mediation sessions with each other moderated by a third-party outside mediator to work to address the issues that created the conflict between them; and (3) each would separately work with outside coaches to further address the issues in the report.  SOF, ¶ 67.

On November 12, 2019, Mr. Jenks met with Plaintiff and Mr. Galvin separately, and explained the results of the investigation, and he advised each of them of the steps that they were required to take moving forward.  SOF, ¶ 68.  Mr. Jenks advised both Plaintiff and Mr. Galvin that their written reflections were due to him by Noon on November 13, 2019.  *Id.*  In response to Plaintiff's November 4th e-mail, Mr. Jenks also advised Plaintiff that she could be re-interviewed by the investigator if she desired, but Plaintiff did not respond.  SOF, ¶ 70.

Mr. Galvin provided the written reflection by Noon on November 13, 2019, as directed by Mr. Jenks.  SOF, ¶ 74.  Plaintiff did not provide her written reflection as requested by Mr. Jenks.  SOF, ¶ 73.  By November 22, 2019, after multiple e-mails with Plaintiff about the status of her written reflection and which had established new deadlines for Plaintiff to submit the document, Plaintiff still had not complied.  SOF, ¶¶ 77-81.  As a result of Plaintiff's failure to submit her written reflection, something which Mr. Galvin had accomplished within 24-hours of the request, Mr. Jenks sent an e-mail to Plaintiff advising her that she was being placed on paid administrative leave beginning December 1, 2019, "to find an amicable path to [her] separation from Rare.  SOF, ¶ 81.

28

Requiring both Plaintiff and Mr. Galvin to prepare written reflections about their roles in the issues addressed in the report of the investigation was not retaliatory, as Rare had a legitimate non-retaliatory reason for requesting both of them to complete this task. *See, e.g.*, *Funk v. BWX Technologies, Inc.*, 2018 WL 4016316 at *10 (W.D. Va. Aug. 22, 2018) (finding that referral of employee to counseling and initiating a security clearance review not retaliatory where employer had honest belief that employee had anger issues which warranted the treatment and extra scrutiny); *Gutwill v. City of Framingham, Massachusetts*, 995 F.3d 6, 13-14 (First Cir. 2021) (finding that adverse actions taken by employer were justified and non-retaliatory where they were based on results from investigation which revealed plaintiff-employee had engaged in misconduct); *Slane v. City of Sanibel*, 2015 WL 4414111 at *9 (M.D. Fla. July 17, 2015) (finding that requiring plaintiff to write a letter of apology was not retaliatory).

Next, Plaintiff was placed on paid administrative leave because she refused to comply with Mr. Jenk's direction to submit a short self-reflection acknowledging the results of the investigation.  SOF, ¶ 81.  The decision to place Plaintiff on paid administrative leave, therefore, was based on a legitimate non-retaliatory reason. *See, e.g.*, *Fries v. Metropolitan Management Corp.*, 293 F.Supp.2d 498, 503 (E.D. Penn. 2003) (finding materially adverse actions not retaliatory where actions were based on plaintiff's refusal to submit a letter of apology to the company); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998) ("Title VII was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work." (citation and internal quotations omitted)).

Finally, Plaintiff's termination was the result of Rare learning that Plaintiff had disregarded its direction to her while she was on paid administrative leave by appearing at a conference in Paris as a registered attendee of Rare.  SOF, ¶ 85.  Plaintiff had been advised that she could attend the conference while on administrative leave, but that she could not represent Rare at the conference.  SOF, ¶ 83.  Kate Schweigart attended the conference on behalf of Rare and reported to Caryn Perrelli and Brett Jenks that she had observed Plaintiff at the conference wearing a Rare badge and that the conference organizers confirmed that Plaintiff had registered as a Rare representative.  SOF, ¶¶ 82 and 84.  Upon learning of Plaintiff's failure to comply with the directive not to represent Rare at the conference, Rare terminated Plaintiff's administrative leave and separated her employment.  SOF, ¶ 85.  Rare's decision to terminate Plaintiff was legitimate and non-retaliatory.  *See, e.g.*, *Barney v. Consolidated Edison Co. of New York*, 2009 WL 6551494 at *15 (E.D.N.Y. Oct. 1, 2009) (finding termination of employee was not retaliatory where it was based on employer's belief that plaintiff had engaged in misconduct); *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F.Supp.2d 98, 111 (S.D.N.Y.2009) ("Where a plaintiff has been terminated for misconduct, the question is not whether the employer reached a correct conclusion in attributing fault [to the plaintiff] . . . , but whether the employer made a good-faith business determination." (citations and internal quotation marks omitted)).

Thus, the undisputed record establishes that Rare did not retaliate against Plaintiff in violation of Title VII; and summary judgment as to Count Two should be granted in favor of Rare.

## CONCLUSION

For the reasons stated above, Rare respectfully requests that the Court grant the motion for summary judgment and dismiss the Amended Complaint with prejudice.

Submitted this 14th day of January, 2022.    Respectfully submitted,

*/s/ Michael E. Barnsback*
Michael E. Barnsback
VSB No. 33113
O'Hagan Meyer, PLLC
2560 Huntington Ave., Suite 204
Alexandria, VA 22303
Telephone: (703) 775-8601
Facsimile: (804) 403-7110
mbarnsback@ohaganmeyer.com
*Counsel for Defendant Rare*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of January, 2022, the foregoing was electronically filed with the Clerk of Court using the CM/ECF System, which will send a notification of such filing to all authorized users.

*/s/ Michael E. Barnsback*
Michael E. Barnsback (VSB No. 33113)