# DEPOSITION TRANSCRIPTS

# DEPOSITION TRANSCRIPT OF BRETT JENKS

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                   (Alexandria Division)

4    _____

5    VALERIA M. RAMUNDO ORLANDO          )

6                                        )

7                         Plaintiff, )

8                                        )

9         v.                            ) CA 1:20cv01323 (TSE/JFA)

10                                       )

11        RARE                           )

12                                       )

13                        Defendant. )

14   _____ )

15             Deposition of BRETT JENKS

16             conducted virtually

17         on Wednesday, December 22, 2021

18                  at 10:00 a.m.

19   Job No.: 418319

20   Pages:  1-134

21   Reported by:  Lisa Barrett,  RPR,   CRR, CRC, CSR

22

Transcript of Brett Jenks
Conducted on December 22, 2021                    58

1    '95, '96, guide training, '97, '98, '99.  So three

2    years as a director of ecotourism and community

3    development.

4              Q      What was your next role?

5              A      President and CEO, starting in 2000.

6              Q      And have you remained in the president

7    CEO role since 2000?

8              A      Yes.

9              Q      Any changes to your title?

10             A      We might have added CEO a couple of

11   years later, but it might have been president and

12   CEO at the beginning.  I don't recall.

13             Q      Do you have a board seat at Rare?

14             A      I have a board seat at Rare.

15             Q      When did you get your board seat?

16             A      That was -- I was made -- that was the

17   way the board was structured.  That was the

18   president and CEO was a member of the board of

19   directors from the beginning.

20             Q      Does any other employee of Rare have a

21   seat on the board?

22             A      Yes, Paul Butler has been a board

Transcript of Brett Jenks
Conducted on December 22, 2021                    75

1    outside counsel.

2        Q     Have you determined what claims are

3    investigated internally versus claims that are

4    referred out for investigation?

5        A     I would say that's probably done in

6    consultation -- that's been done in consultation

7    with HR.

8        Q     Is there any criteria that's

9    established on which claims will be investigated

10   internally versus the claims that will be

11   investigated by, let's say, outside counsel?

12       A     No, not written down, no.

13       Q     Were you involved in the decision to

14   engage counsel to investigate the issues

15   pertaining to Ms. Ramundo Orlando and Mr. Galvin?

16       A     Yes, I was involved.  I was apprised

17   that we were doing that investigation.  I don't

18   think it was -- I think as soon as we -- I think

19   as soon as we saw the formal complaint from Jenny

20   Miller it was clear that we needed to do an

21   investigation, and it needed to be -- we wanted

22   someone from the outside to do it because it

Transcript of Brett Jenks
Conducted on December 22, 2021                              76

1    sounded that was -- it was a serious complaint.

2         Q    Why did you decide to have the Jenny

3    Miller complaint investigated by outside counsel

4    instead Caryn Perrelli?

5         A    Caryn Perrelli was the one that

6    suggested that we have someone outside do it.

7         Q    At that time did Rare have an ongoing

8    relationship with Orrick?

9         A    Yes.

10        Q    Did Rare pay Orrick for the

11   investigation?

12        A    I don't believe so, but I don't know.

13   My understanding is they're pro bono.  We have a

14   pro bono agreement with them.

15        Q    Is it your understanding that all of

16   the work that Orrick does for Rare is done under

17   the pro bono agreement?

18        A    Yes.

19        Q    Do you know who Orrick coordinated with

20   with respect to the investigation.  For example,

21   getting witnesses to be present?

22        A    I would imagine there was an

Transcript of Brett Jenks
Conducted on December 22, 2021                 77

```
1    administrative assistant who helps and I think the
2    gentleman's name was Jeff Lorek and I believe he
3    met with and coordinated with Caryn Perrelli.
4         Q    Do you know whether Mr. Lorek was an
5    employment attorney.
6         A    I do not know.
7         Q    Do you know whether Mr. Lorek's
8    criteria or qualifications to do an investigation
9    were vetted at Rare?
10        A    I do not know.
11        Q    And it's your understanding that the
12   Jenny Miller allegation --
13        A    -- I think they were vetted by Lisa
14   Lupion who was our -- just to be clear.
15        Q    Who is Ms. Lupion?
16        A    She is our pro bono attorney at Orrick.
17        Q    When you say the word "vetted by her,"
18   what does that mean?
19        A    Well, I can't say I know that they were
20   vetted by her.  Jeff Lorek also -- Lisa Lupion, I
21   believe, was the one who found Jeff Lorek or
22   helped Caryn Perrelli find Jeff Lorek.
```

Transcript of Brett Jenks
Conducted on December 22, 2021                    78

1          Q     Is it your understanding that what led

2     to the investigation was the allegations from

3     Jenny Miller?

4          A     Yes.

5                MR. BARNSBACK:  Carla, can we take a

6     break at noon, just a short one?

7                MS. BROWN:  Did you say now or at noon?

8                MR. BARNSBACK:  Noon.  Noon.

9                MS. BROWN:  Sure.

10    BY MS. BROWN:

11         Q     Did you understand that Galvin's

12    conduct was also going to be investigated?

13         A     Yes.

14         Q     Okay, so this is now the second

15    investigation that you are aware of regarding

16    Mr. Galvin?                              .

17         A     Yes.

18         Q     You weren't interviewed as part of the

19    investigation?

20         A     No.

21         Q     No involvement with the investigation

22    until the results came?

Transcript of Brett Jenks
Conducted on December 22, 2021                    81

```
1        A    No, it wasn't about the investigation;

2   it was about her concerns about Dale.

3        Q    All right.  If you could bring up Rare

4   131.  I think we'll mark that -- I think it is

5   Exhibit 2.

6             REMOTE TECHNICIAN:  Yes, it will be.

7             (Jenks Exhibit 2 was marked for

8   identification.)

9   BY MS. BROWN:

10       Q    All right.  If we could go down to the

11  bottom, please, I will tell you this is -- the

12  bottom of page 1.

13            At the bottom of the page you will see

14  a email from Ms. Ramundo Orlando to you,

15  November 4, 2019.  Subject "My side of events."

16            Do you see that?

17       A    Yes.

18       Q    Is this the email that you were

19  referring to where she you, in your view, her

20  thoughts on Dale?

21       A    Yes.

22       Q    And she tells you in that first
```

```
1        A    No, do you mean by Mr. Galvin?

2        Q    I'm sorry.  You understood when you

3   received the email from Ms. Ramundo Orlando on

4   November the 4th, that she was complaining that

5   Mr. Galvin was treating women differently?

6        A    I don't know that that's what I took

7   away from this letter.

8        Q    And none of the training that you'd had

9   at Rare gave you any concern that Ms. Ramundo

10  Orlando's November 4th email was a complaint of

11  gender discrimination?

12       A    No.

13       Q    To the best of your knowledge, the

14  allegations in Ms. Ramundo Orlando's November 4,

15  2019 email were not investigated by Rare?

16       A    I think it would be fair to say that we

17  took this letter very seriously, and we

18  discussed -- we discussed and thought about

19  whether or not -- and what we should do, given

20  this complaint, this is the first time that I had

21  heard Valeria talk about gender discrimination in

22  any way.
```

Transcript of Brett Jenks
Conducted on December 22, 2021                    89

1         Q    Would you agree with me that the

2    allegations in Ms. Ramundo Orlando's

3    November 4th email were not investigated by Rare?

4         A    No, I would say we believed that they

5    were investigated as part of the investigation

6    that had just completed because Dale's behavior

7    was part of the -- was a topic of inquiry in that

8    investigation, and that gender discrimination was

9    not mentioned by anybody in that investigation.

10        Q    So it's your position that the

11   investigation that was conducted in October

12   investigated the allegations that Ms. Ramundo

13   Orlando raised in her November 4th, 2019 email?

14        A    Yes.

15        Q    And to the best of your knowledge, with

16   respect to the individuals mentioned in Ms.

17   Ramundo Orlando's -- I'm sorry, to the best of

18   your knowledge with respect to the individuals Ms.

19   Ramundo Orlando mentioned in her

20   November 4th email each of those individuals was

21   interviewed in the October investigation?

22        A    No, Anna Maria Laura was not, so no.

Transcript of Brett Jenks
Conducted on December 22, 2021                                    90

```
 1        Q      If you were doing an investigation of

 2   the allegations that Ms. Ramundo Orlando made

 3   regarding Anna Maria Laura, wouldn't you agree

 4   with me that Anna Maria Laura would have been

 5   interviewed?

 6        A      If that's all we knew, we'd parse down

 7   to all of this to the line someone has -- that

 8   Dale had spoken inappropriately to Anna Maria

 9   Laura then, of course.  But given the context and

10   the timing of this letter and the amount of time

11   that had been spent hearing from, especially a

12   group of women who worked for Valeria, it was my

13   judgment at that time that it was not necessary to

14   further investigate.

15   BY MS. BROWN:

16        Q      All right.  No further investigation

17   was done after Ms. Valeria -- after Ms. Ramundo

18   Orlando raised these concerns on November 4th,

19   2019?

20        A      No.

21        Q      All right.  You said that you spent a

22   considerable amount of time deciding what to do as
```

Transcript of Brett Jenks
Conducted on December 22, 2021                    91

```
 1    a result of the November 4th, 2019 allegations
 2    from Ms. Ramundo Orlando; is that accurate?
 3            A    Yes.
 4            Q    And then what was done?
 5            A    What was done was I offered her a
 6    chance to bring in a mediator to have an open
 7    series of conversations with Dale Galvin, so that
 8    an outside third party objective professional
 9    could help them discuss the relationship, help
10    them discuss how to make the improvements
11    necessary, so that they could work together more
12    effectively.  And I asked her to, as part of that
13    process, to write a reflection.
14            As I asked Dale, it was my
15    determination that Dale was difficult to work with
16    and that Valeria, had -- Valeria was also
17    difficult to work it with, and that Valeria had --
18    it was very clear to me from my reading of that
19    investigation, that Valeria -- several people who
20    worked for-- several women who worked for Valeria
21    had witnessed her and reported back to the
22    investigator that she had behaved in inappropriate
```

Transcript of Brett Jenks
Conducted on December 22, 2021                    100

```
1    investigation of Ms. Ramundo Orlando and

2    Mr. Galvin?

3         A    And.

4         Q    All right.  If we could pull up exhibit

5    149.

6              (Jenks Exhibit 5 was marked for

7    identification.)

8    BY MS. BROWN:

9         Q    And by the way, Mr. Jenks, while that's

10   pulled up, you weren't involved in directing

11   Orrick's report or directing the findings of

12   Orrick's report in any way, correct?

13        A    (Inaudible)

14        Q    That's a "no"?

15        A    That's a no.

16        Q    And do you know whether Ms. Perrelli

17   was involved in directing the findings of Orrick's

18   report in any way?

19        A    I don't know.

20        Q    Okay, you are looking now at a

21   memorandum to Caryn Perrelli and Niels Crone from

22   Orrick dated November 28th, 2019, titled "Re
```

1    Report of Investigations Finding."  Do you see

2    that?

3           A     Yep.

4           Q     Is this the report you would have

5    reviewed in that fall 2019 time period?

6           A     Yes.

7           Q     All right. If we could go to the second

8    to the last page.  Wait I'm sorry.  Let me go

9    back.  I'm going to give you the page more

10   specifically.  Bear with me for a second.  Sorry,

11   I mean the second last page of the report.  Yep.

12   Okay.  So (D) is the specific allegations raised

13   in the Jenny Miller email; do you see that?

14          A     Yes.

15          Q     And just let me go back a section, to

16   (C).  Just to represent to you at the bottom of

17   the page there is no (E).   Okay, do you see that?

18          A     Yep.

19          Q     Do you know whether there was any

20   section that was devoted to findings regarding

21   Mr. Galvin, with respect to this report?

22          A     Yeah, isn't it part of (C) above?

Transcript of Brett Jenks
Conducted on December 22, 2021                    111

1    that Ms. Ramundo Orlando asked to have the Jenny

2    Miller statements about her discriminating

3    retracted?

4         A    Can you explain that or re-frame it?  I

5    don't understand.

6         Q    Yeah, did you have any conversations

7    with Ms. Perrelli, where she indicated to you that

8    Ms. Ramundo Orlando had requested that the

9    statements that Ms. Miller made be retracted from

10   her file?

11        A    I don't recall, no.

12        Q    All right.  By the way, did you

13   understand from the Orrick, that Orrick concluded

14   that Ms. Ramundo Orlando -- that there was no

15   discrimination?

16        A    I'd have to go back and look at their

17   findings.  I took them at their face value.

18        Q    If we could bring up Rare 123.

19             (Jenks Exhibit 8 was marked for

20   identification.)

21   BY MS. BROWN:

22        Q    Mr. Jenks, you are looking at what was

Transcript of Brett Jenks
Conducted on December 22, 2021                     112

1    marked as Exhibit 8.  If we enlarge it you will

2    see that it's an email from you to Ms. Ramundo

3    Orlando, copying Caryn Perrelli.  Follow-up to

4    your emails and conversations Sunday,

5    November 17th, 2019.  Do you see that?

6         A    Yes.

7         Q    And in this email you are responding to

8    Ms. Ramundo Orlando's concerns that were raised

9    with you, as well as her email to Ms. Perrelli?

10   Is that your understanding of the purpose of this

11   email?

12        A    Yes.

13        Q    If we look at the second paragraph that

14   starts with "First..."  And if we look -- let's

15   see five lines from the bottom, the sentence, that

16   starts:

17        "We are also focused on finding a meaningful

18   effort to engage all staff in a broader

19   conversation about diversity, equity and

20   inclusion..."  Do you see that?

21        A    Yes.

22        Q    Is that the equilibrium matter that you

Transcript of Brett Jenks
Conducted on December 22, 2021                    115

1    Ramundo Orlando on administrative leave.

2         A    Yes.

3         Q    Why did you put her on administrative

4    leave?

5         A    Because she refused to take any

6    accountability for any of the findings of the

7    report, even though they were corroborated by many

8    of her -- all of her staff because -- that was the

9    main reason.

10        Q    All right.  We can take this down.  Did

11   at any point during this time period did you or

12   Ms. Perrelli express to you that Mr. Galvin wasn't

13   taking full responsibility for his actions?

14        A    Can you repeat that?

15        Q    At any point during this time period,

16   did you have any concerns that Mr. Galvin wasn't

17   taking full responsibility for his actions?

18        A    No.

19        Q    No.  When you withheld his bonus on his

20   performance evaluation, didn't he write a response

21   with some concerns about the -- your position?

22        A    I -- probably.

Transcript of Brett Jenks
Conducted on December 22, 2021                        116

```
 1         Q     Right.  And that didn't give you any
 2    concern that he might not be accepting full
 3    responsibility?
 4         A     You know, it might have given me a
 5    little concern, but it wasn't definitive or
 6    determinative.  It wouldn't have --
 7         Q     Do you know whether Ms. Perrelli ever
 8    expressed during that time period that she had any
 9    concern that Mr. Galvin might not be accepting
10    full responsibility for his actions?
11         A     No.
12         Q     All right.  If we can bring up 120 --
13    I'm sorry, Rare 217.  This is an email from you to
14    Ms. Ramundo Orlando, copying Ms. Perrelli,
15    follow-up on next steps 2019; do you see that?
16         A     Yes.
17               (Jenks Exhibit 9 was marked for
18    identification.)
19    BY MS. BROWN:
20         Q     And this is following -- you asked Ms.
21    Ramundo Orlando to give you a statement and she
22    responded to you that she was travelling; do you
```

Transcript of Brett Jenks
Conducted on December 22, 2021                           117

```
 1    recall that?
 2          A    Yes.
 3          Q    And then you responded to her saying
 4    that you knew that she had been travelling, but
 5    that you wanted the reflection, a personal
 6    reflection; do you see that at the top?
 7          A    Yes.
 8          Q    And you said, in the inter -- at the
 9    bottom, you said, "In the interim ... following
10    your vacation..." you are on administrative leave;
11    do you see that?
12          A    Yes.
13          Q    And you told her to cancel her plane
14    reservation to Indonesia?
15          A    Yes.
16          Q    Did you consult with anyone prior to
17    putting Ms. Ramundo Orlando on administrative
18    leave?
19          A    Yes.
20          Q    With Ms. Perrelli?
21          A    Yes.
22          Q    Also with Mr. Crone?
```

Transcript of Brett Jenks
Conducted on December 22, 2021                    121

```
 1   That probably makes more sense instead of then

 2   coming back and then we have a break and then we

 3   start fresh.

 4             MS. BROWN:  I'm fine with that.  Okay.

 5   BY MS. BROWN:

 6        Q    Why was Ms. Ramundo Orlando terminated?

 7        A    Failure to comply with that request,

 8   being put on leave and told not to communicate on

 9   behalf of Rare.  Failure to comply with that

10   request.  Ultimately showing up at a conference in

11   France, representing Rare, shocking her own

12   employee -- former employee and -- and --

13        Q    Who made the decision to terminate Ms.

14   Ramundo Orlando?

15        A    I did.

16        Q    Now, are you aware -- did you have any

17   conversations with Ms. Perrelli regarding whether

18   Ms. Ramundo Orlando was attending the conference

19   on behalf of Rare?

20        A    I don't recall.

21        Q    Do you know whether there were Rare

22   employees also attending the conference?
```

**Caryn Perrelli**

| | |
|---|---|
| **From:** | Valeria Ramundo Orlando |
| **Sent:** | Friday, November 8, 2019 9:13 AM |
| **To:** | Caryn Perrelli |
| **Subject:** | FW: My side of the events |

Caryn,

For your information this was sent to Brett on Monday.

Best,

Valeria



**Valeria Ramundo Orlando | Vice President, Blended Finance**
1310 N. Courthouse RoadSte 110, Arlington, Virginia 22201
T: +1 703-522-5070 x113 | M: +1 917-832-4181 |
rare.org | twitter | facebook | newsletter
Rare inspires change so people and nature thrive

**Rare receives four stars, Charity Navigator's highest rating**

**From:** Brett Jenks <bjenks@rare.org>
**Date:** Monday, November 4, 2019 at 8:28 PM
**To:** Valeria Ramundo Orlando <vramundo@rare.org>
**Subject:** Re: My side of the events

Thank you Valeria. I only read the full report for this first time this weekend so please give me another couple days to process. Then we can discuss fully. Thank you for your patience.

Brett Jenks, CEO
Rare.org

**From:** Valeria Ramundo Orlando <vramundo@rare.org>
**Sent:** Monday, November 4, 2019 3:05 PM
**To:** Brett Jenks
**Subject:** My side of the events

Dear Brett,

I was sorry we were not able to meet to discuss what is happening in the office as per email from Caryn on October 2nd. Since the investigation was completed and Orrick delivered their opinion on the matter to you last week, I wish to share with you my side of the events. I have not had the opportunity to discuss this with you and I feel that you might not have been appraised of the gravity of the current working conditions that the team and myself are subjected to under Dale Galvin's leadership.

1

EXHIBIT
**JENKS - 2**
BP-122221

RARE_000131

Since I started working with Dale in April 2018, I noticed that his demeanor and the language he uses around female colleques was often denigrating, negative and harsh. This started with meetings on NEDA, he had comments about Mercy, NEDA's Assistant Secretary, that were not professional, and dismissed opinions of Anna Marie Laura in-regards to the policy part of the study. As I met more and more co-workers, I realized I began apologizing for Dale's behavior. Our 1:1 would usually be confrontational but I kept dismissing his aggressive behavior due to how much I love the work I do, and I believe in Rare's vision to support and create sustainable coastal communities.

For the last few months I have heard him make comments on whether people were presentable and always appreciated that I was dressed appropriately, I never heard him make comments such as these to any of the male colleagues in Rare. He has often used stereotypical criticisms that a woman hears most of her life, too aggressive, difficult to work with, though these comments cannot be assessed against anything concrete, as I delivered against all my targets and continue to grow the network for Rare in Blended Finance. Again, I dismissed them, at that point I was starting to recruit my team. I remember apologizing and making excuses to Kate during her last interview, because Dale had been rude and difficult. He had expressed concern over the fact that she was emotional, not assertive enough and he did not believe she could express herself clearly or speak publicly. We now know how far that is from truth.

As my team started to grow, I realized I needed to protect them from the aggressive emails from Dale which at times would be very dismissive, in the specific event, which I discussed with Talent, on April 10th 2019 he responded to Molly at 9.52pm that he was disappointed that the work that she had sent him an hour before with less than 12 hours notice was not to the standard he expected. He should have expressed his frustration to me not to a person as junior as Molly. For her to hear the Markets MD was disappointed was very hurtful.

There are number of other incidents that occurred that have lead to the very difficult working relationship we currently have. One comment Dale made me realize that he thinks very little of women and that what he said was incredibly inappropriate, I shared this with Talent. In late June while discussing David Webb, I asked Dale if he was going to live in Jakarta, he replied that it had been decided he would live in Manila, which was better for us, that Filipino women would make sure he would stay there, and he would find a girlfriend in no time. I found that profoundly disrespectful towards women, our Filipino Rare colleagues and all the women at Rare. I felt incredibly uncomfortable and discussed this with talent.

I shared this with Manuel and he had not made the same comment to him, Manuel also thought it was a very offensive thing to say. I have come to realize that we have all dismissed what Dale says and we are quick to make excuses for him. This past summer the way he spoke to my team created a reaction from both Laura and Kate. Laura asked me during our 1:1 why the MD would embarrass her by asking where she was loudly in the open space and make comments while she was working from home. He has never said things this way to any male colleague.

As Meloy faced greater issues at deploying capital and breaking covenant with FMO, and consequently losing one of the largest LPs, he started pressuring the team and interfering with our team dynamic, he started dismissing and speaking to us, we are mostly women, (Paolo and Cecil-Francis were in the Philippines), in a demeaning way. He questioned multiple times our ability to deliver, when there was no cause, as we were on target. He questioned our ability to perform our tasks, again there was no cause, our customers were satisfied. He at times questioned mine or Kate's knowledge about the work we were doing, mind you we both come from very large organizations where our output and our work is traceable and our contributions in the past are documented. Questioning our professional abilities is completely out of line, especially with no cause and

RARE_000132

Case 1:20-cv-01323-TSE-JFA   Document 38-2   Filed 01/14/22   Page 24 of 189 PageID# 618

it's at the basis of being discriminated upon because of gender. Again with no cause, we fundraised more than our initial goals and finalized a number of MOUs in record time. We also brought new partnerships to Rare. But he continuously kept criticizing our work, but not the work of the men. He has been sabotaging me in emails to male collegues when talking about my ability to interact with governments and he can do the job better than me though he will differ to a male colleague (Taufiq) who might know better than him.

I was told that I should not come to you. That you and Dale are very close friends, and if I told you what was happening there would be retaliation. Since then I have found it difficult to come to you and express myself in-regards to the work we do. On occasions, as I have told Caryn, I have sat in a conference room for hours waiting for Dale to leave in the evening, avoiding hostile confrontation.

My only regret is that I should have come forth sooner with expressing how the continuous gender discrimination was affecting me and the other women in the office. But as a woman admitting to gender harassment carries a certain stigma and we just feel we need to put up with it and play well in the sandbox.

I care deeply for this organization, I joined because I believe you are a visionary and under your leadership we can create incredible opportunities for the most vulnerable communities in the world. I took a significant pay-cut (44.6%) and downgraded my title, to join the team at Rare, I opened my professional and personal network to allow us to be recognized as thought leaders in the blended finance space for natural capital and the oceans. I love my job, my team and I love Rare. I ask you for the BF team to be temporarily relocated to another division so we can continue to do the work we are expected to deliver for our partners.

Thank you for your time.

Best Regards,

Valeria



**Valeria Ramundo Orlando | Vice President, Blended Finance**
1310 N. Courthouse RoadSte 110, Arlington, Virginia 22201
T: +1 703-522-5070 x113 | M: +1 917-832-4181 |
rare.org | twitter | facebook | newsletter
Rare inspires change so people and nature thrive

**Rare receives four stars, Charity Navigator's highest rating**

RARE_000133

**CONFIDENTIAL**

ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL



# Memo

| | |
|---|---|
| **To** | Caryn Perrelli, VP Talent<br>Niels Crone, COO |
| **From** | Orrick, Herrington & Sutcliffe LLP |
| **Date** | October 28, 2019 |
| **Re** | Report of Investigation Findings – Sustainable Markets Work Environment |

---

This memorandum summarizes the results of an investigation that Orrick conducted at the request of Rare and with the assistance and logistical support of the above-named recipients. This memorandum includes a summary of our factual findings, impressions and conclusions based on the interviews conducted and the documents reviewed.

## I. BACKGROUND

Rare asked that Orrick conduct an investigation to gather facts surrounding the workplace tension and conflict that has been increasing within the Sustainable Markets and Finance group, primarily between its Managing Director, Dale Galvin, and the Vice President of Blended Finance, Valeria Ramundo Orlando (a direct report to Mr. Galvin). While Rare has been aware of tension among these executives for some time, a formal inquiry by outside counsel was decided upon following Rare's discovery of a complaint that had been made by one of Mr. Galvin's subordinates, Jenny Miller, in which Ms. Miller made allegations of misconduct and harassment by Ms. Orlando. She raised the matter with Mr. Galvin who did not take any responsive action.

On October 18 and 23, 2019, Jeffrey J. Lorek of Orrick conducted a fact-finding investigation at Rare's offices in Arlington, Virginia. As part of his investigation, Counsel interviewed six Rare employees, gathered documents, and obtained additional information by way of discussions with Caryn Perrelli, Tracy Nugent (both of Talent) and Niels Crone (Chief Operating Officer). The employees who were interviewed, in this particular order, were: (1) Jenny Miller (Sustainable Markets); (2) Kate Schweigart (Blended Finance); (3) Manuel Bueno Vera (Sustainable Markets); (4) Dale Galvin (Sustainable Markets); (5) Molly Bradtke (Blended Finance); (6) Lisa Pharaoh (Global Development); and (7) Valeria Ramundo Orlando (Blended Finance).

## II. SUMMARY OF INTERVIEWS

### A. Jenny Miller (Sustainable Markets)

Ms. Miller, a Senior Associate who reports directly to Mr. Galvin in Sustainable Markets, is responsible for providing scheduling and coordination support to Mr. Galvin regarding his meetings, travel, itineraries, as well as any other operational support needed. She also reviews budget reports for Mr. Galvin. She has been with Rare for almost two-and-a-half years. She described Mr. Galvin as a "tough manager but a good manager." He pushes his people to work hard, but they enjoy the work and are productive. She



RARE_000149

**CONFIDENTIAL**



October 28, 2019
Page 2

relayed that Mr. Galvin is overstretched in terms of how many people over whom he is responsible. Before joining Rare, Ms. Miller was warned that Mr. Galvin was "intimidating." Ms. Miller has experienced that he is honest, smart, and a good listener. Mr. Galvin is a better listener than most and Ms. Miller believes that others similarly feel that Mr. Galvin will listen to them. She explained that there is a "two-way managing" with him, and that she feels she can be honest with him about concerns she has. Mr. Galvin gets frustrated if tasks are not getting done. However, he does not yell at people or belittle them. Rather, he tries to get them back on task. For example, he will say "guys, we need to focus on what we're doing here." He only raises his voice if he has already asked someone to focus and has not received a satisfactory response. Overall, Ms. Miller thinks that Mr. Galvin is a "great boss" and she would not want to see him leave.

Ms. Miller has never observed any inappropriate behavior by Mr. Galvin. He treats everyone the same way—tough, but fair. She has not observed any discriminatory conduct. Her only concern about comments made by Mr. Galvin revolved around a comment he made a meeting when Nikki Schulman, a single mother, mentioned she was having a baby. Mr. Galvin's response—rather than congratulating her as others had done—was to ask Ms. Schulman, "are you going to keep working?" However, he immediately apologized and then said "I'm happy for you." Also, Mr. Galvin made one joke after people went around the room sharing what they did over the weekend. When Ms. Shulman said that she had cared for her child, Mr. Galvin said, "boring," or words to that effect. Ms. Schulman told Ms. Miller that what Mr. Galvin said had "kind of sucked."

Mr. Galvin has, however, corrected at least one other person in the office who made an inappropriate comment. On one occasion, Mr. Vera had described his experience at a massage parlor and made the comment, "it was a little gay." Mr. Galvin, who was leading the meeting where the comment was made, immediately chastised Mr. Vera and told him that such comment was not respectful. Ms. Miller and others appreciated that Mr. Galvin corrected Mr. Vera.

Ms. Miller raised concerns about Ms. Orlando engaging in discriminatory, harassing, and unethical conduct in an email she sent to Mr. Galvin on September 11, 2019. **Exhibit A,** attached hereto. The event that triggered Ms. Miller's email was a conversation that the two had concerning an interview that Ms. Orlando was handling involving an applicant for an internship at Rare. The applicant was a male from Saudi Arabia. Ms. Miller heard Ms. Orlando instruct Ms. Bradtke to wear a "short skirt" to the interview, that Ms. Schwiegart should "come with the cleavage," and that Cecil Francis (an intern) should come with a button down shirt (apparently he usually wore tee-shirts). Ms. Orlando stated that they needed to ensure that the applicant was a good cultural fit. When Ms. Miller confronted Mr. Orlando about this, Ms. Orlando further stated that they needed to "test" the applicant to see if he "respected women" because in Saudi Arabia, where he is from, men do not respect women. This was very upsetting to Ms. Miller and she told Ms. Orlando so. Ms. Miller told Ms. Orlando that she should not be making judgments about someone based on their country of origin. Ms. Miller also said that it was "illegal" to say those types of things and that, as a Vice President of Rare, Ms. Orlando should not be saying such

**CONFIDENTIAL**



October 28, 2019
Page 3

things. Ms. Miller was concerned about unfair stereotypes. Ms. Orlando's response was that "I can do whatever I want because I'm the VP, even if that means hiring someone because of their gender." Additionally, Ms. Miller frequently hears Ms. Orlando say "hey gorgeous," and "hey beautiful" to people in the office, which makes Ms. Miller feel uncomfortable. Additional details surrounding specific incidents that Ms. Miller observed are contained in memoranda that Ms. Miller made and kept to herself. **Exhibit B**, attached hereto.

According to Ms. Miller, Ms. Orlando can be very moody and is a difficult person with whom to work. She gets defensive when Ms. Miller asks her about tasks that need to be accomplished (e.g., booking a flight). Rather than accomplishing tasks, Ms. Miller explained that Ms. Orlando makes up excuses, jokes about not doing the tasks, or complains about them. Ms. Miller said that Ms. Orlando spends much time walking around the office, socializing and talking to others. Ms. Miller thinks that Ms. Orlando spends much of her day in the office not actually performing any work.

Ms. Miller has observed Ms. Orlando call several employees "pieces of shit," to include Niels Crone, Ms. Miller, and Mr. Galvin. Also, Ms. Orlando yells and berates Mr. Francis. Ms. Miller said that Ms. Orlando text messages Mr. Francis late at night to do work, including on his 21st birthday. Ms. Miller believes that Ms. Orlando creates an abusive work environment for Mr. Francis and places enormous pressure on him—too much pressure for an intern. Ms. Miller has observed Ms. Orlando openly joke about Mr. Francis in the workplace, which makes it appear as though "he doesn't matter" to Ms. Orlando. Ms. Miller believes that Ms. Orlando has created an unhealthy work environment where people are scared of her and do not feel that they can be honest with her about their work. People are not excited to come to work because they are stressed and anxious. Ms. Miller reported that Jeff Wielgus, Ms. Schwiegart and Ms. Pharaoh all have confided in her that they were very unhappy because of Ms. Orlando.

    **B.**   <u>Kate Schwiegart (Blended Finance)</u>

Ms. Schwiegart is a Director in Blended Finance and reports directly to Ms. Orlando. She has been with Rare since April 2019. She previously spent 10 years with the Overseas Investment Corp. For her, Rare has been an interesting experience, but she is disappointed because what she believed would be an organized and efficient organization is "far from what she thought it would be" when she joined.

Ms. Schwiegart explained that both Mr. Galvin and Ms. Orlando "overpromise and underdeliver." They are too aspirational and do not get enough actual work done. Ms. Schwiegart has raised concerns to Mr. Galvin about Rare being at reputational risk for not delivering on things that the organization said that it would (e.g., Green Bond Sukuk Security). She believes that it is bad form to tell donors and the international community that things were in order on the Green Bond issue. She opined that Ms. Orlando is a great sales person, has a lot of energy, and generally is a positive person. However, Ms. Schwiegart explained that if someone were to dig into her experience, he or she will realize that she lacks the ability to deliver a product that meets her description of what it would be. Ms. Schwiegart is also worried about

**CONFIDENTIAL**



October 28, 2019
Page 4

reputational risk because Rare has deployed only $2M of the $22M in the Meloy Fund. She worries that if the investor FMO pulls its money out of the fund, it will take another five or so years until Rare can return to the market to try and build another fund.

Laura Barasa used to work for Ms. Orlando and was Ms. Schwiegart's immediate subordinate. However, Ms. Barasa quit in mid-September 2019. Her reason for quitting, according to what she told Ms. Schwiegart, was that she felt that Ms. Orlando misled her during her interview about certain capital that had been raised and that Ms. Orlando said would be deployed. After being hired, Ms. Barasa soon learned that Rare was not in the same position of readiness that Ms. Orlando had described during the interview. Also, Ms. Barasa complained that neither Mr. Galvin nor Ms. Orlando were good people to work for due to their lack of experience with multilateral banks, development banks, and because neither executive had ever issued a security. Ms. Barasa felt that "she was duped." She apparently decided to quit after only one week with Rare but held off on actually resigning for a short while.

Ms. Schwiegart conveyed that she is planning to resign from Rare after the Christmas holiday unless things change drastically. One of the biggest issues is the conflict between Mr. Galvin and Ms. Orlando who openly dislike each other. They yell at each other. However, Ms. Schwiegart has never observed Mr. Galvin treat any employees in an unfair or discriminatory manner. While he certainly does "not sugar coat things" and does not say "please and thank you," his behavior does not concern her from a maltreatment or bullying standpoint. Ms. Schwiegart's concerns were limited to his operational competence and leadership deficiencies.

According to Ms. Schwiegart, Ms. Orlando is a volatile person with an explosive personality. Ms. Orlando, rather than admitting any deficiencies, will "try to protect herself" and, when someone "chips away at her armor, she explodes." When faced with a situation that she is not equipped to handle, Ms. Orlando will become defensive and yell at others. She has yelled at Ms. Schwiegart, Ms. Pharaoh, Taufique Alimi, and Mr. Francis. Ms. Schwiegart stated that Ms. Orlando creates a "hostile work environment" for others. Regarding Mr. Alimi, Ms. Orlando once yelled at him for over 20 minutes on the phone in front of others. Ms. Pharaoh texted Ms. Schwiegart about how inappropriate that incident was as it was happening. Another time, Ms. Orlando openly berated Mr. Francis concerning a paper he was working in while he was working for Rare in the Philippines. Ms. Orlando chastised him for how "terrible" it was, called him a "failure," and said that "this is not how you will get through life." Ms. Schwiegart felt that Mr. Francis was set up for failure by Ms. Orlando because had zero experience in the topic on which he was writing and because Ms. Orlando provided no assistance to him. Ms. Schwiegart also relayed an incident in which Ms. Orlando berated Stephanie Buck so badly over a two-page summary that Ms. Buck was creating that it caused Ms. Buck to have to go to the emergency room. It turned out to be a panic attack, though at the time Ms. Buck worried it was a heart attack. Ms. Buck told Ms. Schwiegart this in confidence and it is not clear whether any management officials were apprised. Finally, Ms. Schwiegart stated that Ms. Orlando has called Rocky [last name unknown] a "piece of shit." Ms. Schwiegart stated that Ms. Orlando's behavior is not sustainable and that she is truly toxic.

4158-5632-8223.3

**CONFIDENTIAL**



October 28, 2019
Page 5

Ms. Schwiegart corroborated the incident involving the Saudi male job applicant. Ms. Orlando commented that Ms. Schwiegart should wear a low-cut shirt to the interview because they needed to "test" him to see if he respected women.

Regarding Mr. Galvin, Ms. Orlando often tells Ms. Schwiegart that he is "socially awkward," but has not complained about him in other respects. Ms. Schwiegart was quick to point out that Mr. Galvin is "not the toxic" person in this scenario. Rather, he is simply "in over his head."

### C.   Manuel Bueno Vera (Sustainable Markets)

Mr. Vera is a Senior Director in Sustainable Markets and reports directly to Mr. Galvin. He does not have any particular tension with either Mr. Galvin or Ms. Orlando. His philosophy is that people can disagree on professional things but still get along. He practices "relationship management" to avoid tension.

According to Mr. Vera, Mr. Galvin is a person with a strong vision, is rational, entrepreneurial, and treats people with respect. However, Mr. Galvin can be too lofty, and oftentimes Mr. Vera must help "ground him" and help him determine how to execute his vision. Mr. Vera stated that it is frustrating when Mr. Galvin is thinking three to five years ahead, and Mr. Vera is trying to "put out the fires in front of him." Mr. Vera has become adept at balancing competing urgencies presented by Mr. Galvin's ideas.

Mr. Vera gets along well with Ms. Orlando and considers her a friend. They often get coffee and chat together. She works independently of Mr. Vera and Sustainable Markets, and Ms. Orlando's subordinates rarely interact with Mr. Vera. Mr. Vera would not comment on whether Ms. Orland is "good at her job," but did say that she is "good at thinking things through." Mr. Vera often helps her analyze problems and work through them. He thinks she is similar to Mr. Galvin in that both leaders have big visions and good intuition. They are both "impact-driven" and know what they hope to achieve. Also, both are very direct. This causes conflict between them, and they have not been able to reconcile that conflict. Mr. Vera tries to help Ms. Orlando work through her conflict with Mr. Galvin by relaying techniques to her that he uses himself when managing his relationship with Mr. Galvin.

Mr. Vera has not heard any complaints about unfair treatment or discrimination by either Mr. Galvin or Ms. Orlando of other employees at Rare. Organizationally, he feels that there is a lack of clarity about what Rare is trying to accomplish. There is a degree of carelessness and inefficiency, which is expected with start-up companies but should not be present at Rare, an established organization. He does not blame any particular person for this.

### D.   Dale Galvin (Sustainable Markets)

Mr. Galvin recognizes that there is a lot of tension between him and Ms. Orlando, which began in or around late August 2019. He believes that their conflict began when he started calling meetings among the whole Sustainable Markets team, which Ms. Orlando did not like because she viewed it as an affront

**CONFIDENTIAL**



October 28, 2019
Page 6

to her leadership of Blended Finance. Mr. Galvin explained that he is "just trying to get things done," but Ms. Orlando always gets upset when he injects himself in Blended Finance's activities. He believes that the tension exists because of his expectations. When he asks for things from Ms. Orlando, she does not provide them. When he reminds her and she still does not deliver, he "turns the screws" on her and she gets uncomfortable. Also, recently, Ms. Orlando was very upset over the Board giving Sustainable Markets a "red indicator," meaning that the division was behind on specific goals/measurements. However, he said the whole group received a red, not just Ms. Orlando's Blended Finance team.

Mr. Galvin corroborated what others said about Ms. Orlando being weak when it comes to delivering on her promises. She is a better at sales than she is at producing results. Mr. Galvin is trying to determine whether he can "fix" her. He also conveyed that he has counseled her about how, as a high-level executive, she should not complain to her team about having to work long hours or late in the evening. He also recently counseled her for creating a nametag for him at the World Bank meeting that said "Dale Galvin, Meloy Fund." He said that it should have said "Dale Galvin, Rare." He corrected Ms. Orlando previously on this same issue with another nametag, and made it clear that he wanted to be identified as being affiliated with Rare and not the Meloy Fund. Yet, she did it a second time at the recent World Bank meeting. This upset Mr. Galvin.

Mr. Galvin conveyed that Jeff Wielgus, a former direct report of Ms. Orlando, sent an email to Mr. Galvin complaining that he had never in his career been treated as badly as he had been by Ms. Orlando. Apparently, Ms. Orlando became irate when Mr. Wielgus sent a slide deck to a team without first running it by her. She said "how dare you send this without me seeing it first," and yelled at him and sent nasty emails. Mr. Galvin views this response as Ms. Orlando being "very controlling." Another example of her controlling personality is that she instructed both Ms. Barasa and Ms. Schwiegart not to interact directly with Mr. Galvin. Ms. Orlando has told Mr. Galvin that she does this so as not to overwhelm him, but Mr. Galvin views her conduct as her way of manipulating conversations and communications.

Addressing Ms. Miller's September 11, 2019 email, Mr. Galvin explained that he did not pass it along to Talent because he wanted to first try to "do damage control" and to ascertain whether Ms. Miller really meant "discrimination" and "harassment," or whether perhaps she was using those terms erroneously. He stated that he was trying to "triangulate" Ms. Miller's concerns because she was a sensitive person, and he wanted to discuss the matter with her before "calling in the lawyers." According to Mr. Galvin, the team received harassment training shortly before Ms. Miller's concerns, so he felt like she was using certain words without really understanding their implication. (According to Talent, however, there was no training on harassment around that time period.) Mr. Galvin did feel regret for having put Ms. Miller in the uncomfortable position of having her email accidentally forwarded to Ms. Orlando. He tried recalling the email after sending it, and requested IT support. However, he was unable to retract the email. Mr. Galvin also recognizes that he should have acted differently upon receipt of Ms. Miller's complaint, and should have notified Talent immediately and sought guidance on how to proceed.

**CONFIDENTIAL**



October 28, 2019
Page 7

Regarding the substance of Ms. Miller's allegations, Mr. Galvin confirmed that he discussed her concerns with her about one week prior to his interview in this matter, after he had inadvertently sent the email to Ms. Orlando. He corroborated that he, too, has heard Ms. Orlando make comments that "we should hire more women." Mr. Galvin said that he confronted Ms. Orlando and told her that she cannot say those types of things, but that he never reported her to Talent. Ms. Orlando would then say "oh I'm just joking." Mr. Galvin has not observed any discrimination or inappropriate conduct by Ms. Orlando toward others.

Mr. Galvin does not know how to resolve the conflict with Ms. Orlando, but did say that there is nobody else currently employed by Rare who could lead the Blended Finance team.

### E.    Molly Bradtke (Blended Finance)

Ms. Bradtke is a Senior Associate in Blended Finance, and has worked full-time at Rare since January 2019. She previously was a temporary hire from November 2018 until January 2019. Her duties are similar to Ms. Miller's, but she performs them for Ms. Orlando rather than Mr. Galvin. Ms. Miller also has project management duties.

Ms. Bradtke described the tension between Blended Finance and Sustainable Markets as being attributable to differences in communication styles and because Mr. Galvin is not "in tune with what Blended Finance is doing." She explained that Mr. Galvin only seems interested and involved in Blended Finance when something is urgently required. For example, when there is a deliverable owed to partners, Mr. Galvin attends meetings and shows interest in what Blended Finance is doing. Also, Ms. Bradtke gets frustrated when Mr. Galvin asks for things that cause her to spend time and energy on something that seems to be a conflicting priority. For example, he decided during a meeting that he wanted a binder with a hard copy of all materials concerning a project for the Indonesian government. Ms. Bradtke spent the next two days frantically putting together the binder, even though its contents were "already in the shared file." She does not think that Mr. Galvin ever used the binder. She relayed that Mr. Galvin has been more involved with Blended Finance ever since the Board rated the group red. Also, she feels that Mr. Galvin is only involved now because "a lot of the hard work has already been done."

Ms. Bradtke described Mr. Galvin as being someone who knows what he wants, but also who is inflexible and unyielding. He does not explain the rationale behind why he is asking for something. Otherwise, Ms. Bradtke was able to identify only one specific scenario where Mr. Galvin was "a little insensitive"—namely, when he asked about Ms. Schulman's work plans after she gave birth, as well as commenting that what she did on the weekend with her child was uninteresting. Ms. Bradtke stated that his conduct was "nothing like harassment or discrimination."

Regarding Ms. Orlando, Ms. Bradtke said she gets along well with and likes her boss. Ms. Orlando is an "inspirational boss" and Ms. Bradtke appreciates that she lets her take charge, learn new areas and develop news skills. However, she said that Ms. Orlando is not always the "greatest communicator." For

RARE_000155

CONFIDENTIAL



October 28, 2019
Page 8

example, in meetings, Ms. Orlando would get stuck on defining what the issue is, while others have moved on to discuss how they should solve the issue that has already been defined.

Ms. Bradtke confirmed that Ms. Orlando will say "hello beautiful" to her and others, but that this does not offend Ms. Bradtke. She also confirmed that Ms. Orlando reprimanded Mr. Alimi in the presence of others on the phone call, which was very uncomfortable for those listening (Ms. Pharaoh, Ms. Schwiegart, and Mr. Francis). She also confirmed that Ms. Orlando made comments about how the interview team needed to ensure that the Saudi male applicant would "take a team of women seriously." Ms. Bradtke thought that Ms. Orlando was just joking about the short skirt and cleavage comment. She also agrees with Ms. Orlando's sentiments about having more women at Rare. Ms. Orlando made what Ms. Bradtke referred to as "jokes or comments" about "how great it would be to have an all-woman team" around the same time that Rare was conducting interviews for new team members. Following the Saudi male applicant's interview, Ms. Barasa, a female, was hired. Currently, Rare is interviewing males to replace Ms. Barasa. Ms. Bradtke pointed out that one of their top choice candidates for a vacant position is a male.

F.     Lisa Pharaoh (Global Development)

Lisa Pharaoh is in Global Development, which has a dotted line to Blended Finance. She works very closely with Mr. Galvin on the Meloy Fund. She has been with Rare for five-and-a-half years.

Ms. Pharaoh has not observed any conduct that she would describe as either discrimination or harassment by either Mr. Galvin or Ms. Orlando. However, she confirmed that there definitely are "major communication issues" between Mr. Galvin and Ms. Orlando. She attributes it to both of them having "big egos." Both individuals have strengths and weaknesses, but neither recognizes their own weaknesses or the other's strengths. Blended Finance and Sustainable Markets suffer as a result of their leaders' inability to communicate and move forward.

Ms. Pharaoh described Mr. Galvin as a "lone shark, a lone ranger." She explained that, because of his tendency to develop things "in a bubble," problems are inevitable. For example, with the Meloy Fund, Mr. Galvin developed the project in isolation and did not obtain cross-departmental buy-in or inputs. Personality-wise, Mr. Galvin is a bit socially awkward, but not malicious and does not intentionally upset people. Ms. Pharaoh has found a way to work well with Mr. Galvin, though sometimes he is dismissive of her role. It is frustrating to her when Mr. Galvin leaves her out of meetings or "brushes her off" when she raises concerns. However, she recognizes that he does this, not out of intentional disrespect, but rather because he "just wants to get things done and thinks that others are slowing down the process."

Ms. Pharaoh has observed Ms. Orlando act "too aggressively" and "confrontational" with people. For example, she corroborated the incident involving Mr. Francis, where Ms. Orlando "unleashed on Cecil in front of the whole team." She was very belittling of him. Her behavior went way beyond constructive criticism, according to Ms. Pharaoh. Following this incident, Ms. Pharaoh sent an email to Ms. Orlando

RARE_000156

CONFIDENTIAL



orrick

October 28, 2019
Page 9

concerning her conduct toward Mr. Francis and told her that it was inappropriate, and that it left Ms.
Pharaoh feeling "completely uncomfortable." **Exhibit C**, attached hereto. She relayed that it was not
good for team morale and, as a friend and colleague, wanted to flag the issue for Ms. Orlando so that "as
a team, [they] can all do better in the future." Ms. Orlando was receptive of this feedback and apologized.

Ms. Orlando is more receptive to feedback from Ms. Pharaoh than from Ms. Schwiegart because she
views Ms. Schwiegart "as a competitor." She thinks that Ms. Schwiegart is treading on her territory. If
Ms. Schwiegart had sent the email about how Ms. Orlando treated Mr. Francis, it would not have been
received by Ms. Orlando in such a receptive manner.

Ms. Pharaoh also relayed that Ms. Orlando is very dismissive of Stephanie Buck as if she does not
matter. As a new member of the team, Ms. Buck had a learning curve, but Ms. Orlando was not forgiving
of her and yelled at her and belittled her in a manner similar to Mr. Francis.

Regarding the incident involving Mr. Alimi, Ms. Pharaoh also corroborated that Ms. Orlando became very
combative and was "screaming and yelling at him and throwing a tantrum."

Ms. Pharaoh confirmed that Ms. Orlando often makes comments about wanting to hire more women.

Other than the negative incidents described above, Ms. Pharaoh described Ms. Orlando as well-intended
and transparent most of the time. For the most part, she treats people kindly. However, when she gets
combative, it is very uncomfortable. She has observed Ms. Orlando called certain people "pieces of shit,"
but cannot recall about whom she made these statements. Overall, Ms. Orlando's biggest failure,
perhaps, is her inability to deliver on what she promises.

Ms. Pharaoh's opinion was that Mr. Galvin is a "huge source of institutional issues, is not working
collaboratively, not getting buy-in from stake-holders, and is causing unnecessary churn and not serving
Rare's goals."

G.     **Valeria Ramundo Orlando**

Ms. Orlando is the Vice President of Blended Finance and has been with Rare since April 2018.
Previously, she spent nine years working at NATO in Europe. She decided to come to Rare after being
exposed to non-profit social impact funds while working at NATO. A friend had told her about Rare and,
when she met Mr. Galvin and Brett Jenks, she liked them both. Ms. Orlando said she took a 40%+ pay
cut to join Rare. Ms. Orlando stated that she has brought investments to Rare by virtue of her NATO
contacts.

She described the Blended Finance team as being very close, engaged in continuous communication,
and a team that knows how to reach out to each other. Ms. Orlando believes in flat management, so
when they hire someone it is a whole team decision and Ms. Orlando will not exercise "veto power" if

**CONFIDENTIAL**



October 28, 2019
Page 10

others on the team like a candidate. She believes it is important for the team to respect each other and enjoy working together. Ms. Orlando stated that she empowers her team members to take charge of projects and exercise ownership over them. For example, Ms. Schwiegart is taking lead on a Costa Rican project.

Ms. Orlando explained how she was the first one in Blended Finance and had to build her team. She took on Mr. Francis as an intern and then, in January 2019, hired Ms. Bradtke. Initially, Ms. Orlando liked the way that Mr. Galvin thought "outside the box." It is important in this field of work to be creative. Ms. Orlando appreciated that Mr. Galvin received her constructive criticism and her feedback on how to improve presentations. In fact, the two had a great relationship "while he left her alone and allowed her to operate without much oversight."

She described Mr. Galvin as "crude, rude to people, an introvert, and has issues connecting socially with people." However, she then quickly said that "these are not faults." Ms. Orlando took issue with Mr. Galvin when he once criticized Ms. Bradtke over email late one night while he was in Philippines about something that she had done. Ms. Orlando said that Mr. Galvin expects others to be on "his time" when he is traveling globally, no matter the local time. Ms. Orlando tries to protect her team. She stated that she informed Talent about the email in which Mr. Galvin "attacked" Ms. Bradtke. Ms. Orlando explained that her belief is Mr. Galvin should go through Ms. Orlando if he ever needs to provide feedback to one of Ms. Orlando's subordinates. She does not like when he goes to her subordinates directly.

Ms. Orlando further described Mr. Galvin as being "old fashioned." For example, millennials are willing to teach others and have a different point of view. Mr. Galvin has a hard time accepting this new viewpoint and culture (e.g., when Ms. Schwiegart left early to go her daughter's soccer game). Ms. Orlando was concerned that Mr. Galvin believes if someone is not at their desk, they are not doing work. Ms. Orlando said that Ms. Barasa once raised a concern about Mr. Galvin making comments to others about Ms. Barasa working from home.

According to Ms. Orlando, conflict between her and Mr. Galvin began around April 2019. Around that time, Brett Jenks started having joint meetings between Sustainable Markets and Blended Finance. There was a lot of conflict between Mr. Galvin and Steven Box. Ms. Orlando described the weekly meetings as "painful." Ms. Orlando found herself having to meet separately with Mr. Box. She also reported having tension with Mr. Jenks because she was having difficulty understanding what Mr. Jenks wanted. However, Ms. Orlando stated that, once she figured out what Mr. Jenks wanted, she "became a shining star" at Rare and everything was going smoothly. After Ms. Orlando figured out how to deliver to Mr. Jenks, her Blended Finance team began performing better. Ms. Orlando reported that it soon began bringing in MOUs with governments and new partners.

Around the time that Blended Finance began performing better, Mr. Galvin's Meloy Fund began to perform poorly. Once this happened, Ms. Orlando stated that Ms. Galvin became more demanding with

**CONFIDENTIAL**



October 28, 2019
Page 11

respect to information that he wanted. He injected himself into Blended Finance's operations and asked for documents. This upset Ms. Orlando and Ms. Bradtke because the documents were already on the shared drive. One incident in particular that was distressing for Ms. Bradtke was when Mr. Galvin demanded a binder from Ms. Bradtke that would consist of documents printed out which already were on the shared drive. Mr. Galvin reportedly stated "you can do this in two days." Apparently, the concern was that this task could not be accomplished in just two days. On another occasion, Mr. Galvin allegedly asked for a model based on data that did not exist. When Ms. Orlando explained that Blended Finance did not have the data, she said that Mr. Galvin told her to "make it up." The data was difficult to get from the Indonesian government, but eventually Blended Finance was able to obtain the data and successfully run the model.

Around Summer 2019, Ms. Orlando started talking to Talent about her tension with Mr. Galvin and her perceived need to protect her Blended Finance team from his "outbursts and unreasonable requests." In early August 2019, Ms. Orlando had a tough week because a partner was going to take a project away. Mr. Galvin told Ms. Orlando that her team was suffering, that Ms. Orlando was not managing them well, and that her team all would resign and leave because of Ms. Orlando's failures in leadership. Around mid-August, Ms. Orlando held an alignment meeting with Blended Finance and invited Mr. Galvin to the meeting. He decided not to join. Shortly thereafter, in a weekly meeting with Mr. Jenks, the CEO became very upset over the delivery of the Phase II MFFI and, instead of defending Ms. Orlando in the meeting, Mr. Galvin "turned on her" and "threw her under the bus" to Mr. Jenks. This was extremely upsetting to Ms. Orlando. It was compounded when, later, the MFFI successfully launched but "nobody celebrated this major success" of the Blended Finance team.

In late August 2019, Ms. Orlando drafted a letter that she planned to send to Ms. Perrelli in which she raised her concerns about being bullied by Mr. Galvin. On August 25, 2019, Ms. Orlando shared a draft of her letter with Mr. Vera. **Exhibit D**, attached hereto. (In her draft letter, Ms. Orlando does not mention "harassment," "discrimination" or any other unlawful activity by Mr. Galvin. Rather, her complaint was that Mr. Galvin was "intimidating" her, that she felt "bullied," and that Mr. Galvin was "dismissive" of her. She felt that it was an "unhealthy" work environment.) Ms. Orlando stated that she never submitted this letter to Talent. She claimed that she sent it to Mr. Box. (However, the email that she provided to Orrick was one which she sent to Mr. Vera. This would make sense as Mr. Vera was her confidante and best work friend at Rare.)

On August 23, 2019, when Ms. Orlando returned from a trip, she met with Ms. Perrelli of Talent and conveyed to her that things had gotten worse between her and Mr. Galvin. (Ms. Perrelli confirmed that she spent about three hours with Ms. Orlando that day. The triggering event for this meeting, according to Ms. Perrelli, was that Ms. Orlando felt that Mr. Galvin had "thrown her under the bus to Mr. Jenks" in the recent weekly meeting. Mr. Box also confirmed to Ms. Perrelli that Mr. Galvin had thrown her under the bus.) During her meeting with Talent, Ms. Orlando told Ms. Perrelli that she was not comfortable going back to her desk which was situated in close physical proximity to Mr. Galvin.

# CONFIDENTIAL



orrick

October 28, 2019
Page 12

When confronted with the specific allegations that Ms. Miller raised (and which email Ms. Orlando received from Mr. Galvin), Ms. Orlando denied any wrongdoing.  With respect to the Saudi applicant incident, she claimed that there was no sex-based discrimination because she does not exercise any veto power on her team's hiring decisions and that her entire team is involved in the interview process.  She did, however, confirm that she made the statements that others had reported concerning "testing" the applicant to ensure that he respected women.  Ms. Orlando explained that she wanted to make sure he respected women and did not believe that what she did was discriminatory or inappropriate.  Also, Ms. Orlando relayed that Ms. Schwiegart did not like the candidate.

With regard to the allegations concerning Ms. Orlando's instructions that her team members should wear particular clothing or show cleavage during the Saudi applicant's interview, Ms. Orlando denied those allegations altogether.  She stated that the only time she said anything about wearing short skirts was when Ms. Bradtke was packing for a trip to Indonesia to meet with the Indonesian government.  Ms. Orlando conveyed that she advised Ms. Bradtke that she should not wear a short skirt for those meetings. Ms. Orlando also stated that she would always tell men to wear suits when they go to meetings.  Ms. Orlando claimed that she never said anything about cleavage.

Ms. Orlando believes that Ms. Miller may hold a grudge against Ms. Orlando because Ms. Miller had hoped that one of her friends would get the position for which Ms. Barasa was ultimately hired.  Also, Ms. Miller apparently had wanted to be a part of the Blended Finance projects, but Ms. Bradtke got the position instead due to her experience.

Regarding the incidents surrounding Mr. Francis and Mr. Alimi, Ms. Orlando completely denied that she yelled at either of them.  In fact, she claimed that Mr. Francis "thanked" her for the feedback and said that he "needed the shakeup."  Ms. Orlando conveyed that she did not think that either conversation was a big deal and that if anybody felt differently it was due to their cultural sensitivity.

III.   **FINDINGS AND CONCLUSIONS**

Based on our interviews and review of the documents and other communications, we find that there is no evidence of that either Mr. Galvin or Ms. Orlando discriminated against any Rare employee on the basis of a protected class, or that either of them created an unlawful hostile work environment.  Nor do we find that either Mr. Galvin or Ms. Orlando were motivated to treat any Rare employee differently based on gender or other protected class.  Individual conclusions with regard to specific issues are summarized below.

   A.   **Dale Galvin's Leadership**

Nearly all those interviewed confirmed that Mr. Galvin is a difficult manager to work for.  We find the information gathered from persons interviewed to be credible and sufficient to support the conclusion that he creates unnecessary stress and tension by requesting deliverables and setting deadlines without providing sufficient explanation or rationale to those on his team to allow them to understand why they are

RARE_000160

CONFIDENTIAL



October 28, 2019
Page 13

being asked to take particular actions. Were he to explain the importance of a request, perhaps he could obtain their buy-in. We also find credible the concerns that, as the Meloy fund was perceived to have failed to perform as hoped, Mr. Galvin has attempted to become more involved in other aspects of Sustainable Markets' activities, such as Blended Finance. By doing so when he previously showed little interest, Blended Finance members feel as though he has unfairly taken advantage of their efforts and has not given them credit where appropriate. While the evidence does not support any unlawful discrimination by Mr. Galvin, we find Ms. Orlando's account of Mr. Galvin "throwing her under the bus" to be credible. However, the facts do not support her allegations of "bullying," as no other person interviewed could corroborate such allegations.

It is noteworthy, also, that with respect to Ms. Miller's September 11, 2019 email complaint about Ms. Orlando, Mr. Galvin failed to follow Rare's policies set forth in its Employee Handbook regarding "Complaint Process and Investigation and Prohibition of Retaliation." Specifically, the Handbook provides that "[m]anagers who receive complaints or who observe conduct that may constitute harassment or discrimination must notify the Talent Department immediately." (Handbook, p. 8.) Managers who fail to report suspected violations of the anti-harassment policy may themselves be subjected to discipline. Rare obligates itself to "investigation any report of harassment promptly and thoroughly and will take corrective and remedial, as appropriate." (Handbook, p. 8). Based on information received from Talent in this case, however, Mr. Galvin withheld the disclosure of Ms. Miller's complaints about Ms. Orlando until such time as Ms. Orlando had expressed concerns to Talent about Mr. Galvin bullying Ms. Orlando. It appears as though he used Ms. Miller's email complaint in a defensive manner rather than convey it to Talent per the Handbook's policy and for the sake of performing the appropriate investigation into Ms. Miller's allegations.

     **B.**    <u>Valeria Ramundo Orlando's Leadership</u>

Based on the interviews conducted, we find that Ms. Orlando has maltreated her subordinates and has created a difficult environment in which to work. Persons both on her team and on other teams have corroborated several instances in which she belittled and demeaned three Rare employees. She has a volatile temper and, when upset at someone, yells at them and also has cursed and called senior-ranking Rare employees "pieces of shit." She is passionate about her work and sincerely believes she is trying to protect her team and do what is best for them, but her outbursts have created more tension and anxiety than positive morale and cohesiveness. Also troubling is Ms. Orlando's handling of an interview involving the male Saudi applicant for an internship. While not rising to the level of unlawful discrimination under the particular circumstances in that situation, this incident is an example of potential organizational risk.

     **C.**    <u>Concerns About Sustainable Markets and Blended Finance</u>

There is unanimous agreement among persons interviewed—both on Mr. Galvin's team and Ms. Orlando's team—that there exists tension as a result of the irreconcilable conflict between the two

RARE_000161

**CONFIDENTIAL**



October 28, 2019
Page 14

leaders.  Nobody has been able to articulate any solutions to this conflict.  We find that there is a real concern that Rare could suffer reputational harm by Sustainable Markets' inability to deliver on projects that it has presented to both investors and international partners.  This appears to be attributable to both Mr. Galvin and Ms. Orlando.  For example, Mr. Galvin has been unable to successfully manage the Meloy Fund and Ms. Orlando has overpromised in her role as an effective "salesperson."  While good at attracting opportunities, she has proven to be less capable at delivering results on projects.  Blended Finance has lost one employee (Ms. Barasa) and risks losing another one imminently (Ms. Schwiegart).

    **D.**    **Specific Allegations Raised in Jenny Miller's Sept. 11, 2019 Email**

Addressing Ms. Miller's specific allegations as contained in her September 11, 2019 email, we make the following findings:

1.  That Ms. Orland has berated colleagues.  SUBSTANTIATED.

2.  That Ms. Orlando makes excuses and complains about work.  SUBSTANTIATED.  That Ms. Orlando does not do her work or makes her subordinates do it.  UNSUBSTANTIATED.

3.  That Ms. Orlando uses inappropriate and disrespectful language about or to colleagues (often in front of other colleagues).  SUBSTANTIATED.

4.  That Ms. Orlando requests personal or professional information not related to her work/none of her business.  UNSUBSTANTIATED.

5.  That Ms. Orlando gossips about colleagues.  SUBSTANTIATED as to Mr. Galvin, but not as to others.

6.  That Ms. Orlando refuses to review the budget, respect the budget, and complains when Ms. Miller refutes charges that Rare typically does not cover.  UNSUBSTANTIATED.  However, by putting off things such as buying airfare when first asked, Ms. Orlando's later purchased travel can negatively impact the budget.

7.  That Ms. Orlando lies about conversations, meetings, work progress, and the status of projects.  SUBSTANTIATED.  We found Ms. Schwiegart's testimony as to why Ms. Barasa resigned to be credible.  The reasons for her resignation pertained to Ms. Orlando misrepresenting the status of Rare's projects.  Also, during her own interview during this investigation, Ms. Orlando denied yelling at Mr. Francis and Mr. Alimi, denied making a comment to Ms. Bradtke about wearing a short skirt, and denied making a comment to Ms. Schwiegart about cleavage.  However, even if she was joking when she said those things, eye-witnesses corroborated that they were in fact said in some manner.  Ms. Orlando denied saying them in the first instance, which casts doubt on her truthfulness about this and other topics.

4158-5632-8223.3

**CONFIDENTIAL**



October 28, 2019
Page 15

8.  That Ms. Orlando used inappropriate language.  SUBSTANTIATED.  That she engaged in inappropriate interview practices.  SUBSTANTIATED.  That she made hiring decisions based on ethnicity and gender.  UNSUBSTANTIATED.  That she engaged in sexual harassment of her direct reports.  UNSUBSTANTIATED.

4158-5632-8223.3

CONFIDENTIAL

# EXHIBIT A

RARE_000164

**CONFIDENTIAL**

## Jenny Miller

| | |
|---|---|
| **From:** | Jenny Miller |
| **Sent:** | Wednesday, September 11, 2019 11:55 AM |
| **To:** | Dale Galvin |
| **Subject:** | RE: Laura leaving and VRO toxic culture concerns |

Hi Dale,

Thanks for your thoughtful response. It's good to hear that you've been working on an improvement plan and will dig back in and reconnect with the team and Talent when you're back to evaluate the best path forward.

Do you want help setting up any of these meetings? I personally think it'd be ideal to schedule them for Monday while you have availability and team morale is wavering (I think Kate will be back, but I can check). Please keep me posted on what you think is best so I can balance scheduling time for you and I as well as other conversations you may need to have.

Thank you,
Jenny

PS. Thanks, it's good to hear the travel logistics are going smoothly and fingers crossed they continue to do so



**Jenny Miller | Senior Associate, Sustainable Markets and Finance**
1310 N. Courthouse Road Ste 110, Arlington, Virginia 22201
T: +1 703-522-5070 x146
rare.org | twitter | facebook | newsletter
Rare inspires change so people and nature thrive
**Rare receives four stars, Charity Navigator's highest rating**

**From:** Dale Galvin <dgalvin@rare.org>
**Sent:** Wednesday, September 11, 2019 11:29 AM
**To:** Jenny Miller <jmiller@rare.org>
**Subject:** RE: Laura leaving and VRO toxic culture concerns

Jenny thanks for writing this and being so specific about your concerns. It's a shame about Laura (especially after waiting for her for 2 months!) and I am sure many discussions about this will follow. I did spend about 12 hours 2 weeks ago sorting through the various team concerns opinions, and I noted Laura as a serious flight risk at that point. It was pretty clear she was already looking.

It seemed to me that, while not perfect, we did get on a path to improving and Valeria had received a lot of feedback and began to respond. It's far too early to tell if it's fixed or working, and I will dig back in to determine if there are serious issues that we need to act on in the short term. To that end, I certainly am interested to learn more about your statements below when I am back next week. I will also circle back with Kate, Talent, etc

Thanks again for bringing this to my attention and keep holding down the fort meanwhile!

On another note, your trip planning so far has been impeccable (not to jinx it), but even though nearly all trains to Rotterdam were delayed today mine was on time!

1

RARE_000165

# CONFIDENTIAL

Best,
Dale

**From:** Jenny Miller <jmiller@rare.org>
**Sent:** Wednesday, September 11, 2019 5:04 PM
**To:** Dale Galvin <dgalvin@rare.org>
**Subject:** Laura leaving and VRO toxic culture concerns

Hi Dale,

I hope your meeting with FMO went well, and that your travels have been manageable.

Learning that Laura will be leaving the team was tough news to receive today. Although Laura may have her own personal or professional reasons for leaving Rare, I can't help but wonder how what I view to be a toxic work environment on the blended finance team, may have contributed to her decision and may be a symptom of a larger problem.

As you know, I have worked directly with Valeria since she started and have had my fair share of difficult situations with her. As the team grew to include Molly, Kate, and Laura, I felt a great sense of relief when my work became more distanced from Valeria because I felt less stressed, was able to focus on my work, and didn't feel anxious when she was around because I knew we likely wouldn't be interacting.

Thus, I was no longer directly impacted by the toxic environment that I felt she created. Since then, I have been on the periphery of the blended finance team and I have still seen countless violations of workplace ethics. Some of these instances I have shared with you and some I have not.

During some of the situations that I felt were seriously concerning, I shared my stories with you and had confidence that you spoke to Valeria. Her behavior typically improved temporarily. However, her inappropriate behavior always occurred again as if nothing had truly changed.

This toxic work environment that I was personally affected by or witnessed includes:
- Berating colleagues
- Making excuses/complaining about doing work, and then not doing it or making one of her direct reports complete it
- Using inappropriate and disrespectful language about or to colleagues (often in front of other colleagues, however sometimes these colleagues weren't present)
- Requesting personal or professional information not related to her work/none of her business
- Gossiping about colleagues
- Refusing to review the budget, respect the budget, and complaining when I refute charges Rare doesn't typically cover
- Lying about conversations, meetings, work progress, and the status of projects
- Inappropriate language, interview practices, and hiring decisions based on ethnicity and gender as well as also sexual harassment with some of her direct reports
    - *You and I never ended up discussing this last story in-person, however I can share it in more detail when you're back from Europe

In some instances, I was so alarmed by her behavior that I almost went directly to Talent, but decided to bring it to you instead. I wanted to make sure to bring this up to you again because I am still deeply concerned and am considering going to Talent with my concerns.

2

## CONFIDENTIAL

As a member of the Markets team, I want to express my concern for Valeria's recurring toxic behavior because I'm worried that the team won't be able to effectively deliver on our work because the team is falling apart, has low morale, and the current culture and blended finance leadership doesn't align with Rare's values.

Please let me know your thoughts. I'm open to chatting about this in-person when you're back in the office.

Best,
Jenny



**Jenny Miller | Senior Associate, Sustainable Markets and Finance**
1310 N. Courthouse Road Ste 110, Arlington, Virginia 22201
T: +1 703-522-5070 x146
rare.org | twitter | facebook | newsletter
Rare inspires change so people and nature thrive

**Rare receives four stars, Charity Navigator's highest rating**

3

RARE_000167

CONFIDENTIAL

# EXHIBIT B

RARE_000168

**CONFIDENTIAL**

JM's recount of Valeria/JM conversation from Thursday, May 16, 2019:

- VRO, Molly, and Cecil-Francis came over to the Markets pod. The conversation started because VRO said "Glad you wore a shirt today!" so I turned around because I felt that was a weird thing for anyone to say and asked Valeria "what is that supposed to mean?" She responded that "Cecil-Francis was coming with the shirt to look more professional, Molly was coming with the short skirt and Kate was coming with the cleavage."
- I said "I don't know what that means but it sounds very inappropriate." Valeria explained that "they were interviewing a BF intern candidate who was male and from Saudi Arabia and she wanted to make sure he would be ok working with an all-female team." I told her that "sounded extremely judgmental and that she can't go into an interview with a candidate with so many pre-conceived notions on who they are because it makes for an unfair interview." Molly chimed in and said "Jenny, I think it's more so about making sure he's a right cultural fit for the organization." I responded, "there are many other ways to see whether they're a good cultural fit – primarily by asking questions during the interview and learning about them." I told Valeria "you can't tell people to dress a certain way for an interview." Molly and Cecil-Francis defended her a bit, but I don't remember exactly what they said.
- I don't remember Valeria's next exact words here, but she then went on to say how she has to wear a hijab if she goes to Saudi Arabia and how women are discriminated against there so she wants to make sure he's ok with an all-female team, especially since she's responsible for 11 people (not sure where she got that number). I responded that "what she has to do in Saudi Arabia is a separate conversation from what is happening here and that the laws are different. Here we are interviewing a candidate, and you are making assumptions about them based on their ethnicity, where they originally come from, and their gender which is not only unfair, it's illegal and she shouldn't be doing it or talking about it so openly in the office."
- Valeria asked me why I was so concerned and I responded, "I literally do not know how to explain this any differently because it seems so clear to me – you can't make decisions about someone you're hiring based on their ethnicity or gender, and it sounds like you're making several judgments before ever having met this person. If you do feel this way – and I don't totally disagree with you in terms of wanting to make sure that the team is respected (because I support having awesome female teams too) – but you can't be talking about it this way so openly in the office because you're a VP and representing the Markets team, and I think it's unprofessional and not a good look if other staff were to overhear. I don't want it coming back to bite you or the team in case someone thinks you're being unfair when interviewing and potentially doing something illegal and they say something to Talent about it."
- I also asked, "how long has the intern been the U.S. because I know he's a student," and Molly responded that he'd "been in the U.S. for 10 years". I used this as an example of why he may not align with traditional Saudi Arabia beliefs, and that even if he hadn't been in the U.S. and had been in Saudi Arabia, those stereotypes still may not apply to him.
- I also told her that "the stereotype of being a male from Saudi Arabia may be true in that they may not respect women as much and that having a strong female team would be awesome, however that just because those stereotypes exist, doesn't mean she's allowed to use them as if they're true and apply to this person."
- Valeria asked me "why I was so concerned and thought this was a big deal?" I re-emphasized that I felt she was making too many potentially illegal judgments about this person because she's never met him, and that I didn't think this reflected well as a VP at Rare and on the Markets team."

RARE_000169

**CONFIDENTIAL**

- Valeria said "Jenny, I really want you to stop questioning me here" and I responded that "I will always question anything that makes me uncomfortable." I then encouraged her that if she did feel this way to "be careful about how you talk about this in the office."
- She then said, "Jenny, I want you to stop bringing up any illegal issues here and saying that I am doing anything illegal because it's really starting to bother me and I'm tired of it." This made me extremely uncomfortable and I didn't know how to respond.
- She ended the conversation with "because I am the VP, I can hire whoever I want for what ever reasons I want, even if it's based on gender."
- This is when I personally decided that she more or less self-implicated herself with that statement, and that I would finally write an email to Dale explaining the conversation and how I felt it was inappropriate, unprofessional, reflected poor leadership, and potentially illegal behavior (especially if others were to overhear and say something). I also shared with Dale that this is the fourth time I've had this type of conversation with Valeria – in terms of what judgments you can/can't apply when interviewing/considering candidates (previously, they were all related to her not wanting to hire men and me emphasizing that it's ok to hire men/she can't turn away a candidate just because they're male.
- Issues that stuck out to me here:
  o Profiling/judging candidates and making assumptions based on their gender and ethnicity
  o Asking direct reports to dress a certain way (especially Kate, who started two weeks prior)
  o Asking female staff to potentially put themselves in an uncomfortable situation (what was Valeria's plan if the person interviewing had made an inappropriate comment or done something inappropriate? I don't want this to be the focus, but it's a point to keep in mind, in my opinion.)
  o Valeria making her staff think that it's ok to profile a candidate before having interviewed them and also to dress a certain way as a "test" for them (Valeria was wearing a full professional suit) and that it would lead them to answers on the candidate's qualifications
- I then wrote the email below to Dale:

Email to Dale on 5/16/19:
Valeria and I just had an uncomfortable/difficult convo re: interviewing/hiring candidates who are male and from certain countries. I don't necessarily disagree with how she feels and what she is saying, but I encouraged her to be careful about how she speaks about these issues openly in the office because she's treading on thin ice in terms of what you can and can't do (as a leader and also legally) when hiring people (judging/making decisions based on gender, ethnicity, etc.) I can fill you in more when you get here if you want, but I think some things she's saying/doing are unprofessional (and not great for other people in the office to overhear). This extends to instructing her direct reports on what to wear as a way to "test" the candidate during the interview.

She asked me why I was concerned and I explained that I didn't think it was a great look and didn't set a good example as a VP and representative of the Markets team. I encouraged her to be careful about how she speaks about these issues regardless of how she feels. She wasn't too happy and said she can do whatever she wants *because* she is the VP even if it means hiring someone based on their gender and ethnicity.

RARE_000170

## CONFIDENTIAL

I know we're both kind of used to this (and may not totally disagree with how she feels sometimes), but I felt the need to share it because it reflects poor leadership and other people are noticing.

This is also probably the fourth time I've had this conversation with her, and she will definitely know it was me that told you this which is why I haven't mentioned it yet.

- In my email to Dale, I wrote that Valeria said "..hiring someone based on their gender and ethnicity." However, I only remember Valeria saying "gender" specifically in this sentence (ethnicity was implied in the conversation together), but she didn't actually say that specifically.. just "gender".

RARE_000171

**CONFIDENTIAL**

**CONFIDENTIAL**

August 5, 4:15pm – VRO talking about Niels – "Niels is a piece of shit." Me: "Valeria, you can't say that. Please be careful of what you say so openly in the office." (I looked around to show her there were others that could hear and pointed towards the FF team). She responded "I don't care if people hear, he's a piece of shit and I will be loud and annoying until people complain and Talent/Niels gives BF our own seating area." "I am going to be loud and obnoxious because it's not fair we can't sit together." "I am going to be the loudest and most obnoxious person in the office." I asked her if she had spoken to Niels about this. She said yes and that he was a "piece of shit because he and Caryn lied to her face about the seating arrangements." I told her I didn't know what to say because I wasn't a part of those conversations. She was also speaking negatively about Marybeth and was upset that Marybeth had emailed her back instead of Niels (although I don't remember her exact words here). Kate was also there and heard this whole conversation and participated in part of it (not supporting VRO, but in a concerned/caught in the middle of VRO talking type of situation). Kate gave me concerned eyes as the conversation simmered as if we were both thinking "geez, don't know what to say there, that was harsh."


August 28, ~11:30am – VRO told Molly she hated her twice before leaving to catch her flight to France. Dale and I were both sitting at our desks and heard her say this. Molly responded "I'm sorry you feel that way" (implying that she's just doing her job and VRO needs to deal with it). I glanced over at Dale who made a weird/discomforted/confused face – the situation made me feel uncomfortable because VRO often says "I hate you" to Molly, myself, and all members of her team when they're doing a good job or pushing her to do a certain task required of her and she doesn't want to, which doesn't exactly reinforce feeling positively about doing a good job in one's position (in my opinion). She's also said it about Dale openly where others can hear when he's not in the office (although I don't have a written account of this at the moment). We know she's kidding but she says it a lot which is why I decided to start recording when I hear her say it/am able to record it (sometimes I overhear her say it in passing or saying it loudly across the office).

**CONFIDENTIAL**

RARE_000174

**CONFIDENTIAL**

---

**Jenny Miller**

---

| | |
|---|---|
| **From:** | Jenny Miller |
| **Sent:** | Thursday, May 16, 2019 7:14 PM |
| **To:** | Dale Galvin |
| **Subject:** | Re: fyi-tricky VRO convo |

Let me know if you want to do a quick call on this tomorrow.

Get Outlook for iOS

---

**From:** Dale Galvin <dgalvin@rare.org>
**Sent:** Thursday, May 16, 2019 12:11 PM
**To:** Jenny Miller
**Subject:** RE: fyi-tricky VRO convo

Ok interested to hear more from both of you and will talk to her about it in our meeting later today
Thanks for the heads up
Dale

**From:** Jenny Miller <jmiller@rare.org>
**Sent:** Thursday, May 16, 2019 12:02 PM
**To:** Dale Galvin <dgalvin@rare.org>
**Subject:** fyi-tricky VRO convo

Valeria and I just had an uncomfortable/difficult convo re: interviewing/hiring candidates who are male and from certain countries. I don't necessarily disagree with how she feels and what she is saying, but I encouraged her to be careful about how she speaks about these issues openly in the office because she's treading on thin ice in terms of what you can and can't do (as a leader and also legally) when hiring people (judging/making decisions based on gender, ethnicity, etc.) I can fill you in more when you get here if you want, but I think some things she's saying/doing are unprofessional (and not great for other people in the office to overhear). This extends to instructing her direct reports on what to wear as a way to "test" the candidate during the interview.

She asked me why I was concerned and I explained that I didn't think it was a great look and didn't set a good example as a VP and representative of the Markets team. I encouraged her to be careful about how she speaks about these issues regardless of how she feels. She wasn't too happy and said she can do whatever she wants *because* she is the VP even if it means hiring someone based on their gender and ethnicity.

I know we're both kind of used to this (and may not totally disagree with how she feels sometimes), but I felt the need to share it because it reflects poor leadership and other people are noticing.

This is also probably the fourth time I've had this conversation with her, and she will definitely know it was me that told you this which is why I haven't mentioned it yet.



**Jenny Miller | Senior Associate, Sustainable Markets and Finance**
1310 N. Courthouse Road Ste 110, Arlington, Virginia 22201
T: +1 703-522-5070 x146
rare.org | twitter | facebook | newsletter

RARE_000175

## CONFIDENTIAL

Rare inspires change so people and nature thrive

 **Rare receives four stars, Charity Navigator's highest rating**

RARE_000176

**CONFIDENTIAL**

---

**Jenny Miller**
_____

| | |
|---|---|
| **From:** | Jenny Miller |
| **Sent:** | Monday, August 6, 2018 1:29 PM |
| **To:** | Dale Galvin |
| **Subject:** | RE: Concerns re: Valeria |

Yes, Jeff mentioned he emailed you (because we've been talking about it together for some time).

Sounds good and thanks for being open to speaking. I'll schedule time for the two of us. I might hold a tentative time for you to speak with Jeff (just on your calendar) just in case.. he is very stressed.



**Jenny Miller | Associate, Sustainable Markets and Finance**
1310 N. Courthouse Road Ste 110, Arlington, Virginia 22201
T: +1 703-522-5070 x146
rare.org | twitter | facebook | newsletter
Rare inspires change so people and nature thrive

**Rare receives four stars, Charity Navigator's highest rating**

**From:** Dale Galvin
**Sent:** Monday, August 6, 2018 1:25 PM
**To:** Jenny Miller <jmiller@rare.org>
**Subject:** RE: Concerns re: Valeria

Yes Jeff emailed me separately.  Id' rather hear from you privately first.  Jeff is somewhat of a different issue, but related I'm sure.  Let's find a time to talk.
dale

**From:** Jenny Miller
**Sent:** Monday, August 6, 2018 1:19 PM
**To:** Dale Galvin <dgalvin@rare.org>
**Subject:** Concerns re: Valeria

Hi Dale,

When you get back on Thursday, it would be great if Jeff and I could please speak with you privately about some concerns we have with Valeria.

I have been meaning to speak with you for about these concerns for weeks, but was doing my best to work it out on my own time/see if things got better. I knew if I was having issues working with Valeria then Jeff probably was as well. He and I have spoken a fair amount our joint concerns, and feel we need your help.

Would it be ok for me to schedule some time to speak on Thursday?

Best,
Jenny

RARE_000177

**CONFIDENTIAL**



**Jenny Miller | Associate, Sustainable Markets and Finance**
1310 N. Courthouse Road Ste 110, Arlington, Virginia 22201
T: +1 703-522-5070 x146
rare.org | twitter | facebook | newsletter
Rare inspires change so people and nature thrive

**Rare receives four stars, Charity Navigator's highest rating**

RARE_000178

CONFIDENTIAL

# EXHIBIT C

RARE_000179

**CONFIDENTIAL**

**From:** Valeria Ramundo Orlando <vramundo@rare.org>
**Date:** Tuesday, July 30, 2019 at 4:44 PM
**To:** Lisa Pharoah <lpharoah@rare.org>
**Subject:** Re: This morning's call

Lisa,

Thank you for the feedback. I am sorry it was uncomfortable for the team, it was not my intention. I do truly appreciate the feedback and I will keep it in mind so that next time it can be handled differently.

We stayed with CF for 30minutes longer to support him and go through some other details so he felt completely supported towards the end. I have spoken to him afterwards to make sure everything is ok and that he has what he needs. He now has a way to move forward and the resources to do so.

I have 1:1 with him regularly, he gets most of my attention, I reply to all his emails, and many messages, I spent hours with him when I was in Manila.

Again thank you.

Valeria

1

RARE_000180

**CONFIDENTIAL**

**From:** Lisa Pharoah <lpharoah@rare.org>
**Date:** Tuesday, July 30, 2019 at 3:34 PM
**To:** Valeria Ramundo Orlando <vramundo@rare.org>
**Subject:** This morning's call

Hi Valeria,

In the spirit of transparency, respect and trust, I just wanted to take a moment to raise an issue with you, as I feel I need to as a member of the BF team. I am bit worried about how things transpired during this morning's call on the Policy Brief – as I was left feeling completely uncomfortable by how things were being communicated and managed with CF.

I think that this morning's call with CF could have (and honestly should have) been handled differently, and in a way that did not put CF in the position he was in – basically on blast, in front of the entire team. It was not only a very uncomfortable call to be a part of, but was also pretty unproductive for the first 30 or more minutes (even if we ended up with some decent insights in the end). Quite frankly, how things transpired was not so great for team morale – which I know is not your aim! As such, in future, I would like to respectfully recommend/request that conversations like that happen one-on-one, so as to not a) put the individual on blast, and b) put the rest of the team in a very awkward and uncomfortable position.

Although incredibly smart, I think that we have to remember that CF is quite young and still in the very early stages of his career. He is still learning (heck, we are all still learning). He is also in a bit of a difficult position whereby he is being expected to deliver, but also does not really hold decision making authority. As such, I think he needs clear guidance, support and mentoring to help ensure that he is being set up for success.

We have an awesome BF team and so I want to help ensure it stays that way. I am sure it was not your intention to create an uncomfortable meeting setting this morning, so as your friend and colleague, I just wanted to flag that it was, as I hope we, as a team, can all do better in future.

L*



**Lisa Pharoah | Director, Global Development**
1310 N. Courthouse RoadSte 110, Arlington, Virginia 22201
T: +1 703-522-5070 x213
rare.org | twitter | facebook | newsletter
Rare inspires change so people and nature thrive

**Rare receives four stars, Charity Navigator's highest rating**

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

RARE_000181

CONFIDENTIAL

# EXHIBIT D

RARE_000182

**CONFIDENTIAL**

| | |
|---|---|
| **From:** | Valeria Ramundo Orlando <v.ramundo.orlando@gmail.com> |
| **Sent:** | Friday, October 25, 2019 11:55 AM |
| **To:** | Lorek, Jeffrey |
| **Subject:** | Fwd: first draft |
| | |
| **Follow Up Flag:** | Flag for follow up |
| **Flag Status:** | Flagged |

This is the one I shared with Manuel

---------- Forwarded message ---------
From: **Valeria Ramundo Orlando** <v.ramundo.orlando@gmail.com>
Date: Sun, Aug 25, 2019 at 5:12 PM
Subject: first draft
To: Manuel Bueno

In reference to our meeting on Friday, I would first of all like to thank you for your time and I would like to find a solution to the concern I expressed, that will benefit the organization and the work we are doing in Blended Finance.

As I have mentioned on Friday, last Thursday I felt intimidated by my supervisor, Dale Galvin, to the point that I sat in a conference room waiting for him to leave the office or someone to walk up to him, so I could get my handbag and leave the premises. I have never felt this way in 27 years of work. Since Wednesday all the communications I had with Dale have been intimidating and I felt he was bullying me in different ways. He has done this before, and I have let time pass and dismissed his behavior. His comments are not conducive to a healthy atmosphere in the team and workplace.

I would like to find a positive solution to this situation, whereas we are able to resolve our differences and we can address the issues and concerns in a constructive manner. I have attempted to express my opinion and …….. with Dale, but we have not been able to work out these concerns, I also do not feel comfortable talking to him alone as he has been dismissive of what I have proposed up to now and this has caused me to feel intimidated by him.

I would like to request that a mediator from HR/Talent intervene. I feel like a neutral party would be able to bring us to a positive resolution where we can return to a professional working relationship. I would also like to ask for the Blended Finance team to be moved under the supervision of another executive at Rare temporarily until these issues are resolved fairly and in accordance with Rare's five core principles.

It is essential this is done in a timely manner as we have a number of major deadlines in the coming months that we need to focus on delivering. To ensure the smoothest transition for the team I would like to ask for this matter to stay confidential as it would potentially cause concern and unwanted stress among the team members.

1

RARE_000183

**CONFIDENTIAL**

Thank you for your assistance in this matter.

Sincerely yours,

2

RARE_000184

**Caryn Perrelli**

| | |
|---|---|
| **From:** | Brett Jenks |
| **Sent:** | Sunday, November 17, 2019 4:40 PM |
| **To:** | Valeria Ramundo Orlando |
| **Cc:** | Caryn Perrelli |
| **Subject:** | Follow up to your emails and conversations |

Valeria,

I am sending this email to address the concerns you laid out in your email to Caryn on November 16, as well as to clarify our prior conversation and my expectations of you going forward. I also want to address the specific issues you have again raised about Dale as well as your request to no longer report to Dale. Additionally, I want to provide you with a clear sense of my priorities for the coming months. Finally, on a number of occasions, you have made reference to your attorney and I want to make clear that, to the extent that you have counsel that is representing you in connection with your employment, we need to put your counsel in contact with Rare's legal counsel so that you and I can focus on the important work we are doing and leave legal issues to the lawyers. (And please feel free to forward this letter to your attorney.) I am confident that we can find a way forward that will reduce internal tensions, address ongoing concerns, and enable Rare to advance its blended finance goals.

*Investigation and Going Forward Plan*

First, it is important that you understand that we retained Orrick to investigate both the issues that were raised about certain aspects of your conduct and, importantly, to address the issues that you raised about Dale. We used outside counsel for the very purpose of ensuring that all allegations were properly and fully vetted. With respect to the issues that you raised about Dale, to the extent that was not clear in our earlier conversation, I want to make it clear now. The investigator concluded that Dale did not engage in any unlawful discrimination but found that he was difficult to work with, created unnecessary work-stress for the team, and that you credibly asserted a concern that you feel that he throws you and your team "under the bus." We have taken these findings very seriously and addressed them in no uncertain terms with Dale. He has apologized on paper, taken responsibility for his actions, and committed to working with you and me and a coach to rectify the situation so we can all move forward. I know that your work experience has been challenging the last several months and that Dale has been difficult to work for, but I and the rest of the Rare team have taken your concerns regarding gender discrimination incredibly seriously. We are also focused on finding a meaningful effort to engage all staff in a broader conversation about diversity, equity and inclusion, one that goes beyond the normal training videos and helps each employee see how each of us can help make Rare a more equitable, inclusive, diverse and understanding workplace. I trust that this clarifies the concern that Rare did not take your concerns seriously or responded to those concerns in any improper way.

I also need to emphasize that the investigator reached conclusions as to the allegations raised about you. As I explained when we met and debriefed, the investigator found no illegal behavior on your part, but did find – based on interviews with eight of your coworkers – some significant managerial and behavioral concerns. I want to repeat these corroborated reports and make sure they are in writing so that you understand why it is so important that we work together to address them in a systematic and comprehensive way. The report found that you (and this is not comprehensive, but rather a summary): publicly berated an intern, made inappropriate comments to at least two other female employees prior to an interview with a male Middle Eastern job candidate; made disparaging and inappropriate comments about members of senior leadership in public; and denied each of the alleged behaviors when presented reports that had been corroborated by multiple co-workers, which led to the investigator having a final concern about truthfulness. These findings were reached only after a complaint from a junior staff member was escalated about you. The investigator's findings about your conduct were in no way reactive to the concerns that you raised about Dale.

1

**EXHIBIT**
**JENKS - 8**
BP-122221

**RARE_000123**

I am sharing this information with you in writing now as I need you to understand my absolute expectation that you accept responsibility for these actions/perceptions before we continue with this process. I asked that you write me a letter of personal reflection, the same way I asked Dale to do the same: to give you an opportunity to demonstrate that you really heard the report's findings, that you recognize the impact these behaviors might cause, that you take accountability for these actions, and that you are truly committed to improving. I've been managing senior executives for a long time and over the years have had to help coach or find coaching for employees who have needed to make behavioral or managerial improvements; I've found that the best predictors of future success are acceptance, ownership and contrition. Feel free to explain this to your lawyer, but also know that I fully expect you to complete this requirement by close of business Wednesday November 20 while you're away. (I am sure that Caryn would be happy to help with this if needed.)

The MOCHAs were a terrific first step toward getting clear on roles and responsibilities moving forward. I appreciate you working with Dale and Kate and Niels to get those together this week. I am reviewing them over the weekend. The next steps will be to: get Fish Forever leadership eyes on the MOCHAs and ensure alignment, and then (based on a quick review of them) I'm going to ask the four or you to draft/update quick work plans and resource allocation estimates so that we can make crystal clear what resources (time and talent and funding) is needed to deliver each of these projects.

Over the next week, Caryn will be organizing "intake" meetings for you and Dale with a mediator and perhaps a coach. The goal is – even though I'm going to restructure reporting guidelines – for you and Dale to have a working set of rules for coordination, communication and decision-making moving forward.

*Reporting Lines and Immediate Priorities*

As for reporting guidelines, I will be implementing the following changes to address the issues as I see them. Effective December 1, you will temporarily report to Steve Box. The MOCHAs would stay the same and Dale would still have significant decision rights, but you would report to Steve on the execution and implementation of the projects in Indonesia and the Philippines and continue to lead global engagement, but with a reduced ambition in the near-term until we have successfully delivered on some of these projects. Strange as it may sound coming from me, I want less outside promotion and more internal delivery for the next 4-5 months. There are times for sales and times for delivery and we need all hands on deck for delivery right now.

Kate will report to you, but she will also – on at least one project – have a dotted line to Dale. To that end, I have determined that for the Costa Rica project, Kate should report to Dale on an interim basis on this one project.

Additionally, Dale will be leading a blended finance design process with Paula in Colombia, and probably working with me on a potential high-level engagement with Ahmed Saeed at ADB, which you would be called into if it actually develops into something.

All of these projects will be coordinated by a Blended Finance Task Force, which I will chair.

Hopefully, this will address your concerns about reporting, at least in the near-term.

Valeria, I have appreciated your leadership and energy helping get blended finance off the ground at Rare over the past two years. I thank you for continuing to advance the blended finance cause and for doing your part to help improve work relationships, processes and morale in this area.

Please continue to work with Caryn as needed and please take seriously my offer to connect the lawyers so that we can all get focused on the work at hand.


Brett

RARE_000124



**Brett Jenks | President & CEO**
1310 N. Courthouse Road Ste 110, Arlington, Virginia 22201
T: +1 703-522-5070 x134
rare.org | twitter | facebook | newsletter
**Rare inspires change so people and nature thrive**
**Rare receives four stars, Charity Navigator's highest rating**

RARE_000125

**Caryn Perrelli**

| | |
|---|---|
| **From:** | Brett Jenks |
| **Sent:** | Friday, November 22, 2019 5:18 PM |
| **To:** | Valeria Ramundo Orlando |
| **Cc:** | Caryn Perrelli |
| **Subject:** | Confidential: follow-up and next steps |

Valeria – I understand that you have been traveling this week. However, my request for you to provide me a personal reflection was made over a week ago, on November 12, at a time when you were in the office. Additionally, I only requested a one-page letter.

As I have communicated previously, I expect you to accept responsibility for the actions and the associated perceptions outlined in the independent investigation. The request I made to write a letter of personal reflection was to give you an opportunity to demonstrate that you heard the report's findings, that you accept responsibility for your actions, and that you are truly committed to improving.

Your actions lead me to conclude that you do not understand the seriousness of these issues for you, your team, and for Rare. At this juncture, the best course of action is for us to find an amicable path to your separation from Rare. Caryn is available to discuss next steps with you when you return from vacation after Thanksgiving. Alternatively, you can also provide us the name of your legal counsel, and we can connect them with Rare's.

In the interim, immediately following your vacation, we are putting you on a paid administrative leave of absence, effective December 1, 2019. You should cancel your plane reservation to Indonesia. Since we will need to internally communicate your leave status, please advise if you would prefer that we characterize your leave as administrative or personal.

Brett

**Brett Jenks | President & CEO**
1310 N. Courthouse Rd Ste 110, Arlington, VA 22201
T: +1 703-522-5070 x134
rare.org | twitter | facebook | newsletter
Rare inspires change so people and nature thrive



EXHIBIT

JENKS - 9

BP-122221

RARE_000217

# DEPOSITION TRANSCRIPT OF CARYN PERRELLI

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF VIRGINIA

3                (Alexandria Division)

4    _____

5    VALERIA M. RAMUNDO ORLANDO          )

6                                        )

7                         Plaintiff, )

8                                        )

9         v.                            ) CA 1:20cv01323 (TSE/JFA)

10                                       )

11           RARE                        )

12                                       )

13                        Defendant. )

14    _____    )

15           Deposition of CARYN PERRELLI

16                conducted virtually

17          on Wednesday, December 22, 2021

18                  at 2:23 p.m.

19   Job No.: 418319

20   Pages:  1-123

21   Reported by:  Lisa Barrett,  RPR,  CRR, CRC, CSR

22

1    Rare?

2         A    I was introduced to Rare by Peggy

3    Taylo. [phon.]

4         Q    Do you know how it was you came --

5    well, how was it that you became a full-time

6    employee of Rare?

7         A    The vice-president of talent role was

8    vacant and had been for the balance of 2017 and

9    Rare made me the offer to join on a full-time

10   basis.

11        Q    What is your understanding of who made

12   the decision to hire you on a full-time basis?

13        A    The decision to hire me on a full-time

14   basis in 2017 was made by Tim Childress who at the

15   time was the CFO of Rare.

16        Q    Mr. Jenks, was he involved in that

17   discussion, to the best of your knowledge?

18        A    I believe he -- yes, I believe he was

19   involved as well.

20        Q    Are you currently vice-president of

21   talent?

22        A    I am.

1      Q     What, if any, involvement did you have

2   in determining how the investigation involving

3   Ms. Ramundo Orlando and Mr. Galvin would be

4   conducted?

5      A     The Orrick team -- the Orrick team

6   decided how the investigation would be conducted.

7   My role was to identify employees that they could

8   speak to and then contacting those employees to

9   advise them of the investigation.

10     Q     During the investigation, if Orrick had

11  questions were you the person that they were

12  directed to contact?

13     A     Yes.

14     Q     What is your understanding of what led

15  to the investigation?

16     A     What led to the investigation were

17  Valeria's concerns relative to Dale and, you know,

18  Valeria's concerns with regard to Dale and her

19  desire to work -- to report to someone else

20  because she felt that he had -- you know, he did

21  not understand the work that she -- he didn't

22  understand blended finance, that the requests that

1   he was making of her were administrative in nature

2   and burdensome on her team and so there was a

3   great deal of workplace tension as a function of

4   that.

5           So we had that issue and then we had

6   the concerns that were raised by Jenny Miller

7   regarding Valeria.

8       Q    At the time that you were speaking to

9   Orrick and they were conducting their

10  investigation, did you have an understanding that

11  Ms. Ramundo Orlando was complaining that

12  Mr. Galvin had engaged in gender discrimination?

13      A    The complaint -- the -- in my

14  discussions with Valeria her complaints about Dale

15  were related to the fact that he didn't understand

16  the work that she was doing.  She did not feel he

17  understood blended finance.  She had concerns

18  about him contacting her team members directly,

19  and redirecting their work products, so that that

20  was -- so that was the impetus for -- and that was

21  the summary, you know -- in summary, those were

22  the concerns that she relayed to me.

Transcript of Caryn Perrelli
Conducted on December 22, 2021                    54

 1          Q     At the time that Orrick was conducting
 2    the investigation, did you have an understanding
 3    that Ms. Ramundo Orlando was complaining that
 4    Mr. Galvin had discriminated against her?
 5          A     That was not my understanding of her
 6    complaint.
 7          Q     At the time that Orrick was conducting
 8    the investigation, did you have an understanding
 9    that Ms. Ramundo Orlando was complaining that
10    Mr. Galvin had engaged in gender discrimination?
11          A     That was not my understanding of her
12    complaint with Dale.
13          Q     When was the first time that you heard
14    that Ms. Ramundo Orlando was contending that
15    Mr. Galvin had discriminated against her?
16          A     I think my answer to that is in the
17    early November, you know, in the early November
18    timeframe in subsequent messages that Valeria
19    sent.
20          Q     Did you understand that Orrick was
21    investigating whether -- Ms. Ramundo Orlando's
22    decision not to hire a male candidate?

Transcript of Caryn Perrelli
Conducted on December 22, 2021                                    55

```
1        A     Orrick was looking -- Orrick was
2   looking into -- Orrick was looking into Valeria's
3   concerns regarding Dale and the various issues
4   that Jenny Miller had raised to include the one
5   that you just referenced.
6        Q     Right.  At the time that Orrick was
7   conducting its investigation, you understood that
8   they were looking into a claim by Jenny Miller
9   that Ms. Ramundo Orlando had not hired a man.  You
10  understood that; right?
11       A     My recollection of Jenny's -- Jenny's
12  -- the concern that Jenny raised was that during
13  the interview process, you know, during the
14  interview process of the male in question, that
15  Valeria had directed her team to test that person
16  in terms of how they would get -- how that
17  individual would get along with, you know, with
18  women.
19       Q     Okay.  So you had an understanding that
20  Orrick was looking into a claim by Jenny Miller
21  regarding a candidate that Ms. Ramundo Orlando had
22  been involved in, a man; you understood that,
```

1    November 4th email, Ms. Ramundo Orlando --

2         A    Yes, I do.

3         Q    -- to -- I'm sorry, I need to finish

4    the question.

5              If we scroll down to the bottom of the

6    page, do you see that email from Ms. Ramundo

7    Orlando to Mr. Jenks of November 4?

8         A    I do.

9         Q    All right.  When Ms. Ramundo Orlando

10   forwarded you a copy of this email on November the

11   8th, had Mr. Jenks already shared with you that he

12   had received the email?

13        A    I believe he had.

14        Q    All right.  And with respect to

15   Ms. Ramundo Orlando's November 4th email, did you

16   understand that she was complaining that

17   Mr. Galvin had engaged in behaviors that she

18   believed were derogatory to females?

19        A    Yes.

20        Q    Did you understand that to be a

21   complaint of gender discrimination?

22        A    I understood it to be a complaint of

Transcript of Caryn Perrelli
Conducted on December 22, 2021                    63

```
1   comments being derogatory towards women.
2         Q     Well, looking at the paragraph that
3   starts with "Since I started working with Dale,"
4   she indicates that his comments regarding females
5   is denigrating but then she also says that he had
6   aggressive behavior.
7               Do you see that --
8         A     Mm-hmm.
9         Q     -- at the bottom of the paragraph?
10        A     Yes, I see the -- I see the sentence
11  that you are referring to.  I do.
12        Q     So was this the first time that you'd
13  heard these allegations from Ms. Ramundo Orlando?
14        A     With regard to what is referenced in
15  this paragraph starting with "Since I started
16  working," yes, this was the first time.
17        Q     All right.  Well, with regard to the
18  allegations in the email, had you previously been
19  apprised of the allegations that are contained in
20  the email with respect to Mr. Galvin's behavior
21  with others?
22        A     Could you rephrase -- could you repeat
```

Transcript of Caryn Perrelli
Conducted on December 22, 2021                    66

```
1    with Ms. Ramundo Orlando regarding what the

2    incidents were?

3         A    I did not.

4         Q    And Ms. Ramundo Orlando also tells you

5    in this paragraph that Mr. Galvin had made a

6    comment that a Filipino woman would make sure he

7    stayed in Jakarta -- I'm sorry, in Manila.

8         A    Were you asking me a question?

9         Q    I was.

10             Do you also see that

11   Ms. Ramundo Orlando was complaining that he had

12   made a comment that a Filipino woman would make

13   him more likely to stay in a particular area and

14   that he would find a girlfriend in no time?

15             Was that the first time you were

16   hearing that?

17        A    Yes.

18        Q    Did you bring Orrick back in to conduct

19   an investigation regarding the allegations in

20   Ms. Ramundo Orlando's November 4 letter to

21   Mr. Jenks?

22        A    No.
```

1      Q      Why not?

2      A      Mr. Jenks, myself and the Orrick team

3    consulted on this and made the determination that

4    the course of action that we had put in place

5    following the investigation relative to coaching

6    and mediation between Dale and Valeria was the

7    appropriate next step.

8      Q      Sure.  But you understand that

9    Ms. Ramundo Orlando was raising concerns about the

10   treatment of other women that Mr. Galvin had

11   interacted with; correct?

12     A      Yes.

13     Q      And you didn't do anything to look into

14   those allegations with respect to those other

15   women; isn't that accurate?

16     A      We felt that the investigation that had

17   been done was a comprehensive one, interviewing

18   a -- you know, a number of people who worked in

19   this space.

20            MS. BROWN:  Madam Court Reporter, can I

21   ask you to read the question back?

22              (Court Reporter read back)

Transcript of Caryn Perrelli
Conducted on December 22, 2021                    69

```
1            Q     Right, but you would agree with me with
2     respect to these other individuals that
3     Ms. Ramundo Orlando raised in the November 4, 2019
4     email, mediating between Ms. Ramundo Orlando and
5     Mr. Galvin wouldn't have addressed those issues as
6     to these other women?
7            A     I would agree.
8            Q     You would agree with that.
9            A     I would.
10           Q     Was a collective decision made at Rare
11    not to investigate the items in
12    Ms. Ramundo Orlando's November 4, 2019 email?
13           A     Could you explain to me what you mean
14    by "collective decision."
15           Q     Was there a decision made between
16    yourself and Mr. Jenks not to investigate
17    Ms. Ramundo Orlando's allegations in the
18    November 4 email?
19           A     As I stated previously, Mr. Jenks and I
20    consulted with counsel and made that -- and made
21    that determination after seeking the advice of
22    counsel.
```

Transcript of Caryn Perrelli
Conducted on December 22, 2021                    70

```
1          Q     And was that counsel from Orrick that
2    you consulted?
3          A     Yes.
4          Q     The same counsel who had conducted the
5    investigation?
6          A     It is the same law firm that conducted
7    the investigation.
8          Q     But it was Ms. Lupion this time?
9          A     Yes.
10         Q     Now, you were here when Mr. Jenks
11   indicated that he didn't -- one of the reasons he
12   didn't look into the allegations in the November 4
13   email was the context and the timing.  Do you
14   remember hearing that?
15         A     Yes.
16         Q     Did Mr. Jenks raise those same concerns
17   regarding context and timing with respect to the
18   Jenny Miller allegations that were investigated
19   against Ramundo Orlando?
20         A     I don't recall.
21         Q     You don't recall him raising those same
22   timing context --
```

Transcript of Caryn Perrelli
Conducted on December 22, 2021                                  72

```
1        Q     What was discussed in the meeting

2   following the November 4 email?

3        A     What was -- to the best of my knowledge

4   what was discussed, you know, what was discussed

5   in the meeting that Brett had with Valeria on

6   November 12th were the results of the

7   investigation.  And I believe that Brett also

8   offered at that time to have Valeria speak to

9   Orrick again if she would like.

10       Q     Well, who decides whether an

11  investigation should be conducted, the employee or

12  the company?

13       A     The company.

14       Q     Right, so with respect to whether an

15  investigation should be done, whether

16  Ms. Ramundo Orlando should go back and speak to

17  Orrick again, that's the company's decision, is it

18  not?

19       A     It is.  We were giving her the option

20  to speak with them again if she felt that she

21  would like to do so.  She had had that

22  opportunity -- she had had that opportunity and
```

Transcript of Caryn Perrelli
Conducted on December 22, 2021                                    91

```
1              Go ahead and answer.
2              THE WITNESS:  We took no further
3    action.
4    BY MS. BROWN
5         Q    I guess what I'm trying to figure out
6    is, on November 7th, when you received this
7    request, did you dismiss it right away when you
8    received it or did you take any action to look
9    into whether Ms. Ramundo Orlando's request for a
10   retraction could be possible?
11        A    We did not look into whether her
12   request would be possible.
13        Q    Were you consulted prior to
14   Ms. Ramundo Orlando being placed on administrative
15   leave?
16        A    Yes.
17        Q    What is your understanding of why she
18   was placed on administrative leave?
19        A    She was placed on administrative leave
20   because she had not provided Brett Jenks with the
21   requested self-reflection document.
22        Q    All right.  And did you see a copy of
```

Transcript of Caryn Perrelli
Conducted on December 22, 2021                          96

```
 1    inclusion; do you see that?

 2         A    I do.

 3         Q    Would you think that engaging all staff

 4    in a broader conversation about diversity, equity

 5    and inclusion would be an appropriate response to

 6    Ms. Ramundo Orlando's November 4 email?

 7              MR. BARNSBACK:  Objection to the form

 8    of the question about her opinion.

 9              Go ahead and answer, please.

10              THE WITNESS:  That alone -- well, I

11    think -- I think this email was -- the tone of

12    this email was fine and as I said, I don't

13    specifically recall what Brett is referring to

14    here relative to engaging staff in a broader

15    conversation about diversity, equity and

16    inclusion.

17    BY MS. BROWN

18         Q    You don't know what he was

19    referring to?

20         A    I don't specifically know at that point

21    in time what he was referring to.

22         Q    Why was Ms. Ramundo Orlando terminated?
```

Transcript of Caryn Perrelli
Conducted on December 22, 2021                    97

1          A      She was terminated for failure to

2    follow management direction.

3          Q      Which directions?

4          A      The direction to provide a

5    self-reflection.

6          Q      That's the reason she was terminated?

7          A      Well, let me -- let me -- let me

8    rephrase that.  She was put on -- she was put on

9    administrative leave for that reason and

10   ultimately she was terminated for representing

11   Rare at the conference in Paris at the end of

12   January 2020.

13         Q      All right.  Now with respect to the

14   conference in January in 2020, you were having

15   conversations with Kate Schweigart?

16         A      I don't understand your question.

17         Q      With respect to the conference that

18   Ms. Ramundo Orlando attended in January of 2020,

19   you were in communication with Ms. Schweigart

20   about Ms. Ramundo Orlando's attendance, were you

21   not?

22         A      Yes.

Transcript of Caryn Perrelli
Conducted on December 22, 2021                    98

```
 1        Q    All right.  And in fact, you asked
 2   Ms. Schweigart if there was any documentation from
 3   the conference that reflected Ms. Ramundo Orlando
 4   as being registered associated with Rare; did you
 5   not?
 6        A    Yes.
 7        Q    And did you understand that
 8   Ms. Ramundo Orlando could attend the conference
 9   but she could not represent Rare at the
10   conference?
11        A    Yes.
12        Q    All right.  And did Ms. Schweigart
13   provide you any documentation that would indicate
14   who Ms. Ramundo Orlando was attending the
15   conference on behalf of?
16        A    I don't recall if Ms. Schweigart
17   provided that documentation.
18             MS. BROWN:  All right.  Planet Depos,
19   if we could bring up Rare 220.
20             (Perrelli Exhibit 7 was marked for
21   identification.)
22   BY MS. BROWN:
```

Transcript of Caryn Perrelli
Conducted on December 22, 2021                    99

```
1          Q    Ms. Perrelli, this has been marked as

2    Exhibit 7.  It is a number of exchanges at the

3    bottom between Ms. Schweigart and yourself in

4    January 2020, subject "OECD PF4SD Conference"; do

5    you see that?

6          A    I do.

7          Q    All right.  And if we look at the

8    bottom email that is shown on the screen it says:

9          "Kate -- hope all it well.  Quick question

10   for you."

11         And in that email you ask if there was any

12   document that reflects Ms. Ramundo Orlando was

13   registered being -- as being associated with Rare;

14   do you see that?

15         A    I do.

16         Q    And if we go up to the next email,

17   Ms. Schweigart responds to you and says:

18         "I can try and look into this.  All is well

19   enough here."

20              Do you see that?

21         A    I do.

22         Q    All right.  And do you remember whether
```

Transcript of Caryn Perrelli
Conducted on December 22, 2021                    117

1          Q    All right.  I'm going to ask you about

2     an email exchange between you and Mr. Galvin.

3               MS. BROWN:  Planet Depos, can I ask you

4     to bring up Rare 1070.

5               (Perrelli Exhibit 11 was marked for

6     identification.)

7     BY MS. BROWN:

8          Q    All right.  This is an email from

9     Mr. Galvin to you, cc Mr. Jenks, subject "Laura

10    leaving and VRO toxic culture concerns,"

11    October 3, 2019.

12              Do you see that?

13         A    Yes.

14         Q    And the "VRO" in the subject line, do

15    you understand that to be Valeria Ramundo Orlando?

16         A    I do.

17         Q    All right.  And in the email Mr. Galvin

18    tells you:  Here's an example of an email that he

19    had a few weeks ago in the midst of his Meloy fund

20    damage control travels.  And he says:

21         "I don't want to reveal the source ..."

22              Right, do you see that?

Transcript of Caryn Perrelli
Conducted on December 22, 2021                    118

```
1            A    I do.
2            Q    Do you know who the source of the
3     statements below were -- (overspeaking --
4            A    I -- (overspeaking).
5                 I'm sorry.
6            Q    Did Mr. Galvin tell you who the source
7     of the statements was?
8            A    Yes.
9            Q    Who was the source of the statements?
10           A    Jenny Miller.
11           Q    And did he tell you in that October
12    timeframe prior to bringing Orrick in?
13           A    Yes.
14           Q    Do you know why Mr. Jenks is copied on
15    the email?
16           A    No.
17           Q    All right.  We can take that down.
18                Were you involved in
19    Ms. Ramundo Orlando's request to have her team sit
20    together?
21           A    I was aware of her request.
22           Q    Do you know whether Ms. Ramundo Orlando
```

**From:** Kate Schweigart <kschweigart@rare.org>
**Sent:** Thursday, October 14, 2021 5:04 PM
**To:** Caryn Perrelli <cperrelli@rare.org>
**Subject:** Fw: OECD PF4SD Conference

---

**From:** Kate Schweigart <kschweigart@rare.org>
**Sent:** Wednesday, January 29, 2020 4:07 PM
**To:** Caryn Perrelli <cperrelli@rare.org>
**Cc:** Steve Box <sbox@rare.org>
**Subject:** Re: OECD PF4SD Conference

Hi Caryn,

I can try to look into this. All is well enough here.

Thanks,
Kate

Get Outlook for iOS

---

**From:** Caryn Perrelli <cperrelli@rare.org>
**Sent:** Wednesday, January 29, 2020 6:48:10 PM
**To:** Kate Schweigart <kschweigart@rare.org>
**Cc:** Steve Box <sbox@rare.org>
**Subject:** RE: OECD PF4SD Conference

Kate – hope all is well.  Quick question for you.  Is there any documentation from the conference (such as a list of registered attendees) that reflect that Valeria is registered as being associated with Rare?  Ideally, I would like to have this documentation, for our records.  Thank you in advance.

Caryn

**From:** Kate Schweigart <kschweigart@rare.org>
**Sent:** Tuesday, January 28, 2020 6:45 AM
**To:** Brett Jenks <bjenks@rare.org>; Steve Box <sbox@rare.org>; Caryn Perrelli <cperrelli@rare.org>

EXHIBIT
PERRELLI - 7
BP-122221

**Subject:** Fwd: OECD PF4SD Conference

As Valeria is at the conference and had registered as Rare, I believe Rare Senior Leadership should email Maria and Piera, his email is below, that Valeria is not representing Rare. Thanks for your help with this.

Get Outlook for iOS

**From:** Maria.VILLENA@oecd.org <Maria.VILLENA@oecd.org>
**Sent:** Monday, January 27, 2020 2:49 PM
**To:** Kate Schweigart
**Cc:** Molly Bradtke; Piera.TORTORA@oecd.org; Alberto.AGNELLI@oecd.org
**Subject:** RE: OECD PF4SD Conference

Dear Kate

We're very pleased to have you as a speaker in the Expert Discussion on " Aligning private finance to the sustainable use and conservation of the ocean" (30 January, 9:30 am room BB3).

In order to set the stage before the start of the workshop I would like to kindly ask you to meet with us 25 minutes before the session is due to start (09:05 am ) in the petit salon. We would also appreciate if you could provide a mobile number where you can be reach on the day of the conference.

Please do not hesitate to get in touch with us for any further clarification

All the best

María Verónica

**From:** VILLENA Maria, DCD/FSD
**Sent:** 22 January, 2020 1:26 PM
**To:** 'Kate Schweigart' <kschweigart@rare.org>
**Cc:** Molly Bradtke <mbradtke@rare.org>; TORTORA Piera, DCD/FSD <Piera.TORTORA@oecd.org>; AGNELLI Alberto, DCD/FSD <Alberto.AGNELLI@oecd.org>
**Subject:** RE: OECD PF4SD Conference

Dear Kate,

Please find attached the flyer for the ocean finance workshop (please feel free to share), where you'll find the guiding questions and further info for the session.

Please note that the Dialogue is intended as a dynamic, Davos-style conversation (no PPTs or statements). The moderator will ask each panellist a question to elicit their intervention.

I attach below the specific question that we'd like to ask you. Please let us know if you have any questions regarding your intervention, or if you'd like us to tweak your question.

Many thanks again for accepting to be a speaker in the workshop. We look forward to the discussion.

All the best

María Verónica


Anthony turns to Kate Schweigart: RARE too supports developing countries (including Indonesia and Philippines) to create instruments for pooling together private capital and public finance for the conservation and sustainable use of marine resources. Would you agree with Nicolas in terms of how challenges and opportunities for ocean financing are changing? And could you tell us more about how RARE is working with developing countries to harness some of the new opportunities and tackle specific challenges?

**From:** Kate Schweigart <kschweigart@rare.org>
**Sent:** 15 January, 2020 8:56 PM
**To:** VILLENA Maria, DCD/FSD <Maria.VILLENA@oecd.org>
**Cc:** Molly Bradtke <mbradtke@rare.org>
**Subject:** Re: OECD PF4SD Conference

Dear Maria,

Thank you for your patience, please see attached.  I look forward to seeing you at the conference.

Best regards
Kate

**From:** "Maria.VILLENA@oecd.org" <Maria.VILLENA@oecd.org>
**Date:** Tuesday, January 14, 2020 at 9:32 PM
**To:** Kate Schweigart <kschweigart@rare.org>
**Cc:** Molly Bradtke <mbradtke@rare.org>, Lisa Pharoah <lpharoah@rare.org>, Piera Tortora <Piera.TORTORA@oecd.org>, "Alberto.AGNELLI@oecd.org" <Alberto.AGNELLI@oecd.org>, "Valentina.BELLESI@oecd.org" <Valentina.BELLESI@oecd.org>
**Subject:** RE: OECD PF4SD Conference

Dear Kate

I'm kindly following up on my email below regarding the short bio and photo that we can use in our application to advertise the ocean sessions during the conference.
We will appreciate if you could share them at your earliest convenience.

**RARE_000222**

We are looking forward to hearing from you.

Thank you.

Best regards,

María Verónica

**From:** VILLENA Maria, DCD/FSD
**Sent:** 07 January, 2020 6:37 PM
**To:** Kate Schweigart <kschweigart@rare.org>
**Cc:** 'Molly Bradtke' <mbradtke@rare.org>; Lisa Pharoah <lpharoah@rare.org>; TORTORA Piera,
DCD/FSD <Piera.TORTORA@oecd.org>; AGNELLI Alberto, DCD/FSD <Alberto.AGNELLI@oecd.org>;
BELLESI Valentina, DCD/FSD <Valentina.BELLESI@oecd.org>
**Subject:** RE: OECD PF4SD Conference

Dear Kate,

I hope this email finds you well and you had the chance to spend nice holidays.

I wanted to share with you that as part of the preparations for the Forum, we're developing an
application to advertise all sessions and speakers throughout the three days.  We would very much
appreciate if you could send us a short bio and a photo that we can use for this purpose.

More details on the session will be sent shortly. Please do not hesitate to contact us if you need
anything.

Looking forward to your answer,

Best

Verónica

**From:** Kate Schweigart <kschweigart@rare.org>
**Sent:** 12 December, 2019 10:13 PM
**To:** VILLENA Maria, DCD/FSD <Maria.VILLENA@oecd.org>; Molly Bradtke <mbradtke@rare.org>
**Cc:** FONTOLAN Piero, DCD/FSD <Piero.FONTOLAN@oecd.org>; AGNELLI Alberto, DCD/FSD
<Alberto.AGNELLI@oecd.org>; BELLESI Valentina, DCD/FSD <Valentina.BELLESI@oecd.org>; Lisa
Pharoah <lpharoah@rare.org>; TORTORA Piera, DCD/FSD <Piera.TORTORA@oecd.org>
**Subject:** Re: OECD PF4SD Conference

Dear Maria,

RARE_000223

It is nice to e-meet you too.  I look forward to joining the workshop.  Thank you for providing the concept note and for sharing the prepared questions as we get closer to the event.

Kind regards,
Kate

**From:** "Maria.VILLENA@oecd.org" <Maria.VILLENA@oecd.org>
**Date:** Thursday, December 12, 2019 at 4:37 AM
**To:** Molly Bradtke <mbradtke@rare.org>, Kate Schweigart <kschweigart@rare.org>
**Cc:** "Piero.FONTOLAN@oecd.org" <Piero.FONTOLAN@oecd.org>,
"Alberto.AGNELLI@oecd.org" <Alberto.AGNELLI@oecd.org>,
"Valentina.BELLESI@oecd.org" <Valentina.BELLESI@oecd.org>, Lisa Pharoah
<lpharoah@rare.org>, Piera Tortora <Piera.TORTORA@oecd.org>
**Subject:** RE: OECD PF4SD Conference

Thank you very much for your prompt response, Molly.

Dear Kate, it is very nice to e-meet you. Thank you for accepting to be part of our workshop. As mentioned, RARE's experience on blended finance for the ocean is of great value for our discussion. In case you have not received it, I'm sharing with you the concept note of the event, where you will find background information that you might find useful.  Closer to the event, we will be sharing the questions we prepared to guide the discussion.

I just want to flag that this workshop will be on 30 January between 09:30 -11 :00 , in the OECD office in Boulogne, Paris.

Let us know if you need further information,

Best regards,

María Verónica

**From:** Molly Bradtke <mbradtke@rare.org>
**Sent:** 11 December, 2019 6:43 PM
**To:** VILLENA Maria, DCD/FSD <Maria.VILLENA@oecd.org>; Kate Schweigart <kschweigart@rare.org>
**Cc:** FONTOLAN Piero, DCD/FSD <Piero.FONTOLAN@oecd.org>; AGNELLI Alberto, DCD/FSD
<Alberto.AGNELLI@oecd.org>; BELLESI Valentina, DCD/FSD <Valentina.BELLESI@oecd.org>; Lisa
Pharoah <lpharoah@rare.org>; TORTORA Piera, DCD/FSD <Piera.TORTORA@oecd.org>
**Subject:** Re: OECD PF4SD Conference

Dear María,

Thank you for reaching out, and for inviting Rare to participate in in the panel on January 30.

Valeria is on personal leave from Rare and will therefore be unable to share our work during the panel. However, Kate Schweigart, who is now responsible for the Blended Finance work portfolio, will be in Paris that week and would be more than happy to speak on our work in Costa Rica, Philippines, and Indonesia.

Kate has led our Costa Rica initiative since it's inception and is responsible for crafting the design of the Marine and Fisheries Financing Initiative in Indonesia that was formally agreed to by the Indonesian government in October. She is therefore best placed to speak on these initiatives  and provide lessons learned.

I've added Kate to this email so you can connect with her directly.

Best,
Molly

**Molly Bradtke | Senior Associate, Blended Finance**

1310 N. Courthouse Road Ste 110, Arlington, Virginia 22201

+1 (301) 875 - 6414

rare.org | twitter | facebook | newsletter

Rare inspires change so people and nature thrive

**Rare receives four stars, Charity Navigator's highest rating**

---

**From:** Maria.VILLENA@oecd.org <Maria.VILLENA@oecd.org>
**Sent:** Wednesday, December 11, 2019 12:02 PM
**To:** Valeria Ramundo Orlando <vramundo@rare.org>
**Cc:** Piero.FONTOLAN@oecd.org <Piero.FONTOLAN@oecd.org>; Alberto.AGNELLI@oecd.org <Alberto.AGNELLI@oecd.org>; Valentina.BELLESI@oecd.org <Valentina.BELLESI@oecd.org>; Lisa Pharoah <lpharoah@rare.org>; Piera.TORTORA@oecd.org <Piera.TORTORA@oecd.org>; Molly Bradtke <mbradtke@rare.org>
**Subject:** RE: OECD PF4SD Conference

RARE_000225

Dear Valeria,

My name is María Verónica Villena and I am supporting Piera in the organization of the side event "Aligning private finance to the sustainable use and conservation of the ocean", taking place on 30 January 2020 (09:00-10:30), in the context of the OECD 2020 Private Finance for Sustainable Development Conference.

We are finalizing the speakers' line-up for the event. I would like to know if you will be able to participate in the panel to share RARE's work on blended finance for the ocean in Costa Rica, Philippines and Indonesia. Your participation would be really valuable to inform our discussion and provide insights on what is happening on the ground concerning innovative finance for the ocean.

I am sharing with you the concept note of the event for additional information.

Looking forward to your answer,

Best regards,



**Maria Verónica Villena**
Sustainable Oceans for All
Harnessing the benefits of the sustainable
ocean economy for developing countries
Development Co-operation Directorate

2, rue André Pascal - 75775 Paris Cedex 16
maria.villena@oecd.org || www.oecd.org

**From:** Molly Bradtke <mbradtke@rare.org>
**Sent:** 20 November, 2019 5:38 PM
**To:** TORTORA Piera, DCD/FSD <Piera.TORTORA@oecd.org>
**Cc:** FONTOLAN Piero, DCD/FSD <Piero.FONTOLAN@oecd.org>; VILLENA Maria, DCD/FSD <Maria.VILLENA@oecd.org>; AGNELLI Alberto, DCD/FSD <Alberto.AGNELLI@oecd.org>; BELLESI Valentina, DCD/FSD <Valentina.BELLESI@oecd.org>; Lisa Pharoah <lpharoah@rare.org>; Valeria Ramundo Orlando <vramundo@rare.org>
**Subject:** Re: OECD PF4SD Conference

Dear Piera and team,

Thank you for speaking with us last week and for sending along some further details, and

apologies for the delay in my response and for the lengthy email that is about to follow.

First, are you able to meet briefly with Valeria this week on Friday, following your session at 3pm? She's planning to attend the session and would be able to catch up with you afterwards, if that works for you.

As promised, I'm sending along here some suggestions of people who would make good contributions to the side-event and are active in this space.
- Dana Barsky, Standard Chartered (SC, along with the World Bank, has just launched an impact bond for sustainable use of oceans)
- Ocean Risk and Resilience Action Alliance (ORRAA):
  - Chip Cunliffe,  AXA XL
  - Karen Sack, OceanUnite
- Gregory Watson, Inter-American Development Bank
- Serge Mayaka, Akipeo
- Andrew Deutz, TNC
- Jenn Pryce, Calvert Impact Capital
- Diana Guzman, WEF
- Karin Lindblad, Sida
- Bruce Dunn, ADB
- Naoko Ishii, GEF

Some of the above are likely already on your radar, but I'm happy to help connect you with anyone, or provide email addresses. I can certainly send along further thoughts about attendees, but these are the names that came to mind immediately. I'll likely send around a few other thoughts in the next two weeks as they come to me or hear suggestions from others on the team.

As you know, we are working with the Indonesia Ministry of National Development Planning on a blended finance vehicle to finance SDG 14, specifically aimed at coastal communities. Valeria would be happy to speak on this during the event. We are still in the stages of completing the design and management structure with partners, but she can certainly discuss the concept and the lessons learned to this point. Is the side-event meant to be a roundtable set up, or a panel?

Finally, do you have any updates on the Regional Dialogue that will be held in Indonesia? Valeria and Kate, our Director for Blended Finance, will both be in Jakarta starting December 3, so it would be great if that timing lined up and they could attend. Our partners in Indonesia would likely also be interested in hearing more about this event.

Best,

RARE_000227

Molly

**Molly Bradtke | Senior Associate, Blended Finance**



1310 N. Courthouse Road Ste 110, Arlington, Virginia 22201

+1 (301) 875 - 6414

rare.org | twitter | facebook | newsletter

Rare inspires change so people and nature thrive

**Rare receives four stars, Charity Navigator's highest rating**

---

**From:** Lisa Pharoah <lpharoah@rare.org>
**Sent:** Thursday, November 14, 2019 2:51 PM
**To:** Piera.TORTORA@oecd.org <Piera.TORTORA@oecd.org>; Molly Bradtke <mbradtke@rare.org>
**Cc:** Piero.FONTOLAN@oecd.org <Piero.FONTOLAN@oecd.org>; Maria.VILLENA@oecd.org <Maria.VILLENA@oecd.org>; Alberto.AGNELLI@oecd.org <Alberto.AGNELLI@oecd.org>; Valentina.BELLESI@oecd.org <Valentina.BELLESI@oecd.org>
**Subject:** Re: OECD PF4SD Conference

Dear Piera,

Thank you for all of the information you have provided and for taking time to talk with us yesterday.

Molly will follow up with some additional suggestions etc. shortly.

Best,
Lisa.

**Lisa Pharoah | Director, Global Development**
1310 N. Courthouse RoadSte 110, Arlington, Virginia 22201
T: +1 703-522-5070 x213
rare.org | twitter | facebook | newsletter
Rare inspires change so people and nature thrive
**Rare receives four stars, Charity Navigator's highest rating**

---

**From:** "Piera.TORTORA@oecd.org" <Piera.TORTORA@oecd.org>
**Date:** Wednesday, November 13, 2019 at 10:29 AM
**To:** Molly Bradtke <mbradtke@rare.org>, Lisa Pharoah <lpharoah@rare.org>

**Cc:** "Piero.FONTOLAN@oecd.org" <Piero.FONTOLAN@oecd.org>, "Maria.VILLENA@oecd.org" <Maria.VILLENA@oecd.org>, "Alberto.AGNELLI@oecd.org" <Alberto.AGNELLI@oecd.org>, "Valentina.BELLESI@oecd.org" <Valentina.BELLESI@oecd.org>
**Subject:** OECD PF4SD Conference

Dear Lisa and Molly,

Thank you for taking the time to catch up just now.

As mentioned, the 2020 edition of the Private Finance for Sustainable Development Conference will focus on *Aligning finance with the Sustainable Development Goals*. The aim of this high-level Conference is to discuss new approaches in directing development and commercial finance towards socially and environmentally sustainable projects, as well as ensuring business operations contribute to the Goals, through their employment, sourcing and other relevant policies. It will take place on 28-30 January 2020 at the OECD Boulogne Offices, Paris.

Two sessions will be dedicated to finance for ocean (i.e. SDG14):

- A high-level breakout session during the main Conference day, on 29th January;
- A workshop/side event – on 30th January.

We plan on using the side event to present some of our new analytical work on finance for the ocean (which will be part of our new report on the sustainable ocean economy, to be launched in Lisbon in June 2020) and to hear more about some of the initiatives that other organisations are putting in place to mobilise private finance for the ocean (e.g. WB, TNC, Althelia Fund, etc).

As mentioned, it would be wonderful if you could attend and we'll be happy to scope a possible role in the side event to learn more about your work in Costa Rica, the Philippines, Indonesia.

Please find attached a *draft* Conference Agenda, side events list and concept note for the Conference.

Please feel free to put us in touch with colleagues you think may be interested in participating.

I will keep you posted on the Regional Dialogue on the Sustainable Ocean Economy that is tentatively scheduled for 2-3 December in Indonesia.

All the best,

Piera

RARE_000229

Message

| | |
|---|---|
| **From:** | Dale Galvin [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B43863EF772B44CCB1CEC1F2F1D60F0C-DALE GALVIN] |
| **Sent:** | 10/3/2019 7:54:05 PM |
| **To:** | Caryn Perrelli [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=3680a81a580140a097e362de846644c7-Caryn Perre] |
| **CC:** | Brett Jenks [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=69d7fad6b65744eeb84c89e4aa9f68ac-Brett Jenks] |
| **Subject:** | FW: Laura leaving and VRO toxic culture concerns |

Here's an example of an email I got a few weeks ago when in the midst of my Meloy Fund damage control travels. I don't want to reveal the source (and to Caryn's point, maybe I should have come to her earlier), but I did react to it and spent about 20 hours working to listen to different team members and trying to at least diffuse the immediate tension. I have deleted small amounts of the content to anonymize but have not altered anything.
Dale

-------------
Hi Dale,

Learning that Laura will be leaving the team was tough news to receive today. Although Laura may have her own personal or professional reasons for leaving Rare, I can't help but wonder how what I view to be a toxic work environment on the blended finance team, may have contributed to her decision and may be a symptom of a larger problem.

I have worked with Valeria [extensively] and have had my fair share of difficult situations with her. As the team grew, I felt a great sense of relief when my work became more distanced from Valeria because I felt less stressed, was able to focus on my work, and didn't feel anxious when she was around because I knew we likely wouldn't be interacting.

Thus, I was no longer directly impacted by the toxic environment that I felt she created. Since then, I have been on the periphery of the blended finance team and I have still seen countless violations of workplace ethics. Some of these instances I have shared with you and some I have not.

During some of the situations that I felt were seriously concerning, I shared my stories with you and had confidence that you spoke to Valeria. Her behavior typically improved temporarily. However, her inappropriate behavior always occurred again as if nothing had truly changed.

This toxic work environment that I was personally affected by or witnessed includes:
• Berating colleagues
• Making excuses/complaining about doing work, and then not doing it or making one of her direct reports complete it
• Using inappropriate and disrespectful language about or to colleagues (often in front of other colleagues, however sometimes these colleagues weren't present)
• Requesting personal or professional information not related to her work/none of her business
• Gossiping about colleagues
• Refusing to review the budget, respect the budget, and complaining [about policy]
• Lying about conversations, meetings, work progress, and the status of projects
• Inappropriate language, interview practices, and hiring decisions based on ethnicity and gender as well as also sexual harassment with some of her direct reports

In some instances, I was so alarmed by her behavior that I almost went directly to Talent, but decided to bring it to you instead. I wanted to make sure to bring this up to you again because I am still deeply concerned and am considering going to Talent with my concerns.

**EXHIBIT**
**PERRELLI - 11**
**BP-122221**

RARE_001070

As a member of the Markets team, I want to express my concern for Valeria's recurring toxic behavior because I'm worried that the team won't be able to effectively deliver on our work because the team is falling apart, has low morale, and the current culture and blended finance leadership doesn't align with Rare's values.

RARE_001071

# DEPOSITION TRANSCRIPT OF DALE GALVIN

```
1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF VIRGINIA

3                    (Alexandria Division)

4      --------------------------x

5      VALERIA M. RAMUNDO            :

6      ORLANDO,                      :

7                   Plaintiff,  : Case No.:

8        v.                       : 1:20cv01323 (TSE/JFA)

9      RARE,                         :

10                  Defendant.  :

11     --------------------------x

12

13             CONTAINS CONFIDENTIAL PORTIONS

14             Deposition of DALE GALVIN

15                Conducted Virtually

16              Wednesday, January 5, 2022

17                   10:02 a.m. EST

18

19

20     Job No:  423009

21     Pages:  1 - 135

22     Reported by:  Kelly Carnegie, CSR, RPR
```

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Dale Galvin
Conducted on January 5, 2022                    74

1   funds or that you won't work for anyone other than

2   Rare?

3          A    No.

4          Q    Did you have a non-compete when you left

5   Rare?

6          A    No.

7          Q    Were you under any agreement not to

8   share Rare's confidential information at the time

9   you left Rare?

10         A    I don't recall.

11         Q    When did you join Rare?

12         A    2004.

13         Q    You were hired by Mr. Jenks?

14         A    Yes.

15         Q    Can you walk me briefly through your

16   titles and positions at Rare and the time periods

17   when you held those positions.

18         A    I joined as the vice president of

19   finance and operations.  I became COO, chief

20   operating officer, two years later.  I don't know

21   the exact date.  And then I became managing

22   director of sustainable markets.  I don't remember

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Dale Galvin
Conducted on January 5, 2022                           75

```
 1    the exact date, but roughly 2017.
 2         Q   And did you stay in that position until
 3    you left?
 4         A   Yes.
 5         Q   How many direct reports did you have in
 6    2019?
 7         A   I don't recall.
 8         Q   More than five?
 9         A   Probably somewhere between five and ten.
10         Q   How many of those managing directors
11    were male?  I'm sorry.  How many of those direct
12    reports were male?
13         A   I recall one maybe.
14         Q   Only one of your direct reports in 2019
15    was a man?
16         A   I don't remember exactly who they were,
17    but that's the only one -- I can only think of
18    one.
19         Q   You can only think of one what?
20         A   Male direct report.
21         Q   And who would that be?
22         A   Manuel Bueno.
```

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Dale Galvin
Conducted on January 5, 2022                    87

1    with Jeff Lorek as part of the Orrick

2    investigation?

3         A    I hate to -- I hate to guess.

4         Q    And just to be clear, did you have any

5    discussions with anybody from Orrick regarding the

6    investigation?  Did you have a meeting with

7    anybody else from Orrick?

8         A    I may have, but I don't recall exactly.

9         Q    What is your understanding of what led

10   to the Orrick investigation?

11        A    Some complaints by your client.

12        Q    And at that time, did you provide to Ms.

13   Perrelli e-mails -- an e-mail that you claim you

14   received from an employee at Rare?

15        A    Yes.

16        Q    And was the employee Jenny Miller?

17        A    Yes.

18        Q    Why didn't you tell Ms. Perrelli at the

19   time that the employee was Jenny Miller?

20        A    I'm sorry.  Can you repeat that?

21        Q    Did you provide an e-mail to Ms.

22   Perrelli that you contend was from an employee at

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Dale Galvin
Conducted on January 5, 2022                    88

1    Rare, but refused or declined to identify the

2    employee at that time?

3         A    I don't recall.

4         Q    All right.

5              MS. BROWN:   Planet Depos, could I get

6    you to bring up 107071 and we'll mark it as

7    Exhibit 1.   If we could enlarge it a little bit so

8    the top shows.

9    BY MS. BROWN:

10        Q    All right.   Mr. Galvin, this is an

11   e-mail dated October 3, 2019 to Caryn Perrelli,

12   copy Brett Jenks, with the subject "FW: Laura

13   leaving and VRO toxic culture concerns".   Do you

14   see that?

15        A    Yeah.

16        Q    Do you recognize this as the e-mail that

17   you forwarded to Ms. Perrelli regarding an

18   employee -- I guess an employee's e-mail that you

19   contend you received?

20        A    Yes.

21        Q    All right.   Do you see --

22        A    Just to be clear, I didn't -- I'm not

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Dale Galvin
Conducted on January 5, 2022                    89

1    contending I did receive it.

2         Q   All right.  At the last sentence at the

3    top of your e-mail, you said, "I deleted small

4    amounts of the content to anonymize, but have not

5    altered anything."  Do you see that?

6         A   Yes.

7         Q   All right.  Now, was it your intent to

8    delete obviously the to line so that Ms. Perrelli

9    would not know who the sender was?

10        A   That's what it looks like, yes.

11        Q   You noted that this was something you

12   had received a few weeks ago?

13        A   Yes.

14        Q   Why did you decide to forward this

15   e-mail to Ms. Perrelli at this time?

16        A   I think because it was a need to collect

17   relevant data to respond to the issues that were

18   going on.

19        Q   And is it your testimony that you didn't

20   change any words or anything else, you deleted

21   items in the e-mail?

22        A   That's what that says, yes.

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Dale Galvin
Conducted on January 5, 2022                94

1           Q    Why did you forward Ms. Miller's e-mail

2    at the bottom of Exhibit 1 to Ms. Perrelli at the

3    time you received it?

4           A    Sorry.  Can you repeat that?

5           Q    Why didn't you -- why didn't you forward

6    the e-mail that you had received from Ms. Miller,

7    the one that's at the bottom of Exhibit 1, at the

8    time that you received it?

9           A    Well, I think, as you saw by my response

10   to Ms. Miller, I was planning on dealing with it

11   when I returned from travels and was hoping to be

12   able to work through it given that I had been

13   working on just trying to help improve the same

14   complaints about Valeria for many months.

15          Q    When you say you had complaints about

16   Ms. Ramundo Orlando for many months, who were

17   those complaints allegedly from?

18          A    Well, again, they're not alleged.  There

19   are probably at least nine people who have

20   complained to me about Valeria throughout her time

21   there.

22          Q    All right.  And who were those

Message

| | |
|---|---|
| **From:** | Dale Galvin [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B43863EF772B44CCB1CEC1F2F1D60F0C-DALE GALVIN] |
| **Sent:** | 10/3/2019 7:54:05 PM |
| **To:** | Caryn Perrelli [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=3680a81a580140a097e362de846644c7-Caryn Perre] |
| **CC:** | Brett Jenks [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=69d7fad6b65744eeb84c89e4aa9f68ac-Brett Jenks] |
| **Subject:** | FW: Laura leaving and VRO toxic culture concerns |

Here's an example of an email I got a few weeks ago when in the midst of my Meloy Fund damage control travels. I don't want to reveal the source (and to Caryn's point, maybe I should have come to her earlier), but I did react to it and spent about 20 hours working to listen to different team members and trying to at least diffuse the immediate tension. I have deleted small amounts of the content to anonymize but have not altered anything.
Dale

------------
Hi Dale,

Learning that Laura will be leaving the team was tough news to receive today. Although Laura may have her own personal or professional reasons for leaving Rare, I can't help but wonder how what I view to be a toxic work environment on the blended finance team, may have contributed to her decision and may be a symptom of a larger problem.

I have worked with Valeria [extensively] and have had my fair share of difficult situations with her. As the team grew, I felt a great sense of relief when my work became more distanced from Valeria because I felt less stressed, was able to focus on my work, and didn't feel anxious when she was around because I knew we likely wouldn't be interacting.

Thus, I was no longer directly impacted by the toxic environment that I felt she created. Since then, I have been on the periphery of the blended finance team and I have still seen countless violations of workplace ethics. Some of these instances I have shared with you and some I have not.

During some of the situations that I felt were seriously concerning, I shared my stories with you and had confidence that you spoke to Valeria. Her behavior typically improved temporarily. However, her inappropriate behavior always occurred again as if nothing had truly changed.

This toxic work environment that I was personally affected by or witnessed includes:
- Berating colleagues
- Making excuses/complaining about doing work, and then not doing it or making one of her direct reports complete it
- Using inappropriate and disrespectful language about or to colleagues (often in front of other colleagues, however sometimes these colleagues weren't present)
- Requesting personal or professional information not related to her work/none of her business
- Gossiping about colleagues
- Refusing to review the budget, respect the budget, and complaining [about policy]
- Lying about conversations, meetings, work progress, and the status of projects
- Inappropriate language, interview practices, and hiring decisions based on ethnicity and gender as well as also sexual harassment with some of her direct reports

In some instances, I was so alarmed by her behavior that I almost went directly to Talent, but decided to bring it to you instead. I wanted to make sure to bring this up to you again because I am still deeply concerned and am considering going to Talent with my concerns.

Exhibit #

Galvin 1
1/5/22-JF

RARE_001070

As a member of the Markets team, I want to express my concern for Valeria's recurring toxic behavior because I'm worried that the team won't be able to effectively deliver on our work because the team is falling apart, has low morale, and the current culture and blended finance leadership doesn't align with Rare's values.

RARE_001071

# DEPOSITION TRANSCRIPT OF JENNY MILLER

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF VIRGINIA

 3                 Alexandria Division

 4     - - - - - - - - - - - x

 5   VALERIA M. RAMUNDO          :

 6   ORLANDO,                    :

 7         Plaintiff,            :    CA 1:20cv01323 (TSE/JFA)

 8      v.                       :

 9   RARE,                       :

10         Defendant.            :

11     - - - - - - - - - - - x

12

13              Deposition of JENNY MILLER

14                Conducted Virtually

15             Thursday, January 6, 2022

16                 10:00 a.m. EST

17

18

19

20   Job No.: 419844

21   Pages: 1 - 43

22   Reported By: Carol M. Tayloe, RMR, CMRS, CCR
```

Transcript of Jenny Miller
Conducted on January 6, 2022                    17

```
 1   a, I would say, good, friendly relationship.
 2   However, as time progressed and we continued to
 3   work together I would say our relationship
 4   diminished.
 5       Q  When you say the relationship diminished,
 6   what do you mean?
 7       A  It became more difficult to work together.
 8       Q  At that point you and Ms. -- at what point
 9   are you referring to when you say the relationship
10   diminished?  When did that start?
11       A  I would say it started towards the second
12   half of 2018.
13       Q  Did you ever have an opportunity to
14   observe interactions between Ms. Ramundo Orlando
15   and Mr. Galvin?
16       A  Yes.
17       Q  And how would you describe their
18   interactions?
19       A  I mean that's difficult for me to answer.
20   It varied.  It depends on the day, the time, the
21   conversation.  But generally speaking I'd say they
22   had a decent working relationship.  Some days it
```

Transcript of Jenny Miller
Conducted on January 6, 2022                              18

```
1    was positive, other days it was challenging
2    because the nature of conversations tended to
3    focus on continually requesting Valeria to get
4    work done that had been requested of her that had
5    not been delivered yet.
6         Q   And where would the requests from Mr.
7    Galvin to Ms. Ramundo Orlando to get work done
8    that allegedly had not been done, where did you
9    hear those?
10        A   Verbally, also in e-mails.  I guess if
11   you're speaking about where I was physically, it
12   was usually I was at my desk reading the e-mails
13   that were being sent amongst the group, or it was
14   right beside me.  Dale sat directly next to me and
15   Valeria sat behind me diagonally.  So we were all
16   very close.  So those were in person.
17        Q   And was Mr. Galvin making requests to Ms.
18   Ramundo Orlando on team e-mails that you were part
19   of?
20        A   Yes.
21        Q   Do you know how many other people were on
22   the team e-mails or do you recall how many people
```

Transcript of Jenny Miller
Conducted on January 6, 2022                                    23

1          MS. BROWN:  Can we go off for just five
2     minutes?  I want to check -- make sure the
3     exhibits are there.
4          THE TECHNICIAN:  Sure.
5          (There was a discussion off the record.)
6          MS. BROWN:  If we could bring up Rare 146
7     and mark that as Exhibit 1.
8          THE TECHNICIAN:  Stand by.
9          I'm sorry.  Just stand by.
10         All right.  That should be on screen.
11         (Miller Deposition Exhibit 1 was marked
12    and retained by the court reporter.)
13    Q  All right, Ms. Miller.  We're looking at
14    what's been marked as Exhibit 1.  This is an
15    e-mail from you to Dale Galvin dated
16    September 11th, 2019, subject, Laura's leaving VRO
17    toxic culture concerns.  Do you see that?
18    A  Yes.
19    Q  And is that the e-mail that you were
20    referring to that you believe had been forwarded?
21    A  Yes.
22    Q  And at the time that you wrote this e-mail

1    a long time ago.

2        Q   And did you and Mr. Galvin sit down and

3    discuss matters as mentioned at the top of the

4    e-mail?

5        A   Yes.

6        Q   And what, if anything, did Mr. Galvin do

7    in response to your concerns, if you know?

8        A   I don't know for sure, although my

9    understanding was that he was going to meet with

10   Valeria to talk about some of the issues.

11       Q   All right.  Did you understand that Mr.

12   Galvin was going to speak to Ms. Ramundo Orlando

13   to speak to her about her view on the issues that

14   you were raising?

15       A   Dale did say that he wanted to hear her

16   perspective as well, yes.

17       Q   All right.

18           MS. BROWN:  And if we could bring up Rare

19   169 and mark that as Exhibit 3.

20           THE TECHNICIAN:  Stand by.

21           That's on screen.

22           (Miller Deposition Exhibit 3 was marked

Transcript of Jenny Miller
Conducted on January 6, 2022                              30

```
 1    and retained by the court reporter.)

 2        Q   All right, Ms. Miller.

 3            MS. BROWN:  If we could enlarge this a

 4    little bit.

 5        Q   You're welcome to flip through this.  But

 6    this looks like notes that you prepared at some

 7    point regarding Ms. Ramundo Orlando.  Does that --

 8    do you recognize this document?  You can take a

 9    look.  I'm not trying to play games.

10        A   Yes, I recognize it.

11        Q   All right.  And why did you write these

12    notes?

13        A   I wrote these notes for many reasons.

14    One, I was in the habit of taking notes, it was a

15    big part of my job in terms of taking notes at

16    meetings, tracking follow-ups, this and that, so

17    it was a normal practice for me.  And I wrote

18    these notes because this whole interaction that

19    happened on May 16th, 2019, was very alarming to

20    me.  And I was one of the four people present and

21    I felt that I was on my own in terms of my

22    viewpoint.  And because it was so concerning to me
```

Transcript of Jenny Miller
Conducted on January 6, 2022                    40

```
 1        Q  Ms. Miller, I just have a couple questions
 2   for you.
 3           Exhibit 1, that September 11th e-mail that
 4   you sent to Mr. Galvin, did that accurately
 5   describe the incidents that you observed?
 6        A  Yes.
 7        Q  Also Exhibit 3, those were your notes from
 8   the May 2019 time period.  Did those notes
 9   accurately describe the incidents that you
10   observed?
11        A  Yes.
12           MR. BARNSBACK:  I have no further
13   questions.
14           MS. BROWN:  Mr. McDermott, do you want to
15   give your witness the read and sign or indicate
16   whether you guys want to read and sign to the
17   court reporter?
18           MR. McDERMOTT:  Yeah.  We will.
19           MS. BROWN:  All right.  And if you make
20   substantive changes to your transcript, then I
21   reserve the right to bring you back and ask about
22   the changes.
```

**From:** Jenny Miller <jmiller@rare.org>
**Sent:** Wednesday, September 11, 2019 5:04 PM
**To:** Dale Galvin <dgalvin@rare.org>
**Subject:** Laura leaving and VRO toxic culture concerns

Hi Dale,

I hope your meeting with FMO went well, and that your travels have been manageable.

Learning that Laura will be leaving the team was tough news to receive today. Although Laura may have her own personal or professional reasons for leaving Rare, I can't help but wonder how what I view to be a toxic work environment on the blended finance team, may have contributed to her decision and may be a symptom of a larger problem.

As you know, I have worked directly with Valeria since she started and have had my fair share of difficult situations with her. As the team grew to include Molly, Kate, and Laura, I felt a great sense of relief when my work became more distanced from Valeria because I felt less stressed, was able to focus on my work, and didn't feel anxious when she was around because I knew we likely wouldn't be interacting.

Thus, I was no longer directly impacted by the toxic environment that I felt she created. Since then, I have been on the periphery of the blended finance team and I have still seen countless violations of workplace ethics. Some of these instances I have shared with you and some I have not.

During some of the situations that I felt were seriously concerning, I shared my stories with you and had confidence that you spoke to Valeria. Her behavior typically improved temporarily. However, her inappropriate behavior always occurred again as if nothing had truly changed.

This toxic work environment that I was personally affected by or witnessed includes:
- Berating colleagues
- Making excuses/complaining about doing work, and then not doing it or making one of her direct reports complete it
- Using inappropriate and disrespectful language about or to colleagues (often in front of other colleagues, however sometimes these colleagues weren't present)
- Requesting personal or professional information not related to her work/none of her business
- Gossiping about colleagues
- Refusing to review the budget, respect the budget, and complaining when I refute charges Rare doesn't typically cover
- Lying about conversations, meetings, work progress, and the status of projects
- Inappropriate language, interview practices, and hiring decisions based on ethnicity and gender as well as also sexual harassment with some of her direct reports
  - *You and I never ended up discussing this last story in-person, however I can share it in more detail when you're back from Europe

In some instances, I was so alarmed by her behavior that I almost went directly to Talent, but decided to bring it to you instead. I wanted to make sure to bring this up to you again because I am still deeply concerned and am considering going to Talent with my concerns.

2



**RARE_000146**

As a member of the Markets team, I want to express my concern for Valeria's recurring toxic behavior because I'm worried that the team won't be able to effectively deliver on our work because the team is falling apart, has low morale, and the current culture and blended finance leadership doesn't align with Rare's values.

Please let me know your thoughts. I'm open to chatting about this in-person when you're back in the office.

Best,
Jenny



**Jenny Miller | Senior Associate, Sustainable Markets and Finance**
1310 N. Courthouse Road Ste 110, Arlington, Virginia 22201
T: +1 703-522-5070 x146
rare.org | twitter | facebook | newsletter
Rare inspires change so people and nature thrive
**Rare receives four stars, Charity Navigator's highest rating**

3

RARE_000147

**CONFIDENTIAL**

**JM's recount of Valeria/JM conversation from Thursday, May 16, 2019:**

- VRO, Molly, and Cecil-Francis came over to the Markets pod. The conversation started because VRO said "Glad you wore a shirt today!" so I turned around because I felt that was a weird thing for anyone to say and asked Valeria "what is that supposed to mean?" She responded that "Cecil-Francis was coming with the shirt to look more professional, Molly was coming with the short skirt and Kate was coming with the cleavage."

- I said "I don't know what that means but it sounds very inappropriate." Valeria explained that "they were interviewing a BF intern candidate who was male and from Saudi Arabia and she wanted to make sure he would be ok working with an all-female team." I told her that "sounded extremely judgmental and that she can't go into an interview with a candidate with so many pre-conceived notions on who they are because it makes for an unfair interview." Molly chimed in and said "Jenny, I think it's more so about making sure he's a right cultural fit for the organization." I responded, "there are many other ways to see whether they're a good cultural fit – primarily by asking questions during the interview and learning about them." I told Valeria "you can't tell people to dress a certain way for an interview." Molly and Cecil-Francis defended her a bit, but I don't remember exactly what they said.

- I don't remember Valeria's next exact words here, but she then went on to say how she has to wear a hijab if she goes to Saudi Arabia and how women are discriminated against there so she wants to make sure he's ok with an all-female team, especially since she's responsible for 11 people (not sure where she got that number). I responded that "what she has to do in Saudi Arabia is a separate conversation from what is happening here and that the laws are different. Here we are interviewing a candidate, and you are making assumptions about them based on their ethnicity, where they originally come from, and their gender which is not only unfair, it's illegal and she shouldn't be doing it or talking about it so openly in the office."

- Valeria asked me why I was so concerned and I responded, "I literally do not know how to explain this any differently because it seems so clear to me – you can't make decisions about someone you're hiring based on their ethnicity or gender, and it sounds like you're making several judgments before ever having met this person. If you do feel this way – and I don't totally disagree with you in terms of wanting to make sure that the team is respected (because I support having awesome female teams too) – but you can't be talking about it this way so openly in the office because you're a VP and representing the Markets team, and I think it's unprofessional and not a good look if other staff were to overhear. I don't want it coming back to bite you or the team in case someone thinks you're being unfair when interviewing and potentially doing something illegal and they say something to Talent about it."

- I also asked, "how long has the intern been the U.S. because I know he's a student," and Molly responded that he'd "been in the U.S. for 10 years". I used this as an example of why he may not align with traditional Saudi Arabia beliefs, and that even if he hadn't been in the U.S. and had been in Saudi Arabia, those stereotypes still may not apply to him.

- I also told her that "the stereotype of being a male from Saudi Arabia may be true in that they may not respect women as much and that having a strong female team would be awesome, however that just because those stereotypes exist, doesn't mean she's allowed to use them as if they're true and apply to this person."

- Valeria asked me "why I was so concerned and thought this was a big deal?" I re-emphasized that I felt she was making too many potentially illegal judgments about this person because she's never met him, and that I didn't think this reflected well as a VP at Rare and on the Markets team."



Exhibit #

Miller 03

01/05/22 - BS

RARE_000169

**CONFIDENTIAL**

- Valeria said "Jenny, I really want you to stop questioning me here" and I responded that "I will always question anything that makes me uncomfortable." I then encouraged her that if she did feel this way to "be careful about how you talk about this in the office."
- She then said, "Jenny, I want you to stop bringing up any illegal issues here and saying that I am doing anything illegal because it's really starting to bother me and I'm tired of it." This made me extremely uncomfortable and I didn't know how to respond.
- She ended the conversation with "because I am the VP, I can hire whoever I want for what ever reasons I want, even if it's based on gender."
- This is when I personally decided that she more or less self-implicated herself with that statement, and that I would finally write an email to Dale explaining the conversation and how I felt it was inappropriate, unprofessional, reflected poor leadership, and potentially illegal behavior (especially if others were to overhear and say something). I also shared with Dale that this is the fourth time I've had this type of conversation with Valeria – in terms of what judgments you can/can't apply when interviewing/considering candidates (previously, they were all related to her not wanting to hire men and me emphasizing that it's ok to hire men/she can't turn away a candidate just because they're male.
- Issues that stuck out to me here:
  - Profiling/judging candidates and making assumptions based on their gender and ethnicity
  - Asking direct reports to dress a certain way (especially Kate, who started two weeks prior)
  - Asking female staff to potentially put themselves in an uncomfortable situation (what was Valeria's plan if the person interviewing had made an inappropriate comment or done something inappropriate? I don't want this to be the focus, but it's a point to keep in mind, in my opinion.)
  - Valeria making her staff think that it's ok to profile a candidate before having interviewed them and also to dress a certain way as a "test" for them (Valeria was wearing a full professional suit) and that it would lead them to answers on the candidate's qualifications
- I then wrote the email below to Dale:

Email to Dale on 5/16/19:
Valeria and I just had an uncomfortable/difficult convo re: interviewing/hiring candidates who are male and from certain countries. I don't necessarily disagree with how she feels and what she is saying, but I encouraged her to be careful about how she speaks about these issues openly in the office because she's treading on thin ice in terms of what you can and can't do (as a leader and also legally) when hiring people (judging/making decisions based on gender, ethnicity, etc.) I can fill you in more when you get here if you want, but I think some things she's saying/doing are unprofessional (and not great for other people in the office to overhear). This extends to instructing her direct reports on what to wear as a way to "test" the candidate during the interview.

She asked me why I was concerned and I explained that I didn't think it was a great look and didn't set a good example as a VP and representative of the Markets team. I encouraged her to be careful about how she speaks about these issues regardless of how she feels. She wasn't too happy and said she can do whatever she wants *because* she is the VP even if it means hiring someone based on their gender and ethnicity.

RARE_000170

**CONFIDENTIAL**

I know we're both kind of used to this (and may not totally disagree with how she feels sometimes), but I felt the need to share it because it reflects poor leadership and other people are noticing.

This is also probably the fourth time I've had this conversation with her, and she will definitely know it was me that told you this which is why I haven't mentioned it yet.

- In my email to Dale, I wrote that Valeria said "..hiring someone based on their gender and ethnicity." However, I only remember Valeria saying "gender" specifically in this sentence (ethnicity was implied in the conversation together), but she didn't actually say that specifically.. just "gender".

RARE_000171

CONFIDENTIAL

RARE_000172

**CONFIDENTIAL**

August 5, 4:15pm – VRO talking about Niels – "Niels is a piece of shit." Me: "Valeria, you can't say that. Please be careful of what you say so openly in the office." (I looked around to show her there were others that could hear and pointed towards the FF team). She responded "I don't care if people hear, he's a piece of shit and I will be loud and annoying until people complain and Talent/Niels gives BF our own seating area." "I am going to be loud and obnoxious because it's not fair we can't sit together." "I am going to be the loudest and most obnoxious person in the office." I asked her if she had spoken to Niels about this. She said yes and that he was a "piece of shit because he and Caryn lied to her face about the seating arrangements." I told her I didn't know what to say because I wasn't a part of those conversations. She was also speaking negatively about Marybeth and was upset that Marybeth had emailed her back instead of Niels (although I don't remember her exact words here). Kate was also there and heard this whole conversation and participated in part of it (not supporting VRO, but in a concerned/caught in the middle of VRO talking type of situation). Kate gave me concerned eyes as the conversation simmered as if we were both thinking "geez, don't know what to say there, that was harsh."


August 28, ~11:30am – VRO told Molly she hated her twice before leaving to catch her flight to France. Dale and I were both sitting at our desks and heard her say this. Molly responded "I'm sorry you feel that way" (implying that she's just doing her job and VRO needs to deal with it). I glanced over at Dale who made a weird/discomforted/confused face – the situation made me feel uncomfortable because VRO often says "I hate you" to Molly, myself, and all members of her team when they're doing a good job or pushing her to do a certain task required of her and she doesn't want to, which doesn't exactly reinforce feeling positively about doing a good job in one's position (in my opinion). She's also said it about Dale openly where others can hear when he's not in the office (although I don't have a written account of this at the moment). We know she's kidding but she says it a lot which is why I decided to start recording when I hear her say it/am able to record it (sometimes I overhear her say it in passing or saying it loudly across the office).

RARE_000173

# DEPOSITION TRANSCRIPT OF PLAINTIFF

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF VIRGINIA

3              ALEXANDRIA DIVISION

4   ────────────────────────────

5   VALERIA M. RAMUNDO ORLANDO,

6           Plaintiff,

7       v.                              Civil Action No.

8   RARE,                              1:20-cv-01323

9                                      (TSE/JFA)

10          Defendant.

11  ────────────────────────────

12          VIDEOCONFERENCE DEPOSITION OF

13        VALERIA M. RAMUNDO ORLANDO

14  DATE:          Tuesday, December 21, 2021

15  TIME:          9:07 a.m.

16  LOCATION:      Remote Proceeding

17                 Alexandria, VA 22305

18  REPORTED BY:   Janel Folsom, Notary Public

19  JOB NO.:       4971798

20

21

22

Page 14

1    don't really recall.  And then I was asked to fly

2    myself -- I purchased a ticket to fly myself to Zurich

3    to meet Dale Galvin for the day.  He had just landed

4    when I met him, and I met him at his hotel.  And then

5    I flew back that same day.

6         Q    So before the meeting with Mr. Galvin, who

7    did you interview with on the Zoom calls with Rare?

8         A    I -- I had met with Mr. Galvin before on

9    Zoom.  I believe that I had a meeting with Gerald

10   Miles.  I believe that there was a call with Rocky

11   Sanchez Tirona.  Gerald Miles, I think he took his

12   call from Australia, and Rocky Sanchez Tirona took her

13   call from Manila.  And I believe I was also on a call

14   with a Jeffery Wilgnus [ph].  And I honestly do not

15   remember if there were other people, but I did talk to

16   Kami House [ph], who was working for talent at the

17   time.  And she was taking care of the recruitment.

18   She left prior to my joining.

19        Q    So your meeting with Mr. Galvin in Zurich,

20   how long did that last?

21        A    The whole day.

22        Q    And as best as you can, what did you discuss

Page 19

1      And I believe it was -- I don't remember.  I don't

2      even think it arrived to 160, but I don't really

3      remember.  It was quite offensive actually, especially

4      since I had specifically said to Mr. Galvin what my

5      minimum amount was.

6              As I recall, he called me from the boat

7      where he was with the board members to tell me that

8      they were going to find some sort of agreement, and

9      then he raised it to 165 with a 5,000 sign-in bonus

10     and a 5,000 -- promise of a 5,000 increase, but with a

11     total increase of 10,000 by the end of the year.  It

12     was done very fast.  I was supposed to give NATO two

13     months, and I ended up giving them only three weeks'

14     notice.  And I was just eager to join Rare, and I

15     should have been more cautious.

16         Q    That meeting in Zurich, what was your

17     impression of Mr. Galvin?

18         A    The two things that -- my first impression

19     was that he had just landed from a long flight.  He

20     was definitely eager to have a full working day to

21     interview me, but it was quite unusual.  But

22     definitely somebody who's not only eager to meet me in

Page 20

1    person, but also somebody who wanted to get things

2    done.  I told him, at the time, that the presentation

3    that Rare had shared with NEDA was not really

4    respectful of the sovereign, in terms of the language

5    that they used was questionable.  And for the risk

6    that I took, because I was still being interviewed, I

7    figured that I would be very frank and honest with

8    that opinion.  Just because, if he wasn't going to

9    listen to me then, there was really no point in

10   working together.  I still have, actually, the

11   presentation -- he sent it to me -- somewhere, and it

12   was actually quite disrespectful.  I worked for many

13   years while I was in --

14        Q    Are you saying Mr. Galvin was disrespectful

15   or the PowerPoint presentation?

16        A    The language in the PowerPoint presentation

17   that he created.

18        Q    My question to you was, what was your

19   impression of Mr. Galvin?

20        A    I think I answered that.

21        Q    Did you have any hesitation of accepting a

22   position knowing that you'd be working with

Page 21

1    Mr. Galvin?

2         A    So I -- yes, because I didn't think he used

3    appropriate language when dealing with countries and

4    sovereign nations.

5         Q    And what was the inappropriate language that

6    you were concerned about?

7         A    I remember commenting on it.  I do not

8    recall exactly what the appropriate language was.  I

9    am sure that Rare can find that specific PowerPoint,

10   since it was one of the first shared with NEDA.  And

11   Rare can see what the language was.

12        Q    Now when you were interviewing with

13   Mr. Galvin, did you have an understanding that you

14   would be working with him when you came to Rare?

15        A    I did, yes.

16        Q    And when you interviewed with him, did you

17   get the impression that he wanted to hire you?

18                  THE REPORTER:  I'm so sorry, Mike.  I

19   didn't catch the first half of your question.

20                  MR. BARNSBACK:  Oh.

21   BY MR. BARNSBACK:

22        Q    And when you interviewed with Mr. Galvin,

Page 22

1    did you get the impression that he wanted to hire you?

2         A    Well, he was spending the entire day with

3    me, and he had flown from D.C. to Zurich for multiple

4    reasons.  But he was definitely dedicating a rather

5    large piece of time of his workday, so yes.  I don't

6    think he would waste his time otherwise.

7         Q    So throughout the deposition, I'll be

8    putting a number of documents on the screen and asking

9    you about them, so there will be a number of exhibits

10   they're called.  So I'm going to do the first one

11   right now for us.  Can you see what's on the screen?

12        A    Yes.

13        Q    I'll scroll down.  It looks to be a March 5,

14   2018, letter to you.  It looks to be the offer of

15   employment.  Do you recall receiving this document?

16        A    I received a number of letters from

17   Ms. Quesada, so I cannot recall if I ever received

18   this document.

19        Q    I'll scroll down.  Do you see a signature

20   line; is that your signature?

21        A    I guess it was.

22        Q    And would that indicate that you signed this

Page 25

1      Q    And at the time that you began working, did

2   you have any staff working directly for you?

3      A    I did not.

4      Q    When you accepted the offer, did you

5   understand that you would be moving to Arlington,

6   Virginia?

7      A    I did.

8      Q    Now if you look at the letter, at the very

9   top, it has your name and it has an Arlington,

10  Virginia address.  What is that address?

11     A    A friend from school.

12     Q    Pardon me?

13     A    It's of a friend from school.

14     Q    And why did you use that address for the

15  receipt of the offer letter?

16     A    I actually did not.  I did not write the

17  letter.

18     Q    How did Rare become aware of the address of

19  a friend of yours from school?

20     A    Because they did not want my Netherlands

21  address, which was my address.

22     Q    Did there come a time that you moved to

Page 55

1           A    I probably did.  It's written in the

2      document that you are showing, but I do not recall,

3      no.

4           Q    You have no recollection of Exhibit 5?

5           A    I do not.  I was being asked by Mr. Galvin

6      to produce so many documents that, specifically, no, I

7      do not recall.

8           Q    Do you have any recollection of making any

9      complaints about the content of your mid-year review?

10          A    If I don't have any recollection of the

11     mid-year review, how would I recollect making comments

12     about it?

13          Q    So the answer is no, you have no

14     recollection of making any complaints about the

15     content of the mid-year review.

16          A    I do not recall the mid-year review.

17          Q    Now did there come a time in 2019 that you

18     were involved in hiring staff for the blended finance

19     team?

20          A    Yes.

21          Q    And who was the first person that was hired?

22          A    Molly Bradtke.

Page 56

1          Q     And when was Ms. Bradtke hired?

2          A     I believe we finalized her letter of offer

3    in January 2019, but I cannot be certain.

4          Q     And who was involved in the interview

5    process for Ms. Bradtke?

6          A     Ms. Bradtke's case is slightly particular.

7    She was hired as a temp to support the work that we

8    were doing.  In 2019, she joined Rare from a temp

9    agency.  I was actually not in Arlington at the time

10   that she was selected, and Ms. Jenny Miller supported

11   with the selection and worked with the talent, I

12   believe, in finding Ms. Molly.  I remember receiving

13   her resume and agreeing, and I was incredibly and

14   highly impressed of the work that she was doing right

15   off the bat the first few weeks.

16              And when Dale Galvin met me in the

17   Philippines and Molly was helping us and supporting

18   us, we were in a van -- I still remember this clearly

19   -- we were in a van with Dale Galvin and Paolo

20   Domondon and myself, and I was really impressed about

21   the fact that Molly was up at 5:00 a.m. in the morning

22   and supporting us on what we were trying to do before

Page 58

1   how she could fit within the team.  So that's the

2   answer.

3       Q    Were there any other individuals hired in

4   2019 to support the blended finance team?

5       A    Yes, a number of them, actually.  We had --

6   in 2019, we hired Kate Schweigart.  She came within

7   spring, I believe, of 2019.

8       Q    What position was she hired for?

9       A    Director of blended finance and the deputy

10  for my position.  And then we hired -- we offered, I

11  believe, a position to Laurencia Varrasa prior to

12  hiring Kate Schweigart, but Laurencia was waiting for

13  her work permit to come from the World Bank.  And so

14  we had to wait for that quite a long time, and she

15  only joined us for a few months.  And then we hired

16  Harry -- I can't recall his last name, and I'm

17  terrible with pronunciation -- in Indonesia at the end

18  of 2019 in the fall.

19      Q    Was Mr. Galvin involved in the interview

20  process for the hiring of Kate Schweigart?

21      A    Yes, he was.

22      Q    Did he approve of her hiring?

Page 67

1          Q     Now was it a fairly regular practice for you

2     and Ms. Schweigart to text throughout the day about

3     business issues?

4          A     I was traveling 85 percent of the time, so

5     it was probably the only way to reach each other.

6          Q     So in 2019, is it fair to say that about 80

7     percent of the time, you were outside of the Arlington

8     office, traveling on behalf of --

9          A     Yes, correct.

10         Q     Down to 81.  It has a reference of, "He is

11    crazy."  And just so I'm reading this correctly, so if

12    I understand, it appears to me that the messages from

13    Kate are in the white bubbles, and your responses are

14    in the blue bubbles; is that accurate?

15         A     I believe that is accurate, yes.

16         Q     So would you know who Kate is referring to

17    about, "He is crazy"?

18         A     Do we have -- do we have the text right

19    before?  Because it's a little bit out of context.

20         Q     There's the one right before.

21         A     I cannot fairly answer this question.  I --

22    it's a little bit out of context.  I know PT SMI, and

Page 71

1      Q     What involvement did Mr. Box have with the

2    work that was being performed by the blended finance

3    team?

4      A     The biggest program for Rare was managed by

5    Steve Box, so whatever we did.  He also was the

6    supervisor for Rocky Sanchez Tirona in the

7    Philippines, who we worked with for the Philippines

8    projects.  And he was also the supervisor for Taufiq

9    Alimi, who was the vice president for Indonesia, who

10   also we worked with on the Indonesia project.

11           And also, Mr. Jenks kept on wanting us to

12   work with Steve, and we did.  We worked closely with

13   his team, and we made sure that we were aligned as

14   much as possible.  Because the work that we did

15   ultimately had to benefit Rare and the program Fish

16   Forever, which was the largest funded program in Rare.

17   So we would work with him closely, and we would talk

18   to him regularly.

19     Q     But he was not your direct supervisor in the

20   chain of command.

21     A     He was not my direct supervisor, no.  He was

22   -- he and Dale Galvin had had a history of conflict,

Page 83

1    incredible, but he will be soon solved."  What is that

2    referring to?

3         A    I have no idea what I said -- wrote there.

4         Q    You don't know what you mean about him --

5    I'm assuming "he" means Dale will soon be solved?

6         A    I do not know what that means.

7         Q    Did you have any plans to see Dale removed

8    from his position at that point?

9         A    No, I do not believe so.  I -- at that point

10   in time, I believe the plan was that -- for us to be

11   transferred under Fish Forever, because it was more

12   relevant -- the work that we did for Steve Box's team,

13   since we worked constantly with Steve Box.

14        Q    Now as the Costa Rica project was

15   progressing, did you share information with Mr. Galvin

16   about Costa Rica?

17        A    Yes, we did.

18        Q    And that was even though you wanted him to

19   stay out of that project?

20        A    It was really stay out of that project.  It

21   was stay off of Kate, meaning not to be on her case in

22   his manner.

Page 85

1          A     The way the Meloy fund was structured with

2     donor funding and the various stakeholders of Meloy,

3     it's a very common blended finance structure that is

4     very recognizable and has been replicated

5     internationally.  So she just stated something that

6     Rare did not want to agree by keeping an impact fund

7     managed by an NGO as a private -- almost private

8     equity level fund or hedge fund -- private equity more

9     correctly -- versus blended finance, what we were

10    doing where we were -- our counterparts were mostly

11    sovereigns.  So technically, she was correct.

12         Q     We'll go to 99.  You see that Kate is

13    texting, "Dale's making me meet with him next week to

14    discuss.  I ignored him."  Do you know what she's

15    referring to?

16         A     No, I have no idea.

17         Q     Did Kate talk to you about ignoring Dale's

18    requests?

19         A     She felt harassed, so she did talk about

20    trying to avoid Dale and trying to stay away from him,

21    yes.

22         Q     She felt harassed in what way?

Page 86

1      A    She's trying to ignore him, because she felt

2   harassed.  I cannot describe how she felt harassed.

3   That's a question for Kate.

4      Q    Did she explain to you how she felt harassed

5   by Dale?

6      A    I believe that that's a question for Kate to

7   answer.

8      Q    No, the question is, did she explain to you

9   how she felt harassed?

10      A    She did at various times.

11      Q    And what did she explain to you?

12      A    I do not recall exactly.  It's -- I do not

13   recall what was specifically said in that

14   circumstance.

15      Q    Was it the nature of that Dale was very

16   demanding and asking her to do things that she didn't

17   feel was aligned with what she wanted to accomplish at

18   work?

19                  THE REPORTER:  Is she frozen?

20                  MR. BARNSBACK:  Ms. Ramundo Orlando,

21   are you considering, or is your screen frozen?

22                  THE REPORTER:  I think she's frozen.

Page 89

1          I don't know if she's coming back from Costa

2    Rica.  I'm assuming that that was the case, but I'm --

3    it's an assumption.  It's not -- it's a nine-hour

4    flight.  "Can you get back on Monday?"  It's a three-

5    hour flight.  It's a nine-hour flight.  And she needed

6    to take time, since she had worked that weekend.  So

7    I'm not suggesting she take her time.  I'm suggest her

8    to stay home for a day to recover from a nine-hour

9    flight.

10         Q    And what's the reference to "so he does not

11   interfere"?

12         A    I do not recall.  I have no idea.  I do not

13   know.

14         Q    Did you and Kate have a different goal or

15   plan for blended finance from Mr. Galvin?

16         A    I'm not sure what that means.

17         Q    Well, was your goal with what was going to

18   happen with blended finance aligned with what

19   Mr. Galvin's vision of what blended finance was going

20   to do?

21         A    Well, seeing how we were being treated by

22   Mr. Galvin, our goal was to be transferred to Steve

Page 90

1    Box's team under Fish Forever.

2         Q    So when you're talking about "does not

3    interfere," is that part of the effort to obtain a

4    transfer to Fish Forever and get out of sustainable

5    markets?

6         A    I doubt that that was what it was referring

7    to, but I do not know.

8         Q    Was it referring to him not interfering with

9    Costa Rica?

10        A    I don't -- really do not know what that

11   means.

12        Q    So on page 101, you mention, "We have

13   outperformed.  We will get credit for it.  They are

14   after him, and we got caught in the crossfires."  What

15   is that referring to?

16        A    So I'm going to try to answer this to the

17   best of my recollection and not exactly, because I

18   don't completely recall exactly.  But I believe that

19   Brett or the executive team or his team -- Brett

20   Jenks, the CEO -- had sent out an e-mail showcasing

21   which divisions were -- okay, so -- sorry.  I'm really

22   trying to recall.  So there was -- and I do not recall

Page 91

1    the name of the spreadsheet or the management plan,

2    but there was a management plan that was based on

3    strategic goals of Rare, that then divided into

4    divisional goals, and then divided into specific

5    targets and specific achievable targets.

6         And we would work -- and again, they have

7    specific names.  I'm not using the correct names,

8    because I don't remember them correctly.  But this

9    management plan was also used to provide bonuses,

10   let's say, to Mr. Galvin and to the division.  So his

11   bonus was very much linked to the performance of all

12   of these criterias or targets that he would outline.

13   Obviously, Mr. Steve Box would be subject, let's say,

14   to -- to the same standard.  And then it went down

15   into the performance of the team and into the

16   performance of -- like, which goals had been achieved.

17   And so what happened was that it was sent on an e-mail

18   where the sustainable -- the markets teams had

19   received negative scoring.

20        And the entire team, including Paolo

21   Domondon, Lisa Pharoah, that were only a small

22   percentage working with blended finance had become

Page 92

1    really upset that we had gotten scored negatively.

2    And what I'm saying is that they were going after Dale

3    Galvin, because he had underperformed under Meloy.

4    What I mean with that is he was sent to do a certain

5    number of investments in Meloy in 2019, and he had

6    fell short, meaning he had been unable to make those

7    investments.  While instead, if you had looked at our

8    side, we had accomplished our targets, and that is

9    where I said, "We got caught in the crossfires."  But

10   Kate, as you can see from her text message was really,

11   really upset, because we had been working extremely

12   long hours, traveling, and delivering on our targets

13   according to this master sheet that -- I apologize,

14   but I don't remember exactly what it was called.

15        Q    I'll see if I can find that e-mail for you.

16   Mark this as Exhibit 9.  Let me scroll down.  There's

17   an e-mail from Dale Galvin dated Friday, September 27,

18   2019.  It includes you, among others and talks about a

19   sole red circle on the BSC.  Is that what you're

20   referring to?

21                    (Exhibit 9 was marked for

22                    identification.)

Page 93

1      A    Yes.

2      Q    What does that red circle mean?

3      A    I don't know.  I think you will see it up on

4    top.  I think there is literally a red circle around

5    BSC.  I think it's quite literal.

6      Q    So here at this page of the e-mail,

7    Mr. Galvin is asking everyone that received the e-mail

8    to, quote, "Please help me make the case that we've

9    had a great year, which started all the way back on

10   October 1, 2018."  Did you and your team provide

11   information to help Mr. Galvin show that the blended

12   finance group was doing well?

13     A    Yes, we did.  And it was a very, very, very

14   long list.  The whole team participated in providing

15   that information.

16     Q    Can you agree with me that Mr. Galvin was

17   not critical of blended finance in this e-mail or

18   blame blended finance for the red circle rating?

19     A    No, but he was not being -- taking

20   responsibility that the red circle rating was actually

21   the Meloy fund.

22     Q    In the e-mail at the top from September 27,

Page 94

1    2019, from you to Mr. Box, it looks like you're

2    forwarding him a response that you sent to Mr. Galvin.

3    First, I'll ask, why were you forwarding this response

4    to Mr. Box?

5         A    Because he probably asked me to.

6         Q    Do you recall him asking you that?

7         A    I do not recall, but he probably asked me

8    to.

9         Q    And do you know why he asked you to forward

10   that response?

11        A    I do not recall.

12        Q    And do you know how he was aware that you

13   had responded to Dale?

14        A    As I mentioned, I had a number of team

15   members that were not only blended finance, but they

16   worked for other divisions.  So it might have come

17   from any other team member that informed Steve Box.  I

18   do not recall.  We were very upset as a team, and

19   especially, some of the team members were extremely

20   upset.

21        Q    You see that you asked, "Why did BF get a

22   red," and add four question marks.  Is that, kind of,

Page 95

1   you expressing your frustration in being upset with

2   that result?

3       A    Actually, no.  I'm known for overly

4   punctuating things.  I use a lot of dot-dot-dots and

5   question mark and exclamation points.  It's just my

6   style of writing.

7       Q    Did Mr. Galvin respond to you about --

8       A    I do not know.

9       Q    -- why BF got a red?

10      A    I have no idea.

11      Q    But that was an issue of significance to you

12  at the time.

13      A    It was a -- an issue of significance to my

14  team.

15      Q    But not necessarily to you?

16      A    I do not recall.

17      Q    You mentioned that you brought in three new

18  MOUs.  What are you referring to there?

19      A    We did an MOU with Philippines, an MOU with

20  UNDP, and we had another MOU.  I can't recall exactly

21  which one it was, but I'm pretty sure it was on the

22  list of the e-mail that went back to Dale.  Two LOIs.

1    to say and say yes but go ahead with our plan."  Does

2    that give you any idea what you were talking about?

3         A    Well, I'm sure it's something that we were

4    working on Costa Rica, but I have no idea.  I don't

5    know.

6         Q    So did Dale have a different plan or a

7    different vision of what should be done, and you

8    decided to go and say to him but carry on with what

9    you wanted to do?

10        A    I don't actually think so.  I don't think

11   that Dale had such a different opinion or perception

12   about Costa Rica.  I think I was just trying to keep

13   him away from harassing Kate.

14        Q    And is that the harassment that you said you

15   didn't fully talk to Kate about and don't understand

16   what she's saying when she means "harassment"?

17        A    No, I said that Kate can talk to you about

18   the harassment that she underwent under Dale.

19        Q    But when you're trying to keep Dale from

20   harassing Kate, what are you trying to keep Dale from

21   doing?

22        A    Whatever Kate feels that she's being

Page 120

1    harassed by, she came to me, and if she feels

2    harassed, I try to keep Dale -- I tried -- past -- to

3    keep Dale away and to talk to me about whatever

4    concerns he has, so that she didn't have to be exposed

5    to that.

6         Q    And my question is, harassed in what way?

7         A    That is a question for Kate Schweigart.

8         Q    So when this was going on, you didn't know

9    what Kate meant when she talked to you about Dale

10   harassing her?

11        A    When a woman is harassed, it's very

12   personal, and it's very emotional.  And it's -- can be

13   described in many different ways, and I'm sure that

14   Kate may be able to describe that.  And all I knew is

15   that I had a staff member that, as you might have seen

16   from the text messages, was extremely concerned of

17   meeting with Dale.  She was extremely concerned about

18   Dale's inputs in our projects, because she didn't --

19   as you may see in the text messages -- she didn't not

20   just agree with his contributions, but at times, he

21   thought -- she thought that the contribution might be

22   causing a liability for the projects that we were

Page 122

1    A    'Cause why would I ever want any woman to be

2    exposed to harassment and discriminatory behavior and

3    belittling and bullying?  Nobody should want that from

4    anybody.

5    Q    What harassment was Kate exposed to?

6    A    Whatever harassment she was perceived that

7    she was exposed to.  That is for Kate to answer.

8    Q    You understand that Kate still works for

9    Rare; correct?

10   A    Correct, and she was moved under Steve Jobs

11   -- no, sorry.  She was moved to work under Steve Box

12   under Fish Forever, immediately after I was put on

13   administrative leave.

14   Q    What is your reference here on the text,

15   quote, "Like we did for the consulting firm"?

16   A    I don't know.

17   Q    What consulting firms were you and Kate

18   working with in 2019?

19   A    If it's related -- and I'm assuming, and I'm

20   not sure that it's related to Costa Rica -- we hired a

21   consulting firm that was local to work with us on the

22   feasibility analysis that we were doing from the

Page 128

1    you mean by that?

2         A    Probably exactly what I'm saying, that he's

3    become more arrogant and insensitive.  At the time,

4    that's how I felt.

5         Q    And is that tone in writing or in phone

6    calls?

7         A    It is possible in both and in text messages.

8         Q    And what about his message was arrogant and

9    insensitive that you're referring to?

10        A    At this point in time, I cannot recall

11   exactly.  It was 2019.

12        Q    You say he's pushing his agenda, and what is

13   that referring to?

14        A    I believe that that was referred to the fact

15   that he did not want to lose the blended financing,

16   and he had probably been told that we were asking to

17   be moved to somebody else.

18        Q    It says, "Have the team double the work."

19   What double of work was your blended finance doing?

20        A    So we had -- September 2019 was -- as with

21   August -- August and September '19 were very crucial,

22   because, as I mentioned earlier, we were going to have

Page 132

1   printing?  Who on the team --

2        A     The blended finance team.

3        Q     But who on the team was doing the printing?

4        A     I did some to support Molly.  Molly did

5   some.  We all helped Molly, because it was a lot of

6   printing, two years of work on every single one of our

7   projects.

8        Q     Anything else that he asked that would

9   double the work for the team?

10       A     There's actually -- there was, at some

11  point, an e-mail with all of the requests.  So I

12  believe that's in the possession of Rare, with all the

13  requests of all of the things that we had to do in

14  addition to what we were already doing.  Most of the

15  requests were actually quite administrative.  It was

16  really -- it was time -- very time-consuming work, and

17  it was really not necessary.  Because he had access to

18  everything anyway, so it was just one thing that we

19  had to -- a menial task for people who were actually

20  trying to deliver projects for Rare.

21       Q     So when you say in the next paragraph, "My

22  team is being bulling," what do you mean about them

1    being bullied?

2        A    They were no longer comfortable being in the

3    office.  With Molly, we had an agreement already when

4    we hired her that she would work most of the time

5    remotely when I was traveling.  And she would be in

6    the office only when I would be there, so we could

7    have one-on-one time.  But the fact was that -- as we

8    know that we were marked red, because he included

9    Meloy and the deliverables of his work altogether with

10   BF -- what happened is that we were paying the

11   consequences of his Meloy team -- not Meloy team, but

12   his Meloy project underperforming.  Blended finance

13   was paying the consequences and being told that we

14   weren't doing great, when we had achieved a number of

15   successes.

16        And in terms of bullying is that if we

17   hadn't delivered the pieces of paper or delivered

18   things in the format that he wanted, he would give us

19   even more demeaning tasks.  And he didn't respect the

20   work that we were doing, or he would frankly make us

21   feel that he didn't think that we were capable of

22   delivering the work and that we needed his presence

Page 134

1    and his management in order to actually successfully

2    deliver the work that we did.

3         Q    So it fair to say that it's your opinion

4    that you preferred to work independently without

5    Mr. Galvin's supervision or interference?

6         A    No, that's an assumption.  That's not what I

7    said.

8         Q    Okay.  So then you did not mind working with

9    Mr. Galvin and having him supervise your team?

10        A    I didn't mind Mr. Galvin supervising me.

11        Q    But you had an issue when Mr. Galvin tried

12   to deal directly with your subordinates?

13        A    I did not say that either.  We provided

14   everything to Mr. Galvin that he asked for, and he

15   would have us do it in many different ways that would

16   stress the team out.  And that's why they felt that

17   they were being bullied, because he would say that he

18   would be disappointed in them.  And he should have

19   gone through me, before he went directly to them to

20   tell them that he was disappointed in their

21   performance.

22        Q    Did any of your team members ever tell you

Page 135

1    that Mr. Galvin threatened to discipline them or

2    terminate them if they didn't do what he'd asked?

3         A    I don't know.

4         Q    Why, in this e-mail to Ms. Perrelli, did you

5    mention that you took a 44.6 percent pay cut?

6         A    I don't know what I was thinking at the

7    time.

8         Q    At the top, you seem to -- it appears that

9    you forward this e-mail to Mr. Box, and you state,

10   "And now it's official."  What do you mean by that?

11        A    Well, Mr. Box had told me that I should have

12   written a complaint sooner in August 2019, when I

13   wrote that letter to Ms. Perrelli.  But Ms. Perrelli

14   told me that I shouldn't put anything in writing, and

15   I shared what Ms. Perrelli had told me to Mr. Box.  He

16   thought that I should have put it in writing, and I

17   was concerned that if I had put anything in writing

18   and then left for a work trip, then my team would be

19   there taking the brunt of it.

20            So I didn't put anything in writing then.

21   But the situation was escalating, so I told Mr. Box.

22   I confided in Mr. Box, and in all honestly, if I

Page 136

1    wanted to hide it from Rare, I wouldn't have sent it

2    to Mr. Box officially from my e-mail to Rare e-mail.

3    There was nothing -- it was not under-handed, and it

4    was not behind anybody's back.  I just said that I was

5    done with Dale's behavior, and I finally put it in

6    writing, as he had suggested that I should do ahead of

7    time.

8          Q    And in the hierarchy at Rare, Mr. Box was,

9    although in a different department, he was above you

10   in the hierarchy.

11         A    Correct.

12         Q    Did you ask him to take any action on your

13   behalf or on your team's behalf?

14         A    When I was put on administrative leave, I

15   asked Mr. Box to take care of Kate and Molly, and to

16   protect them.

17         Q    Prior to administrative leave, in this

18   August timeframe when you talked to him about this

19   letter that you had written, did you ask him to do

20   anything to report to Mr. Jenks or the board or any

21   organization or any division within Rare about what

22   you claim was going on?

1     Q   It says she witnessed you "requesting

2  personal or professional information not related to

3  her work or none of her business."  Did you ever

4  request personal or professional information about

5  individuals working in Rare that was not associated

6  with your business with Rare?

7     A   No, I do not believe so.  I don't know.

8     Q   Ever engage in "gossiping about colleagues"?

9     A   I was literally not in Rare Arlington

10  offices in that time to engage in gossip.

11     Q   I believe you said you were traveling about

12  85 percent of the time.

13     A   Correct.

14     Q   It says that you were "refusing to review

15  the budget, respect the budget, and complaining when I

16  refute charges Rare doesn't typically cover."  Did you

17  refuse to review the budget?

18     A   No, that is incorrect in the e-mail.  We

19  told Jenny Miller that we wanted to have visibility of

20  the budget, and there is a number of e-mails that I

21  believe Rare has with Esteban Chavarria and between

22  myself, Kate, and Esteban, where we are asking to have

1    high fever to feed me and sometimes spoon feed me.  So

2    that is the reason why the two people were aware of

3    this, because they found me on that Saturday

4    completely anxious, stressed, absolutely in atrocious

5    pain for what had just happened --

6        Q    Ms. Ramundo Orlando, did I ask why Manuel

7    and Veronica were aware?

8        A    Oh, no.  I apologize.  I thought that you

9    asked the relevance about that text message, and

10   that's what the relevance was.

11       Q    So are you describing that October 5th

12   e-mail that was sent to you by Mr. Galvin as what is

13   "so low and horrible"?

14       A    "So low and horrible" was the defamation and

15   what Dale Galvin stated in that e-mail.

16       Q    Well, what did Mr. Galvin state in the

17   e-mail?

18       A    He sent me an e-mail that he didn't need to

19   share with me.

20       Q    Okay.  So it wasn't so much what he stated,

21   because it was what Ms. Miller stated.  It was the

22   fact that he forwarded Ms. Miller's e-mail to you was

Page 173

1   "low and horrible."

2         A    Yes, that's true.  So this is why in the

3   text message as in "he did something."  He didn't -- I

4   didn't say he said something.  "He did something that"

5   -- he sent that e-mail.

6         Q    Would it be fair to say that that was really

7   the worst thing that Mr. Galvin had done to you at

8   that time, in your mind?

9         A    No, I think that there are quite a few

10  others that have been compiled into continuous

11  bullying and harassing and causes a lot more trauma

12  than just one event.  I could --

13        Q    And what was the -- well, let's go through

14  each and every event that you believe was lower and

15  more horrible than that October 5th e-mail.

16        A    As I said, the constant berating, constant

17  humiliating, the constant belittling about the fact of

18  not just me but of every woman that was around him.

19        Q    Okay.  I want each and every event, each

20  date, every time this happened.  Please, go through

21  the list.

22        A    I -- I do not recall what was said exactly.

1    I do not remember exactly each date.  I cannot recall

2    exactly each incident from 2018 to 2019, because today

3    is December 2021.

4         Q    How about just one other incident that you

5    believed was more low and horrible than him sending

6    that October 5th e-mail?

7         A    I did not say that he did something more low

8    and horrible in one incident.  I said the compilation

9    of all of the incidents created trauma.  It was --

10        Q    I'm asking for one incident.  Give me

11   details of one incident that created trauma.

12        A    I'll give you a few, but I just want to be

13   on the record that these are just a few of very, very,

14   very many.  We can start in December of 2018 during

15   the workshop that I led for the leadership team to

16   understand what we were doing in blended finance.  At

17   the time, he was supposed to be there as the person --

18   since I didn't have anybody in my team, and Molly at

19   that time was only temporary.  And Lisa Pharaoh was

20   only at 20 percent or 30 percent.  Dale was there as,

21   not only supervisor, as my support system for blended

22   finance, because I had nobody else.

Page 175

1    And when Brett Jenks started questioning the
2    way that I explained the terms that I used to describe
3    blended finance and how this could be sold to -- for
4    fundraising purposes and for marketing purposes, he
5    did not try to protect the team, which was him and I
6    at the time.  He emphasized the fact that I wasn't
7    providing Brett Jenks with the right marketing
8    statements, which were never actually the reason why I
9    was hired, because blended finance has very little
10   with marketing to do.
11       He then started -- which is probably -- when
12   -- which is much worse, in a way, that that forward
13   was when he started giving Brett Jenks the idea that I
14   wasn't to be trusted.  Rare and Brett and his team, as
15   well as Dale, all work on loyalty and trust.  And the
16   reason I could not be trusted is that I did not speak
17   the same language as Brett.  The second reason I
18   couldn't be trusted is that I couldn't structure a
19   security for Rare to issue, since Rare is a not-for-
20   profit.  The third reason I couldn't be trusted that
21   he said to Brett Jenks -- and Brett Jenks had a
22   meeting with me, Laura, and Kate together, trying to

1   figure out how Rare could support the design and

2   issuance for a bond in the Philippines or Indonesia

3   and then be re-hired at the local level with the use

4   of proceeds.  And the three of us, Kate, Laura, and I

5   kept on saying that that was unethical, and that was

6   when the harassment started.

7           From that point on, Brett Jenks wanted

8   regular meetings with updates of what I was doing, how

9   I was doing on every project.  But every single time I

10  gave them updates, the format of the updates was

11  changed.  We had to do traffic lights; we had to write

12  reports.  And in one case, specifically as I reported

13  in one of my interrogatory answers, Brett and Dale

14  Galvin threw me under the bus in a meeting.  And the

15  meeting was Brett Jenks in the room with Dale Galvin,

16  with Steve Box on the audio speaker, and me in the

17  room.  And at that point, after the meeting, Steve

18  said, "Wow.  Dale really threw you under the bus."

19  And how I felt about --

20      Q    What do you mean "threw you under the bus"?

21  I don't know what that means.

22      A    He did not give me -- he started questioning

Page 177

1    with the same line of questioning as Brett Jenks,

2    while he was supposed to be my supervisor.  If he had

3    anything to say or question to ask, he could have

4    asked after or before the meeting.  Ganging up on me

5    with Brett Jenks wasn't something that I would have

6    expected of a supervisor, but at this point, it wasn't

7    unexpected from Dale Galvin.

8            At this point in time, when Brett Jenks

9    asked me to present to the board the updates on

10   blended finance, he had me repeat them constantly.

11   And when I went to Dale Galvin to ask for support, he

12   kept on saying that I had to do whatever Brett said,

13   and that he wasn't going to get involved.  And that,

14   again, it was my supervisor.  The level of damage that

15   Brett did with the relationship between -- I'm sorry,

16   Dale did with the relationship between Brett and I,

17   was quite significant, especially because he

18   undermined me, undermined the type of work that I did

19   in the eyes of Brett.  So that's when Brett decided

20   that he could no longer trust me.

21            There are a number of other events of what

22   Dale did.  He would call me to tell me -- he called me

1    in August to tell me I was a terrible person, and I

2    don't recall actually why he decided to call me.  I

3    had just landed, I believe, from Jakarta.  And then

4    again, he called me.  And he said terrible things when

5    they hired David Web [ph] who I was the only person on

6    the panel who said that I would not agree with his

7    hiring, but I went forward.

8           I introduced him to some of my network in

9    Indonesia, and I asked him if he was going to be

10   located in Jakarta.  And he said no, in the

11   Philippines, because there's going to be women there

12   that are going to keep him there.  He was going to --

13   it was going to be easy for him to find a girlfriend,

14   kind of, thing.  I told him that that was hugely

15   disrespectful towards women, when he would say that,

16   you know, I dressed appropriately for my job, but

17   other people at Rare were too casual or didn't dress

18   or were too granola.  And I kept on saying, "These are

19   people that I work with.  Please do not say that.

20   That is so irrelevant."  He put me in a terrible --

21        Q    Wait.  I didn't fully understand that.  Hold

22   up.  Just on the dressing, when he said you dressed

1    appropriately, you took offense to that?

2         A    Because he was disparaging towards all the

3    other women at Rare.  Yes, I took --

4         Q    People that he felt did not dress

5    appropriately.

6         A    Everybody else.  All the other women at

7    Rare, not men.  The other women did not dress as

8    appropriately as I did.  There was no point or reason

9    to comment on my dress ever.  It is not appropriate to

10   comment on my dress.

11        Q    Did you ever make comments to any of your

12   staff members about how they dressed or how they --

13   their appearance at work?

14        A    At work?  No.

15        Q    Never did.

16        A    At work in the Arlington office?  No, I did

17   not.

18        Q    How about 85 percent when you were on the

19   road; did you ever comment to your staff members about

20   their dress and whether it was appropriate?

21        A    I never commented and their dress and

22   whether it was appropriate.  The only comment I ever

Page 180

1   made was when Molly Bradtke asked me what to wear when

2   she would go to her meetings in Indonesia.  I -- I had

3   sent her to Indonesia to meet some of her

4   counterparts, get to know the program, get to know the

5   people.  She asked me what I wore.  I said I wore

6   suits, and that I always wore a scarf.  And I never

7   wore anything that could be disrespectful according to

8   their culture.

9           There are -- in Indonesia, the majority of

10  our counterparts -- not all, but the majority were --

11  are -- sorry -- Muslim.  And the majority of the women

12  that we work with wore hijabs, so I made a comment to

13  keep that in mind and be respectful of the culture of

14  where she was going to stay.  But it was never a

15  comment about what she wore, whether it was

16  appropriate or not, because everybody in my office

17  could wear whatever they wanted.

18      Q    So in preparing to interview a gentleman

19  from Saudi Arabia for a position at Rare, did you tell

20  Molly Bradtke to wear a short skirt?

21      A    No, I did not.

22      Q    In preparation for that same interview, did

Page 199

1          A    Because I wanted to make sure that -- when I

2     provided him the draft, my intent was to submit it in

3     writing, and he responded that I would be blacklisted

4     by Brett Jenks.

5          Q    Did he send you an e-mail saying that, or is

6     there anything in writing from him saying that you

7     would be blacklisted by Brett Jenks?

8          A    I -- I do not recall.  I haven't checked.

9          Q    Let's look at Exhibit 15.

10                   (Exhibit 15 was marked for

11                   identification.)

12                   THE REPORTER:  There wasn't a 14;

13    right?

14                   MR. BARNSBACK:  Not yet.  There will

15    be.

16                   THE REPORTER:  All right.  Thank you.

17    BY MR. BARNSBACK:

18         Q    So please look at Exhibit 15, and is this

19    the letter of the draft that you wrote to Manuel?

20         A    Yes.

21         Q    Can you please show me in here where you

22    discuss discrimination or gender discrimination, where

Page 203

1    Ms. Schweigart, and that Ms. Schweigart didn't feel

2    comfortable being in the office.  And in that meeting

3    specifically in August when I met with Caryn, I told

4    her that I was going to be more comfortable for Kate

5    to be working from home, so she didn't have to

6    interact with Dale.  And she thought that that was a

7    good idea, because it decreased the number of

8    incidences.  Because also Kate -- go to Dale, and I

9    know that even Manuel Bueno Vera raised this issue

10   with Ms. Perrelli on the fact that there was gender

11   discrimination in the office.

12        Q    Now I just want it to be really clear, when

13   you're using the word "harassment," I want to be

14   precise on the record to understand what you mean.

15   When you're saying that Mr. Galvin harassed yourself

16   and the other women on the team, you're not suggesting

17   that he engaged in sexual harassment where he sought

18   sexual favors or did anything inappropriate sexually;

19   are you?

20        A    No, I am not.

21        Q    So it would be a different type of

22   harassment based on gender, but not -- again, not a

Page 204

```
 1     supervisor trying to seek sexual favors.  He didn't
 2     ask you out or any one of your team members out on
 3     dates; did he?
 4          A    No, I do not believe -- well, he never asked
 5     me out.  I do not know of anybody of their team.  I
 6     cannot speak for them, but I do not believe so.  It is
 7     not -- I'm not privy to that information.
 8          Q    And you didn't observe him make any
 9     inappropriate sexual comments to yourself or any other
10     women.
11          A    No, I -- other than jokes, no.  He would
12     joke a lot.
13          Q    What do you mean by "jokes"?
14          A    He would joke.  He would say -- make
15     inappropriate jokes.
16          Q    Like, what?  What do you mean?  Give me an
17     example of an inappropriate joke.
18          A    I can't.  I apologize.  Because these are
19     jokes that women hear from the age of, like, 15 in
20     high school, and hearing them even at 48 is a little
21     bit disheartening.  But you still hear men making
22     inappropriate jokes, and they think they're funny.
```

Page 205

1        Q     What inappropriate joke did Mr. Galvin make?

2        A     He made quite a few, but I don't recall

3   specifically what he said.  But it's something that

4   slides off.  It's not something that I consider

5   harassment.  It was just the way he was.

6        Q     And what was the specific behavior that

7   Mr. Galvin engaged in that you considered to be

8   harassment?

9        A     Belittling, demeaning, harassing.  Meaning,

10  harassing, constantly demanding and asking and

11  retaliating and using language as, "I am disappointed.

12  I expected more," and only exclusively to women.

13  That's gender discrimination.

14       Q     But who were the men on your team?

15       A     We only had a man part-time that was -- he

16  was Paolo Domondon, worked primarily for the

17  development team, and he was in the Philippines.  He

18  supported in the Philippines.  I believe right now

19  he's with Rare in Germany, and he was with -- in

20  support of the team for a period of time.  Harry

21  joined the team late 2019.  He was in Indonesia.  And

22  then we had an intern in the sustainable markets team.

Page 220

1    guy; it was his interview?

2                    MS. BROWN:   Objection.   Calls for

3    speculation.

4        A    I have no idea.   I don't even remember a

5    Saudi guy.   I -- we have interviewed so many people in

6    2019, because we were launching team from the

7    Philippines to Indonesia.   There were interviews every

8    single week.   So I really don't understand.   If there

9    is no relevance to this, I'm not really sure what

10   we're commenting on.   It's Kate's comment; it's not

11   mine.

12       Q    And why did you respond, "And I wish to keep

13   it that way" that there are no e-mails on the Saudi

14   guy?

15       A    I don't know.   I have no idea.   I -- I have

16   no idea why I answered that way, and I don't even

17   understand the conversation, to be honest, at this

18   point in time.   When I do understand, I'm very happy

19   to disclose all the information I have on it.   But

20   this really -- I don't -- I don't know.

21       Q    Exhibit 16, please.   I don't know why I'm

22   saying please.   I'm the one who's pulling it up.   So

Page 221

1     this is Exhibit 16.  Can you identify this for me?  Do

2     you need me to scroll down?

3                    (Exhibit 16 was marked for

4                    identification.)

5          A    Yes, please.

6          Q    Tell me when to stop.

7          A    Can you please go to the last sentence?

8          Q    Go where?

9          A    To the last sentence, please.

10         Q    To the best last of the whole document?

11         A    Yes, please.  Is that the last sentence?

12         Q    Yes.

13         A    I believe that this was what Brett asked me

14    to type while he was talking to me when we had our

15    one-on-one meeting on November 12th.

16         Q    So did you have a meeting with Mr. Jenks on

17    November 12th?

18         A    I believe so, yes.

19         Q    And tell me the details about how you

20    prepared this document.  First, when was this

21    prepared?

22         A    I -- I think that I'm typing as he's

Page 227

1      Q    What evidence do you have that this

2   conversation was recorded with Mr. Jenks?

3      A    I do not have evidence that this

4   conversation was recorded with Mr. Jenks, but

5   Mr. Jenks had the habit of sharing some of his

6   recorded conversation and recorded other conversations

7   that I was part of in the past.

8      Q    Where did this conversation take place?

9      A    In a conference room that had a recording

10   machine.

11      Q    Was the recording machine turned on to your

12   knowledge?

13      A    I do not know, because it would have been

14   covered by my laptop.  I wondered if the conversation

15   was being recorded or not.

16      Q    Did you ask if it was being recorded?

17      A    No, I was not there to ask question.  I was

18   told that I was just there to listen.

19      Q    Now during this meeting, is it accurate when

20   we look down here, that by noon tomorrow -- which

21   would have been the next day -- that he needed you to

22   write a reflection on the feedback about you as part

Page 228

1    of the investigation?

2         A    No, he asked me to repent.

3         Q    Okay.  So when you wrote that down, where it

4    says, "By noon tomorrow, I need you to write a, quote,

5    reflection on the feedback about me and no one else,"

6    you really meant to write, "He told me to repent."

7         A    Oh, I think that that's a little bit below,

8    because that's exactly what he said.  But no, he did

9    ask me about a reflection on the feedback about my

10   behavior, my -- about me and nobody else, yes.

11        Q    Now do you know if Mr. Jenks had a meeting

12   on the same day with Mr. Galvin about the results of

13   the investigation?

14        A    No, I do not know.

15        Q    Do you know if Mr. Jenks made the same

16   request of Mr. Galvin to prepare a reflection?

17        A    No, I do not know.

18        Q    Do you know if Mr. Galvin responded and did

19   prepare a reflection as requested?

20        A    No, I do not know.

21        Q    Did you write the reflection that was

22   requested by Mr. Jenks for the next day?

Page 229

```
1          A    No, I did not.

2          Q    Item number two --

3               MR. BARNSBACK:  Well, hold on.  Let's

4     take a two-minute break.  I apologize for this.

5               THE REPORTER:  Okay.  Off record at

6     3:30 p.m.

7               (Off the record.)

8               THE REPORTER:  Okay.  We're back on --

9               MR. BARNSBACK:  Yeah, we can go back

10    on.  We've got --

11              THE REPORTER:  Sure.  I'm sorry.

12              MR. BARNSBACK:  Perfect.

13              THE REPORTER:  3:32 p.m.  Go ahead.

14    BY MR. BARNSBACK:

15         Q    So back on the exhibit on this item number

16    two, it mentions that you and Dale need to have a

17    M-O-C-H-A alignment.  First question to you, what is

18    an M-O-C-H-A alignment?

19         A    They call it MOCHA, and we had a training on

20    MOCHAs and how to make them at Rare.  And it was

21    actually -- I would say, it was a lot of fun.  But it

22    was -- it's manager.  It's owner.  The C stands for
```

Page 232

1      Q    Yeah, it's clear that you really like this

2    tool, and it's very helpful.  But all that level of

3    detail, we don't need.  But it sounds like it's

4    something that's a helpful management tool that your

5    team used quite often.  But that task was completed.

6      A    Correct.

7      Q    So for number three, for the mediator -- if

8    I recall, I thought that was something that you had

9    talked about in the draft letter that didn't get sent,

10   your willingness to work with the mediator.  Is that

11   accurate?

12     A    Yes, yes.  I've -- I've always -- I don't

13   mind mediators.  I think that they can resolve a lot

14   of conflict resolutions.  They're great.

15     Q    And did you have any issue with the concept

16   here presented as summarized in your notes of the

17   meeting with Mr. Jenks about working with a mediator

18   with Dale?

19     A    Well, the mediator had to be between Dale

20   and I, because we were the ones obviously having an

21   issue.

22     Q    No, no.  I understand.  But did you have any

Page 233

1    objection in working with the mediator to try to work

2    through issues that were going on with Dale?

3        A    No, I don't think so.  I did not have an

4    issue.  I worked with Dale in record time to get the

5    MOCHAs done, and we worked as a team to get the MOCHAs

6    done by Friday.

7        Q    And then the fourth point was talking about

8    coaching.  Would that have been -- because it's not

9    clear on this.  That would have been individual

10   coaching with you, or would it have been coaching with

11   you and Dale, like a mediator, sort of?

12       A    I didn't understand.  When he was speaking

13   about coaching, he mentioned his own experience with

14   coaching, and I remember that.  He went on for it --

15   for a while about how coach had really helped him, and

16   how it had been recommended by the board for Brett.

17   So I don't really -- I don't really know much about

18   what was being proposed in terms of coaching.

19       Q    And I take it the discussion never got to

20   the point that permitted you to have any more

21   understanding of what Mr. Jenks was talking about on

22   coaching.

Page 234

1         A    Correct.

2         Q    I'll go to the last page of the document.

3    So just so it's in context, there's another series of

4    numbered items, and this is number eight in this item

5    on the last page.  It indicates in your hand that,

6    "Brett asked me if I wished to be re-interviewed by

7    Orrick and add gender discrimination."  In that

8    meeting with Mr. Jenks, did he in fact ask you if you

9    wanted to be re-interviewed as part of the

10   investigation?

11        A    Yeah, specifically, but he said that he

12   didn't believe in what I said.  And he didn't believe

13   -- he believed that it was only pertinent to me, and

14   he would not re-interview anybody else.  So there was

15   really no point.

16        Q    Did you say that you wanted to be

17   re-interviewed; did you respond to him and say, "Yes,

18   please.  Let me be re-interviewed again by the

19   investigator"?

20        A    Personally, I don't really recall exactly

21   what answer I provided at the time.  I didn't really

22   speak.  I wasn't asked to speak during that meeting.

Page 235

1       Q     Well, if not at the time -- I understand

2    that.  Did you say, at any point after that meeting,

3    that you wanted to be re-interviewed by the

4    investigator to add a claim of gender discrimination?

5       A     No, because after this meeting, actually,

6    things really got very frightening.  So there was no

7    talk about being re-interviewed ever.

8       Q     We'll go to Exhibit 17.  Okay.  This is an

9    e-mail from Mr. Jenks dated November 17, 2019, to you

10   copying Ms. Perrelli.  Subject is "Follow up on your

11   e-mails and conversations."  The first question I have

12   is, do you recall receiving this e-mail?

13                    (Exhibit 17 was marked for

14                     identification.)

15      A     I think this was one of two e-mails that

16   left me shaking.  I was traveling, if I'm not

17   mistaken, on November 17th, and when I received this

18   e-mail -- yes, this was the e-mail that I received at

19   JFK or Dallas.  I don't remember which airport I was

20   flying out of.  But I remember that I was holding

21   phone, and my hands were sweating and shaking when I

22   was reading it.  And I called Manuel to let him know

1   you told both Chris and Caryn that you had left Rare
2   at that time.
3       A    I will answer that the attorney of Rare
4   connected with my attorney and explained to my
5   attorney that as long as I did not represent Rare, I
6   could go to the OECD conference.  At the time, the
7   attorneys, Lisa Luken [ph] and my attorney, were
8   discussing with Rare the terms of -- and the
9   communication of my departure.
10           But Rare's position was that as long as I
11  did not represent Rare in any possible way, we were
12  still in conversation about what that communication
13  looked like.  So all they were saying is, "Do not
14  represent Rare, but you can go."  So I went -- before
15  going, I informed the -- which I still belong to,
16  which I belonged to at the time --
17      Q    What question are you answering?  I'm just
18  trying to figure out what question.  Because my
19  question was --
20      A    I am answering why I am -- why I sent this
21  e-mail to the two individuals.
22      Q    No, I didn't ask the why.  I asked that you

| Message | |
|---|---|
| **From:** | Valeria Ramundo Orlando [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0D54F62A62674872A0778085CE718D1E-VALERIA RAM] |
| **Sent:** | 9/27/2019 2:47:23 PM |
| **To:** | Steve Box [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Steve Box]; Caryn Perrelli [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=3680a81a580140a097e362de846644c7-Caryn Perre] |
| **Subject:** | Fwd: FY19 team accomplishments |

This is my response to Dale:

Dale,

Why did BF get a red????
And why has it been rough for BF? Aside from losing a team member we have gone beyond our 2019 goals bringing in new partnerships, three new MOUs, 2 LOIs, and one new relationship. We are also bringing new money with CR and opportunity. We are delivering against Oak and Bloomberg targets for BF.

We should not have any red. This is not ok. I will send you the list of all of our accomplishments.

Best,

Valeria

Get Outlook for iOS

---

**From:** Dale Galvin <dgalvin@rare.org>
**Sent:** Friday, September 27, 2019 21:44
**To:** Manuel Bueno Vera; Valeria Ramundo Orlando
**Cc:** Molly Bradtke; Mauricio Child; Jenny Miller; Veronica Yow; Kate Schweigart
**Subject:** FY19 team accomplishments

Hi guys, it's review time and following up from the board meeting (where yes, we got the sole "red" circle on the BSC as the sacrificial lamb), we need to lay out what our team has accomplished this year, which is significant! The last few months have been rough for both the Meloy Fund and Blended Finance, and we want to avoid the Recency Effect, which is that we are judged only on what happened these last few weeks. What we are doing is new and hard, and we have a small, extremely motivated and hard-working team that got a LOT done over the last 12 months, so let's be sure we celebrate a bit!



DEFENDANT'S EXHIBIT
9

RARE_002487

Please help me make the case that we've had a great year, which started all the way back on October 1, 2018. It's hard to think back to then but can you do some digging and list for me in FY19:

- MF:
  - Any funding closed
  - Any deals made
  - Any other good news (events, articles, etc)
- BF:
  - LOIs/MOUs signed
  - Deliverables accomplished (eg Phase I)
  - Funds raised
  - Other accomplishments
- Other markets
  - China (despite the exit what can we say we contributed to people, nature, and Rare)
  - Aquaculture grant/program
  - Any other accomplishments

Please just send me in bullet point form, and Jenny can accumulate. A draft by Monday COB would be much appreciated as I have a meeting with Brett to review on Tues.

Thanks!

Dale

RARE_002488

**Message**

| | |
|---|---|
| **From:** | Valeria Ramundo Orlando [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0D54F62A62674872A0778085CE718D1E-VALERIA RAM] |
| **Sent:** | 10/2/2019 6:48:36 PM |
| **To:** | Steve Box [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Steve Box] |
| **Subject:** | Fwd: Do you have an update? |

And now it's official

---

**From:** Valeria Ramundo Orlando <vramundo@rare.org>

**Sent:** Wednesday, October 2, 2019 18:43

**To:** Caryn Perrelli

**Subject:** Re: Do you have an update?

Caryn,

Thank you for your concern and kind thoughts.

But my team is not ok, they call me and text me completely stressed out knowing I am sick. I had to make sure Kate is working from home to avoid direct interaction with Dale but she will leave soon. Dale's tone has become more arrogant and more insensitive. He is pushing his agenda and the team has to double the work. Weekends and nights.

I cannot rest when my team is being bullied after I promised them I would do everything I could to prevent that. So the solution is for them to work at home and ignore his emails. Not a way to retain them, Kate will leave soon. She is done. Rare is not a good place to work at this point not for the three of us. This is not the place I thought it was when I joined and took a 44.6% pay cut, I thought it would care more and protect employees versus someone who bullies them.

Thank you for your support and kindness but no one is looking out for them and they feel it.

Best

Valeria



**RARE_001259**

Get Outlook for iOS

RARE_001260

Message

| | |
|---|---|
| **From:** | Valeria Ramundo Orlando [v.ramundo.orlando@gmail.com] |
| **Sent:** | 10/25/2019 11:54:59 AM |
| **To:** | Lorek, Jeffrey [jlorek@orrick.com] |
| **Subject:** | Fwd: first draft |
| **Flag:** | Flag for follow up |

This is the one I shared with Manuel


---------- Forwarded message ---------
From: **Valeria Ramundo Orlando** <v.ramundo.orlando@gmail.com>
Date: Sun, Aug 25, 2019 at 5:12 PM
Subject: first draft
To: Manuel Bueno


In reference to our meeting on Friday, I would first of all like to thank you for your time and I would like to find a solution to the concern I expressed, that will benefit the organization and the work we are doing in Blended Finance.

As I have mentioned on Friday, last Thursday I felt intimidated by my supervisor, Dale Galvin, to the point that I sat in a conference room waiting for him to leave the office or someone to walk up to him, so I could get my handbag and leave the premises. I have never felt this way in 27 years of work. Since Wednesday all the communications I had with Dale have been intimidating and I felt he was bullying me in different ways. He has done this before, and I have let time pass and dismissed his behavior. His comments are not conducive to a healthy atmosphere in the team and workplace.

I would like to find a positive solution to this situation, whereas we are able to resolve our differences and we can address the issues and concerns in a constructive manner. I have attempted to express my opinion and ........ with Dale, but we have not been able to work out these concerns, I also do not feel comfortable talking to him alone as he has been dismissive of what I have proposed up to now and this has caused me to feel intimidated by him.

I would like to request that a mediator from HR/Talent intervene. I feel like a neutral party would be able to bring us to a positive resolution where we can return to a professional working relationship. I would also like to ask for the Blended Finance team to be moved under the supervision of another executive at Rare temporarily until these issues are resolved fairly and in accordance with Rare's five core principles.

It is essential this is done in a timely manner as we have a number of major deadlines in the coming months that we need to focus on delivering. To ensure the smoothest transition for the team I would like to ask for this matter to stay confidential as it would potentially cause concern and unwanted stress among the team members.

Thank you for your assistance in this matter.

Sincerely yours,



DEFENDANT'S EXHIBIT 15

**RARE_001127**

**Meeting with Brett Jenks, CEO of Rare**                    Arlington November 12, 2019

At the start of the meeting Brett asked me to take notes on my laptop.
He stated that the meeting was to go over the findings and provide feedback and the way forward.

He said he read the email I sent him showed it to the lawyers and they said that there were no findings of gender discrimination from the investigation. I replied that I was never asked questions inregards to gender discrimination and the interview was focused on the investigation about me and the allegations that were made on the email by Jenny Miller.

He said that I needed to "take the feedback" and show that I could grow. That I needed to carefully reflect on the findings, and he expects me to write a reflection by noon tomorrow (11/13)

Brett stated that 9 people were interviewed including Dale and myself. He mentioned that he was not interviewed.

*The other 7 were: Molly Bradtke (Senior Associate for Blended Finance, my assistant), Kate Schweigart (Director of Blended Finance, my Deputy), Lisa Pharoah (Director Global Development, was part of my team until 9/30, as per agreement), Caryn Perelli, (Head of Talent), Niels Crone (COO), Manuel Bueno Vera(Senior Director in sustainable markets, also directly reports to Dale Galvin), and Jenny Miller (Senior Associate for sustainable markets, author of the email from 9/11 and assistant to Dale Galvin).*

Findings of are of an independent investigator from Orrick. (Jeff Loreck interviewed me, he stated he had only 60min and it was pro-bono)
Brett wants me to say:"I hear this … Hope to see … take ownership, lending credibility to the peers, remorse, a commitment to improvement." I need to show remorse, he wants to see remorse for my actions and behavior.

Brett stated that "Tangentially let me say performance reviews and specific reviews were not done as they should have been in my case". I was not given the right feedback.
He stated that I need to show: "Commitment to personal growth." He wants this as part of my reflection.
He will recommend that I work with a coach. He stated that "Coaches and 360s – most members of Executive board do it, and that Steve Box will have to do it and that Dale has done that and management courses".

Brett stated that I need to feel "Comfortable with saying I am not perfect and I take the feedback that I get from my peers- from a panel of peers and rate you with feedback positive and negative, acceptance." I need to accept that this is the truth and he does not want me to blame others or to say it is not true.



**PL-00177**

Brett shared his philosophy about management and self-improvement that comes from feedback from peers. He gets his rating by the board. But has always found coaching useful. There was a time where his board rated him very low and he was ready to resign and the past chairman, Ed Soule, told him to take on the challenge and to improve his score and went from a C to an A-. He wants me to take his feedback as a challenge and accept "my faults" and improve.

Brett said he would discuss the findings of the report and that I need "to own as much as I can before I respond" He spoke for 56 minutes without me making any statement or having a chance to speak. He mentioned that it was not a meeting where I was being invited to express my opinion and that I had to listen and reflect on what I had done and find a way to improve. That he expected "knee jerking" but I should understand that the findings were true, and I needed to accept them as difficult as they were.

Brett stated that: "the Purpose of the meeting provide me with findings and conclusion of the investigation". He stated that: "I was the subject of investigation because of community and concerns from a number of people". He also mentioned that it is policy that after an email such as the one from Jenny Miller was received action was to be taken. (I did say I had spoken to HR since July and I only got the email from Jenny Miller after I had said in an email to HR that I was keeping my team at home because of fear of harassment by Dale Galvin)

He stated that 9 employees were interviewed including Dale and I. That this intervention was to "Help me personally and professionally to move forward"
I had to perform 4 assignments for him to be satisfied that I understood the results of the investigation and show willingness to grow.

1. By noon tomorrow I needed to write a "reflection on the feedback about me and no one else"
   i. "Reflect on my notes.
   ii. Can I own my part of this?
   iii. Can I own that I have work to do?
   iv. Feedback 3rd party that has come back to me to be a better manager, a better person."
2. By Friday that Dale and I need to have a MOCHAs alignment (management tool for assigning tasks, my team has used it since the spring, Dale does not believe in it)
3. Mediator – with me and Dale for a working agreement and what that is, is to be determined (where I am delivering or not) mediator for the space of the conversation that according to Brett has not been happening. There has not been feedback been given – (I should read the book – getting to yes) – and "learn from the negotiation of middle east peace".
4. Coaching – get a 360 – 3 month/90 day process

PL-00178

Findings of an independent investigators by Orrick:

1. No evidence – no discrimination
2. Nor that I created an unlawful work environment
3. No finding that either Dale or I discriminated on gender or anything else
4. Brett Mentioned that I was in violation of Rare values and policies and I was found to:

    i. Berating collegues (specific example was give of Cecil-Francis, our Blended Finance intern, who was not interviewed by the investigator. I care deeply about him and I am very protective. Jenny Miller overheard that I had been very tough with him on a call because he had failed to deliver an assignment, when two members of my team had mentioned that it was a rather uncomfortable conversation to be part of I made sure to make time with both of them to reassure them that after the call I had some time with Cecil-Francis and he had stated that he had appreciated the feedback. The three people are of different cultural backgrounds, and I apologized to the whole team and said I would do better. I am very protective of Cecil-Francis) Brett stated that 3 people who were interviewed confirmed I had berated CF

    ii. Using inappropriate and disrespectful language to and about other collegues who are not present. (I do admit to using language that might be considered inappropriate but I have checked with the team and they use the same language.) *I can own to this, I am happy to apologize as there was no intent of harm or offence. It was also mentioned that I called a senior executive a "piece of shit" both Molly and Kate said they were asked but had no recollection, I have no recollection. Brett said 3 people confirmed this, but I sit with Molly and Kate, and Jenny Miller could have only overheard the statement. According to Kate and Molly they were asked if I had made the statement about the COO, I have only spoken to the COO a handful of times, and I do not believe I would have made that statement. I mentioned this to Brett and he said he did not believe me.*

    iii. Engaging in an interview process that is not in line with proper procedure. (I reacted to this. I said I had always seeked advice from HR and communicated with the Director of Recruitment. He said I should discuss this with Caryn head of Talent and she would disclose the details)

    iv. Not forthcoming of status of projects. (I have outperformed all of our goals and delivered on time)

    v. Can be a difficult manager to work with.

    vi. Orrick also found that I have created a difficult environment to work at times.

Brett added that I brought a lot to Rare and this qualifies for success.

    - I need to Double down.
    - I should be concerned about "How I am perceived as a manager and a colleague"

**PL-00179**

- I am "Passionate about my work and sincerely tried to protect my team, my behavior has created divisiveness"
- **Brett stated that Orrick found that there are "irreconcilable differences and tension between Dale and I. Both our faults."** Brett immediately stated that it was due to:
  - My behavior and actions have created a very difficult environment. *(my team has said they will leave if we continue to report to Dale)*
  - "Lingering lack of concern – how we are going to reconcile. We are going to need to lead to get this back on track."
  - "I need to be wholly committed to taking steps and turning the situation around- self exploration, and I need to show commitment to change."
  - I called a senior manager a "Piece of shit" – (Brett stated that 3 people corroborated this)
  - I should not disparage Dale with the team and Steve. Brett said Dale has never disparaged me, (*though I have this on email*)
  - "Working cross-functionally – take the high road – as an executive presence I should be biting my tongue. Quickly create an improvement"

Last point of the investigator - given the times that I have denied the accusations against me. (*Though I was asked to tell my side of events and only very few specific questions*) Brett stated that his interpretation: "there is a question about truthfulness that had been reported by my staff and others" this was said at the end of the interview with Brett. "There is this perception and I cannot talk myself out of this. I should no longer control the narrative and I should accept that I am lying".

"To repeat a new way. Far beyond – "

"I need to create a chart – of what success looks like for Valeria"
1. 5 or 6 behaviors never to repeat again
2. On course but there are few
3. Behaviors I want to exhibit on a regular basis.
4. 6:1 ratio – I have to make up for disparaging others.

2. Outside of the Report he is going make sure that I:
   1. "Getting things done and getting them done well"
   2. He did state that I celebrate great progress and getting Rare's name out there" That I have great external skills.
   3. I should "Be concerned with communication and project management and timeliness and product deliverables internally"
   4. External spike of recognition of Rare's work since I have joined.
   5. Project management internally – challenge is for the people around me we have more questions that answers. Surrounding myself with people who can project management. (*My deputy is a very skilled project manager she is excellent*)
   6. Spike on one category – and lots of room for improvement – I need to:
      i. Dig level deeper

PL-00180

ii. Assess the quality of the work (though he has never directly worked with me)

7. Are we really on the right track... (Brett does not believe me) – not celebrate the goods until we see them. We have delivered MOUs, LOIs, and a design for the first BF vehicle for fisheries and marine, this has been internationally recognized.

8. Senior executives we need to see a balance. Work more closely with me Dale. I need to work with Dale and spend more time with him.

9. He will not authorize my move because it would do me harm as it will show everyone that I am "difficult to work with". (he told Steve a different reason)

Brett added I should not communicate with any other senior manager. I should not discuss any part of this process with my team. He stated I should no longer share any information with Steve Box or I will be dismissed. Steve Box and I work together on the projects he is the MD for Fish Forever, our work relies on his inputs and our coordination with him and his team.

He repeated I need to create MOCHAs – I will have to share them only among Brett, Dale and myself. I also have to

- Little gossip
- Reporting out as possible
- Any retaliation – is unlawful – and ground for dismissal.
- If I show no growth it is ground for dismissal though he believes we will find a way forward.
- We got the report.
- No Steve – I cannot communicate with Steve Box. (*he has been very supportive and on my side the last three months, he has also talked on behalf of the team*)

3. Meet the challenge. Make a plan. Score sheet – listening – empathy – making it less about my big victory and celebrating the team – changing – "Brett's score went up" "Made me a better husband, better father and better person." I should take the challenge for my scores to go up!

4. 90-100 days – changes will be made if no improvement is recorded or assessed.

5. Travel to Paris – He does not believe I need to speak at the conference he stated the conference is not aligned with what we are doing. *I am speaking of blended finance and the blue economy (which is what our team does and what we are engaged by governments to do).* He has the final say for all my travel to see if this is beneficial in his mind. (I convinced him that it was necessary for me to go to the conference) He mentioned that I needed to stay in Arlington so I could closely work with Dale and we could align our work.

6. I stated that I have a lawyer and that I will share the information with her. (He did not seem to believe me). He repeated that he wanted to see remorse in my reflection and ownership of my faults.

**PL-00181**

7. I stated that I would not disparage Dale and I added I would report him every time he would make an appropriate comment that qualifies as gender discrimination and I would report Dale to him. Brett added I would need to go through HR, I said HR did not do anything when I did report him in July and August and had discouraged me from making a statement in writing and encouraging mediation. That he would have to do something about it.

8. Brett asked me if I wished to be re-interviewed by Orrick to add Gender Discrimination, but since he believes this is only pertinent to me he will not re-interview the other people.

9. Brett scheduled 1:1s with Kate (my deputy) and Manuel (my colleague) this week.

<u>Notes post meeting:</u>
Lisa Pharoah stated that she discussed gender discrimination on the part of Dale towards her. She would leave but cannot because of her green card status. <u>She is afraid of retaliation from management because of what she said to the lawyer for Orrick and she does not believe that Brett with not share it with Dale.</u> She did make a statement that she was concerned about what she said as the investigator mentioned he was working for the CEO, she added that the CEO and Dale Galvin were very close friends. She is currently concerned about retaliation from them.

Anna Marie Laura, will disclose gender discrimination she suffered by Dale Galvin tomorrow during her exit interview as he and how he has treated her is one of the reasons for leaving.

I was supposed to have my performance review done two weeks ago but I it has not been scheduled again after the investigation has begun.

**PL-00182**