# EXHIBITS A-C

# EXHIBIT A

## PL-000183-000191

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

_____ and EEOC
*State or local Agency, if any*

| AGENCY | CHARGE NUMBER |
|---|---|
| [ ] FEPA<br>[x] EEOC | |

NAME *(Indicate Mr., Ms., Mrs.)*
**Ms. Valeria M . Ramundo Orlando**

HOME TELEPHONE *(Include Area Code)*
**(917) 832-4181**

STREET ADDRESS
**2727 S. Quincy Street**

CITY, STATE AND ZIP CODE
**Arlington, VA  22206**

DATE OF BIRTH
**08/31/1973**

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

NAME
**RARE**

NUMBER OF EMPLOYEES, MEMBERS
**101-200**

TELEPHONE *(Include Area Code)*
**(703) 522-5070**

STREET ADDRESS
**1310 N. Courthouse Road**

CITY, STATE AND ZIP CODE
**Arlington, VA 22201**

COUNTY
**Arlington**

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

[ ] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN

[X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] OTHER:

DATE DISCRIMINATION TOOK PLACE
EARLIEST **May 2018**   LATEST **12/1/2019**

[X] CONTINUING ACTION

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

Please see Attachment A.

[x] I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 1/9/2020  Charging Party: *[signature]*

Commonwealth of Virginia
County of _____ to wit:

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

/x/
SIGNATURE OF COMPLAINANT                        DATE

Sworn to and subscribed to before the undersigned notary public in and for said jurisdiction this
day of _____, 200___.

My commission expires:      /      /

Notary Public

EEOC Form 5 modified

PL-00183

## ATTACHMENT A

1.      Rare is an international conservation organization whose stated mission is to help communities adopt sustainable behaviors toward the environment and natural resources.

2.      Prior to my employment with Rare, I had a distinguished career in finance spanning almost twenty-five years, and most recently served at NATO before taking a significant drop in pay and title in order to join Rare as Vice President of Blended Finance in April 2018.  My direct supervisor was (and is) Dale Galvin ("Mr. Galvin"), Managing Director of Sustainable Markets.

3.      At Rare, I grew my team, established a Blended Finance (BF) strategy to position Rare as a thought leader in the Blue Economy (the investment and preservation of the marine environment/ecosystem), designed unique, replicable and scalable BF vehicles, engaged governments and development banks with MOUs and LOIs creating strong partnerships for the development of BF mechanisms at the national and sub-national level, and positioned Rare as an innovator within international forums as OECD, ASEAN, WEF and WOC.  I went above and beyond my duties as a VP at Rare.

4.      However, my history of achievement was apparently insufficient to overcome discrimination and retaliation.

5.      In my position as Vice President, I have witnessed numerous instances of gender discrimination and hostile work environment, aimed at both me, my team and other female colleagues.  When I had the courage to complain about Mr. Galvin, who is a close, personal friend of Rare's CEO Brett Jenks ("Mr. Jenks"), I was subjected to a continuing course of retaliation.

6.      Mr. Galvin bullied me in front of Mr. Jenks and accused me of putting too much pressure on my team.  He did not treat male VPs of high performing teams in the same manner.

7.      Mr. Galvin also used personal information I had disclosed to him in confidence against me as tool for intimidation.

8.      I reported Mr. Galvin's actions and the tone of his emails to Caryn Perrelli (VP of Talent) and over the course of several months, I met with Ms. Perrelli to try to find solutions to protect me and my team from Mr. Galvin's conduct.

9.      In July and August 2019, I had multiple conversations with Ms. Perrelli, and with Tracey Nugent (Director of Recruitment), reporting that I felt bullied, harassed, and intimidated, to the point that I was uncomfortable sitting at my own desk (it is an open work space).  In response, I was told we would look into alternative solutions rather than taking any formal action.  Multiple times Ms. Perrelli stated that the best course of action would be that Mr. Galvin would take a six-month sabbatical and that she was aware of the negative environment he was

responsible for.  In less than one year he had terminated two Fund Managers of Rare's Impact Fund Meloy, within months of hiring them, he had also terminated two other staff members within the markets team.  Mr. Galvin when hiring the last fund manager had mentioned that he would best be located in Manila, where Filipino women would make sure he would stay and not leave than in Jakarta where he would have a hard time finding a girlfriend.  I felt insulted when he mentioned this and immediately reported this to Ms. Perrelli and to another colleague.

10.    I also discussed feeling bullied by Mr. Galvin with Paula Caballero, a Managing Director, and had numerous discussions with three colleagues who have also worked with Mr. Galvin for years, all of whom warned me that I would be "blacklisted" by Mr. Jenks and treated differently if I persisted in complaining about Mr. Galvin, his personal friend.

11.    Significantly, in August 2018, during the course of my conversations with Ms. Perrelli, I was warned that raising a formal complaint in writing concerning Mr. Galvin would have a negative impact on my relationship with the CEO, Mr. Jenks, and I was discouraged from taking formal action and submitting the written complaint I had prepared.  I was told to find a more "proactive" way to "get along" with Mr. Galvin.

12.    Starting on September 30, 2018, per doctor's orders, I was absent from work (quarantined) for 17 days with the chicken pox.  On 12 of those days, I worked remotely, from home, to prepare for an upcoming event during the World Bank meetings.

13.    While I was on leave, I was contacted by members of my team on several occasions, reporting that the working environment was challenging and that many were going to start looking for new employment due to the time consuming demands of Mr. Galvin, which were not related to our work.  One team member had already left in September. During a phone conversation, Mr. Galvin questioned if we could "pull her work permit" to force her to stay.  I replied that it would be unethical to do so, and her work permit had been granted by the World Bank Group.

14.    As a result, despite being warned about, and discouraged from, taking formal action against Mr. Galvin, on October 1, 2019, while I was out on sick leave with the chicken pox, I sent a written complaint via email to Ms. Perrelli stating, "I think I am starting to feel that Rare might not actually be the organization I thought it was when I joined. I am constantly worried for my team being bullied, even now as I have a high fever, because they call me, they are stressed and concerned.  It has to stop . . . . I am very concerned about what is going on and the fact that my team is suffering from this unjustified behavior of an executive leader."

15.    On October 2, 2019, Ms. Perrelli responded by email, stating that she had discussed my concerns with Mr. Jenks and Niels Crone (COO), and that Mr. Jenks wanted to meet with me upon my return to the office in order to address my concerns.

PL-00185

16.     On Saturday, October 5, 2019, Mr. Galvin forwarded me an email that he received from his assistant, Jenny Miller, on September 11, which had not been shared with me or with talent previously.  The email accused me of, among other things, creating a toxic environment for my team.  Notably, this email was never brought to my attention until after I had complained about Mr. Galvin – for doing the very thing the September email was accusing me of.

17.     In the September email which was not shared with me until after I alleged gender discrimination against Mr. Galvin, Ms. Miller also falsely accused me of gender bias after I hired a Kenyan woman as a senior Financial Analyst, and not the male candidate she had recommended.  Ms. Miller based her accusation on my comment that I was pleased that the most qualified candidate turned out to be a female since women in finance were underrepresented.

18.     On October 18, 2019, I received an email from Ms. Perrelli stating, "We recognize that we have had some workplace tensions on the team over the last few months.  We believe the best course of action at this time is to engage outside assistance to help us look into these matters and provide you the opportunity to discuss the facts and circumstances."  Jeff Loreck ("Mr. Loreck"), an attorney consultant from Orrick, Herrington & Sutcliffe ("Orrick") was engaged, and I was instructed to meet with him that day.

19.     No one even discussed the September email with me (the one accusing me of creating a toxic environment) before initiating an investigation.

20.     Notably, while I complained for months about Mr. Galvin's harassing conduct and no action was taken (and, in fact, I was discouraged from making a formal reporting and told that alternative solutions would be explored), a formal internal investigation was launched within a week of Mr. Galvin's October 5 email providing the complaint by Jenny Miller against me.

21.     My first day back at work from sick leave was October 16, 2019, to attend a luncheon meeting with our Indonesian government partners on the way forward on the blended finance mechanism that the team had designed and that they had agreed to implement.

22.     I officially returned to the office on October 24.  On October 25, 2019, I was interviewed by Mr. Loreck, who started off by telling me he only had an hour and was doing this *pro bono*.  My team members had been interviewed the previous week.

23.     On November 4, 2019, I wrote an email to Mr. Jenks explaining my side of the story and what had led me to come forward in-regards to the continuous gender discrimination and harassment from Mr. Galvin towards me and other women, since I had started working for Rare.  I provided Mr. Jenks with examples of what Mr. Galvin had said in my presence to other women or to me of the women in Rare.  I asked Mr. Jenks to temporarily have my team report to another division so we could focus on our deliverables to our government partners.

3

**PL-00186**

24.     On November 12, 2019, I met with Mr. Jenks to go over the findings of the investigation and to receive feedback for the path forward.

25.     Mr. Jenks said that the purpose of the meeting was to provide me with the findings and conclusion of the investigation, and that I was the subject of investigation because of community and concerns from "a number of people." He also mentioned that it is policy that after an email such as the one from Jenny Miller was received that action was to be taken. He did not respond when I pointed out that I had been engaged in discussions with HR since July regarding harassment by Mr. Galvin, and that I had sent an email detailing my complaints of gender discrimination and harassment on October 1, 2019, and that my written complaint about Mr. Galvin had not been afforded adherence to the same policy as Ms. Miller's complaint about me.

26.     Mr. Jenks said he reviewed the email I sent him on November 4 and provided it to Orrick, and that the investigation did not reveal any evidence of gender discrimination. I told Mr. Jenks that I had not been asked any questions regarding to gender discrimination – that the interview had been focused solely on the investigation about me and the allegations made by Jenny Miller.

27.     Mr. Jenks said that up to this point, I had not received performance reviews and feedback as I should have, and that I needed to show "commitment to personal growth," and he planned to recommend that I work with a coach.

28.     Mr. Jenks further stated that I needed to feel comfortable with saying I am not perfect, accept the feedback, and not blame others, and "to own as much [of the results of the investigation report] as I can before I respond." I was not given a chance to respond – to the contrary, Mr. Jenks said it was not a meeting where I was being invited to express my opinion and that I had to listen and reflect on what I had done and find a way to improve.

29.     Mr. Jenks referred to the investigation and our meeting as an "intervention" to "help me personally and professionally to move forward." My complaints about the harassment, discrimination, and unlawful conduct by Mr. Galvin were not addressed.

30.     Instead of taking any action to protect me or my team from Mr. Galvin's conduct, I was instructed to prepare a written "reflection" on the feedback about me and no one else, including if I could own my part in the problem and recognize I have work to do to fix it, and accept the feedback I received to make me a "better manager" and a "better person."

31.     I was completely shocked that my complaints, which I had been voicing for months, and about which I had submitted a formal, written complaint, completely ignored, and that the investigation was completely focused on me, as a result of Jenny Miller's email to Mr. Galvin back in September, which Mr. Galvin did not even share or make an issue until after I formally complained about him.

4

PL-00187

32.     I was also instructed to work with a mediator to come to a "working agreement" with Mr. Galvin to move forward together, and Mr. Jenks suggested I read the book "Getting to Yes" and "learn from the negotiation of peace in the middle east."

33.     I was placed on a 90-day plan with an executive coach which would culminate in a 360 review. Orrick's independent investigators interviewed a number of people besides me, all of whom were selected by Rare:  VP of Talent Caryn Perrelli; COO of Rare Niels Crone; Jenny Miller, Assistant to Dale Galvin' Dale Galvin; Lisa Pharaoh, Director of Global Development, who worked with the BF 20% of the time; Molly Bradke, my assistant; Kate Schweigart, BF Director, my deputy; and Manuel Bueno Vera, Senior Director for the Meloy Fund.

34.     The investigators found no evidence to support any of Jenny Miller's accusations against me – that I created a toxic or unlawful work environment, or that I engaged in discriminatory practices when I hired a female for the finance role.

35.     The investigators also found no evidence of gender discrimination by Mr. Galvin, despite the fact that 1) I had recently shared with Niels Crone my concerns about Mr. Galvin, and Mr. Crone was aware that I had asked for my team to be moved away from Mr. Galvin's area; and 2) Lisa Pharaoh expressed that she feared retaliation because she reported concerns about gender discrimination by Mr. Galvin to the Orrick investigator (and she also followed up with Talent (HR).

36.     Despite the investigators finding no evidence to support the allegations against me, Mr. Jenks stated that that I was in violation of Rare's values and policies and I was accused of berating a colleague (although the colleague was never questioned about it), using inappropriate and disrespectful language to and about other colleagues who are not present, engaging in an interview process that is not in line with proper procedure, not being forthcoming about the status of projects (despite outperforming  all of our goals and delivered on time); being a difficult manager, and sometimes creating a difficult work environment.  He countered this by stating that I brought a lot to Rare and "this qualifies for success."  He suggested I "double down," be more concerned about how I am perceived as a manager and a colleague.

37.     Mr. Galvin, on the other hand, was not treated similarly, and was not found in to be in violation of Rare's values and policies, despite his discriminatory and retaliatory conduct towards me, and his harassment of me and my team.

38.     Mr. Jenks stated that Orrick concluded there were "irreconcilable differences" and tension between me and Mr. Galvin, which was both of our faults, but Mr. Jenks said it was due to my behavior and actions (and not Mr. Galvin's) which have created a very difficult environment.  He ignored the fact that members of my team said they would leave if we continued to report to Mr. Galvin.

PL-00188

39.     Mr. Jenks also said that given the number of times I denied the accusations against me, that my truthfulness was in question, and I should accept the fact that I am lying. This was completely opposite from how Mr. Galvin was treated.

40.     Mr. Jenks said he would create a chart of how I could be successful, including a list of behaviors never to repeat again.  Mr. Galvin was not subjected to this same consequence.

41.     Mr. Jenks refused to authorize my request for my team to report to a managing director other than Mr. Galvin, and instructed me not to communicate with any other senior manager, or discuss any part of this process with my team.

42.     Mr. Jenks stated that I should no longer share any information with Steve Box (who had been very supportive of my position, and had also spoken out on behalf of the team) or I will be dismissed.  This made it difficult to effectively do my job, since Mr. Box and I work together on the projects for which he is the Managing Director for Fish Forever, and our work relies on his inputs and our coordination with him and his team.

43.     Mr. Jenks repeated that he wanted to see remorse and ownership of my faults in my written reflection. He also added that he expected me to "repent" for my actions.

44.     When I told Mr. Jenks that I intended to report to him any continuing acts of gender discrimination by Mr. Galvin, he said that any further reporting needed to go through HR. I replied that HR had not taken any action in response to my reports in  July and August, and to the contrary, had discouraged me from making a statement in writing.  I said he needed to do something about it.

45.     When I pointed out that these actions constituted retaliation, I was told I would be separated from the Company.

46.     Mr. Jenks asked if I wished to be re-interviewed by Orrick to address my complaints of gender discrimination, but stated he would not re-interview anyone else regarding gender discrimination.

47.     On November 13, I started receiving a number of emails from Mr. Jenks, requesting me to deliver the self-reflection, and he stopped by my desk to make sure I was writing it specifically adding he wanted to see me repent for my actions.

48.     On November 15 at 7.21a.m., shaken from the recent events, I texted Ms. Perrelli and asked for a call. During the call I told her that the emails from Mr. Jenks were leaving me shaking and that I truly cared for Rare and only wanted to have the opportunity to deliver for our partners, and then I would be willing to leave the organization if it was requested of me.  When asked, I told Ms. Perrelli I would be able to deliver by April 2020. I asked for the intimidation to stop and for this to be handled in a professional manner and not to make it personal. She followed up with me an hour later asking when the emails that had caused "concern" from Mr.

PL-00189

Jenks had been sent.  On November 16, 2019, I sent an email to talent, and the following day, November 17, while at the airport on my way out for a work trip, I received two emails from Mr. Jenks which were intimidating in nature and left me shaking.

49.     During a trip to Europe where I was representing Rare at the World Ocean Council meetings, prior to returning to DC I was informed by a colleague that I had been terminated. He and my deputy had been called into separate meetings with Mr. Jenks and were told that I was going to be separated from Rare. I had not received any information from either Mr. Jenks or Talent. I had finished my work and it was late evening and was ready to take a week of leave during Thanksgiving. When I mentioned to Mr. Box that I had just been told by a colleague that I had been terminated he informed me that Mr. Jenks had told him he would be sending me an email. In the email Mr. Jenks did not mention termination and told me that I was being placed on paid Administrative leave effective December 1, 2019 (I had already scheduled personal leave for Monday, November 25 through Wednesday, November 27, and Rare was closed for the Thanksgiving holiday on November 28 and 29), and to cancel any upcoming work trips.  My access to my work email removed as of November 22, while I was still on a duty trip. This caused significant hardship as I no longer had access to my travel (TSA) and health insurance passwords and I was in a foreign country.

50.     I informed my counter parts and proceeded to cancel my meetings stating that due I was postponing my trips due to personal reasons. Within two hours I was denied access to my work email.  In the ensuing weeks my team members were not instructed on what to say to our partners about my absence, so they stated I was on leave and most likely would not be returning to Rare. Rare continued to engage with people I had set up meetings with without informing them in advance that I would not be attending. Many of the individuals that they are meeting with have been part of my network prior to me joining Rare. Since the separation has not yet occurred this is causing damage to my reputation and further retaliation.

51.     Since being put on administrative leave effective December 1, 2019, without any ability to access my email (as of November 22) and without being able notify the people I have worked with for years of my leave, I have been informed that my colleagues have been intimidated from connecting with me, that management has sent emails to senior executives advising them not to ask questions on my case or contact me.  When I asked if I could have access to my business cards, my assistant was told not to give them to me, even though they were not property of Rare.  Mr. Jenks and Ms. Perrelli have gone above and beyond trying to discredit me and harm my professional reputation.  Mr. Jenks is using me as an example of what happens if you do not do what he wants or if you dare to speak out against discrimination. I have since met with a number of women who have said they are afraid of reporting any wrong-doing.

7

PL-00190

52.     I am aware of several other female employees who have been subject to gender discrimination by Mr. Galvin.  Lisa Pharaoh told me she discussed the issue of gender discrimination by Mr. Galvin during her Orrick interview, and that she was afraid of retaliation. She said she was concerned about what she said since the investigator mentioned he was working for the Mr. Jenks, and Mr. Jenks and Mr. Galvin are very close friends.

53.     Anna Marie Laura reported issues related to gender discrimination by Mr. Galvin during her exit interview in late October or early November, and cited Mr. Galvin's treatment of her as a factor in her decision to leave.

54.     I have since learned of a number of other instances of gender discrimination and harassment.  As one of the most senior women in the organization I have been told that there is fear that if any other women speaks up, they will lose their job. Two of the women left of my team have been directed not to talk to me or communicate with me in any manner. I was informed that they were promised promotions in exchange for disassociating themselves from me. My assistant sent a message to a colleague "hoping I would understand" that she has no choice. On December 28, 2019 a colleague from the European office reached out to me, having heard that I was put on administrative leave and expressed concerned on issues of gender discrimination. He mentioned that a colleague of ours had asked to be promoted to the position vacated by her supervisor and was told she was unfit due to her current divorce and her status as a single mom.

55.     I believe I was discriminated against and subjected to a hostile work environment because of my gender (female), and retaliated against for reporting and opposing the discrimination and harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended.

I declare under penalty of perjury that the foregoing is true and correct.

_Valeria M. Ramundo Orlando_                     January 9th 2020
Valeria M. Ramundo Orlando                                    Date

8

PL-00191

# EXHIBIT B

## PL-000195-000196

**From:** CHRISTOPHER BASHAW
**To:** Leslie Hoff
**Subject:** Assessment Letter (Orlando vs Rare)
**Date:** Tuesday, June 23, 2020 1:37:53 PM

Ms. Hoff,

I have had the opportunity to review your client's information provided by both parties.  In your client's charge of discrimination, she alleged that she was subjected to harassment, placed on administrative leave, and her employment was terminated in violation of Title VII of the Civil Rights Act of 1964, as amended.

Respondent denied the allegations of discrimination.  Respondent asserted that your client received a positive year-end review in 2018, and mid-year review on or about May 15, 2019. Respondent asserted that the Chief Executive Officer began to have concerns with your client's "deliverables" sometime in mid-2019, and he instructed your client's Supervisor to get more involved.  Respondent asserted that your client on or about August 23, 2019, reported to Ms., Perelli that the relationship between your client and her Supervisor had deteriorated.  Respondent asserted that your client reported to Ms. Perelli on October 1, 2019, regarding her Supervisor bullying her. Respondent asserted that a complaint was filed in September 2019, regarding your client creating a toxic work environment.  Respondent asserted that there were other complaints from employees regarding your client's behavior.  Respondent asserted that after an internal investigation it was determined that your client and her Supervisor both acted inappropriately and/or unprofessionally. Respondent asserted that your client and her Supervisor were required to submit "self-reflections". Respondent asserted that your client did not submit hers prior to the due date.  Respondent asserted that your client was then placed on administrative leave.  Respondent asserted that your client's employment was terminated effective January 31, 2020, following her insubordination in that she represented the company in Paris after being notified that she was not allowed.

Our preliminary assessment is that the Respondent did not violate the statute as there was no evidence gathered to show that your client was subjected to harassment, placed on administrative leave, and her employment being terminated based on her sex and/or retaliation for participation in a protected activity.  Once the Respondent articulates a non-discriminatory reason for its employment decision, the burden of proof rests with the Charging Party to show that the stated reason is either untrue or that others, of a different class (example: race, sex, national origin), were treated more favorably under similar circumstances.  This is your client's opportunity to provide information to rebut the Respondent's defense.  If your client has information which may lead to evidence to overcome Respondent's defense please submit your evidence within ten days of the date of this letter.  I can be reached between 6:00 a.m. and 6:30 p.m., Tuesday, Wednesday, and Friday at (202) 419-0732, or at christopher.bashaw@eeoc.gov.  If you reach my voice mail, please leave a message with a telephone number where you can be reached during those hours.

If I do not hear from you within the ten-day time frame, a determination will be made based on the available information.  If your charge is dismissed, you will be issued a Notice of Right to Sue which will allow you to file a private suit in federal court within 90 days of the Notice.

PL-00195

Christopher Bashaw
Investigator
U.S. EEOC Washington Field Office
131 M Street, NE
Fourth Floor, Suite 4NWO2F
Washington, DC 20507-0100
Direct dial:  (202) 419-0732
Fax:  (202) 653-6052
http://www.eeoc.gov/

PL-00196

# EXHIBIT C

## PLAINTIFF'S ANSWERS TO INTERROGATORIES

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

|  |  |  |
|---|---|---|
| VALERIA M. RAMUNDO ORLANDO | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CA 1:20cv01323 (TSE/JFA) |
| RARE | ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFF'S OBJECTIONS & RESPONSES
TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

Plaintiff Valeria M. Ramundo Orlando ("Ms. Ramundo Orlando" or "Plaintiff"), pursuant to Fed. R. Civ. P. 33, and Local Rules 26(B) and 26(C), hereby objects to Defendant RARE's First Set of Interrogatories as follows:

**INTERROGATORIES**

**Interrogatory No. 1:  Identify all individuals who have knowledge of any facts alleged in the Complaint and provide a summary of the knowledge of facts known or believed to be known by each.**

Objection:  Plaintiff objects to this Interrogatory to the extent it seeks information that is attorney-client privileged or work product protected; and seeks the mental impressions of counsel.

Response:  The following individuals, in addition to myself, have knowledge of facts alleged in the Complaint:

14 step increases. I was awarded promotional steps when I was transferred from NAGSMA to NAPMA. I also received 30days of leave and an additional 10 days of leave every two years for home leave to come back to the US, the travel to the US from my post location was paid for all my family members.

**Interrogatory No. 3**: **Describe in as much detail as you can the factual basis for your allegations in paragraph 24 of the Complaint, including the identity of the male colleagues in similar position you allege were being paid more than you, and the identity of the other VP's that had received pay increases in pay upon joining Rare.**

Response: Manuel Bueno Vera was a Senior Director (more junior to my position) within the same team - Sustainable Finance. Mr. Bueno Vera was 11 years my junior, with a decade less experience, yet was paid the same as me.

Brian Ullmann was hired two months before I was hired, at the same level as I was hired (he was hired as VP for Communications). He was paid more than me. We were/are of similar age, and had the same number of years of experience.

Gerald Miles received a pay increase upon joining Rare and was allowed to live in Australia instead of having to move to Arlington VA

Steve Box was hired as a VP at Rare and received a large increase from his previous position.

Esteban Chavarria he was hired in a junior position, was promoted to VP, and is currently earning more than I did as a VP at Rare. Mr. Chavarria junior to me, and did/does not possess similar experience in Ops Finance.

David Webb was hired to manage the Meloy Fund and was paid 40% more than I was despite being more than 10 years my junior with less experience in Finance.

13

**Interrogatory No. 4**: **Identify and describe in as much detail as you can all of the "instances of gender discrimination and hostile work environment by Mr. Galvin, aimed at [you], [your] team, and other female colleagues" that you allege in paragraph 26 of the Complaint you witnessed. Include in your answer the identity(ies) of the individuals subjected to the alleged "gender discrimination and hostile work environment," a description of the actions or incidents you allege constituted "gender discrimination and hostile work environment," and the dates of the actions or incidents.**

Response:  Many of these instances are outlined in the Complaint. The first instance of gender discrimination and harassment I witnessed was in April 2018 during a meeting with Dale Galvin, myself and Anna Marie Laura. They were introducing me to the work they were doing with in the Philippines with NEDA (NEDA is the Philippines' social and economic development planning and policy coordinating body). Ms. Laura had been managing the project from a policy stance and Mr. Galvin's team was in charge of the data analysis. Brett Jenks had mentioned that he had gotten coffee in Paris with the head of NEDA (a woman) and he had had a formal agreement with her on a coffee napkin, but since the meeting, he had not heard back from her.  By the time I joined Rare they had not had any follow up from NEDA. Mr. Galvin was very dismissive of the capacities of the NEDA team and its leadership, which was, at the time, all women. Mr. Galvin questioned their intellectual capacity and their ability to do "simple math" and understand what his team (at the time, all men) had done.  He was very disparaging towards the team during the meeting in front of Ms. Laura. Once Ms. Laura left the room, Mr. Galvin said that even though she had given her best and was very dedicated he did not believe she had the capacity to understand how to convey the message to NEDA about the proposal and that she just did not "get the details." NEDA did not want to have anything to do with Mr. Galvin because he had been so dismissive of them and his behavior had put them off, so they did not return his calls or his messages.  Rocky Sanchez Tirona is also aware of this.

14

In May 2018, before my departure for my first trip to the Philippines (I was there to meet with the Country VP, Rocky Sanchez Tirona - a Filipino woman), Mr. Galvin told me that he was highly disappointed with her - that she did not follow through and was not pulling enough strings to get things done for him in the Philippines. Jenny Miller, Mr. Galvin's assistant was present. He sent Ms. Tirona emails (sometimes prepared by Ms. Miller) that were inappropriate in tone and request. Mr. Galvin was dismissive of Ms. Tirona's role as Country manager.

In May 2018, Mr. Galvin also fired Megan Smith. Mr. Galvin claimed he had given her plenty of warnings, but we were all surprised by her termination. Mr. Galvin called me into a conference room and said Ms. Smith was not capable to do anything, she could not write, and was unable to perform even basic tasks he would ask of her. Ms. Miller and Mr. Bueno-Vera, both of whom had worked with Ms. Smith for a few years, were also very surprised by her termination. Mr. Galvin stated to me in an open space, that she just was not qualified for her job and could not perform even the most basic tasks.

In August 2018 Melissa Kang joined the Sustainable Finance Team to lead the Meloy Fund. She was based out of Singapore and had been a senior executive in Corporate Finance. Mr. Galvin began micro managing her and questioning not just her ability to perform her job but her ethical standards, stating that she was terrible and that she was not a good performer. Mr. Galvin terminated her soon after. Ms. Kang was a senior professional Asian woman who was driven, capable and had lead teams before joining Rare, but all of a sudden, according to Mr. Galvin, was unable to perform any task he gave her. Mr. Galvin commented to me that Ms. Kang had "failed" him. Months later, when Mr. Galvin asked me to meet Ms. Kang's former team in Jakarta to provide moral support, I learned she was well liked by the team and that a member soon after left to join her in her new venture.

In November 2018 I met with Mr. Galvin in Manila, Philippines. During a dinner, over beers, he discussed my performance review, and told me I was getting a bonus and a $10,000 increase (this was something that had been promised to me verbally when Rare was not able to match or come even close to my salary requirement). He also told me we should connect with the Filipino diaspora in the US where "a lot of Filipino women had married white Americans and now are very rich,"

In December 2018, during a two day workshop with the Leadership Team, I asked Claudia Quintanilla to support the mediation and the conversation, and she was outstanding. Mr. Galvin did not trust she could handle the senior level management. During that meeting Mr. Jenks began telling me that he could not understand what I did, and the way I explained it was wrong, and that he needed to take control to make sure I would be able to deliver. He did not trust I could. Mr. Galvin did not say anything.

In January 2019, in conjunction with my request to hire Molly Bradke as full-time assistant for the Blended Finance team, I asked if she could work from her home part of the week or when I was not in Arlington. She worked flexible hours to support me when I traveled in Asia. Mr. Galvin questioned whether I could be assured that she did all the work that we were paying her to do.

In February 2019, at the Pre Oak Meeting for Pro Blue, Mr. Galvin made disparaging comments towards Anna Marie Laura before the meeting, and during the meeting 26th of February Mr. Galvin was dismissive and did not support her in front of an outside person/member, Imani Morrison, of the Oak Foundation.

Mr. Galvin sent an email to Molly Bradke late in the evening to tell her he was disappointed in her and that he expected more. I replied to the email saying it was not necessary.

Lisa Pharaoh had been working supporting me at 30% (I had no team when she started and since I was working with stakeholders from her portfolio and she understood the country complexities she was an ideal partner). In December we had delivered the first draft of a proposal to the Minister of Development of Indonesia. In January I praised her to Mr. Galvin and hoped that she could get a promotion. But he dismissed it saying he did not see her value.

Every meeting we had on BF, Ms. Pharaoh had to defend her position. It was a veiled but constant form of discrimination. In 2019, Ms. Pharaoh was in the middle of the renewal of her green card and she was at Rare's mercy, as a Canadian, their sponsorship for a green card was very important to her, they held that over her.

In April 2019, Ms. Laura called a meeting to present to our team an opportunity for Rare to become member of ORRAA (Ocean Risk Resilience Alliance). In order to apply for membership we had to provide some background on sustainable finance. The membership fee would be waived in exchange for services. Nevertheless, Mr. Galvin repeatedly stated it was a waste of time and that Ms. Laura should not bother him with such requests. During the presentation meeting (Mr. Galvin, Mr. Miles and Ms. Laura were present), Mr. Galvin was being incredibly dismissive of Ms. Laura. During the meeting he said that the membership was useless, a waste of time and a dumb idea. After the meeting he sent Ms. Laura unnecessarily strongly worded emails. I sent Mr. Galvin an email telling him he should treat her better. This was not the only time I had to ask Mr. Galvin to be nice to female co-workers.

In April 2019 we had selected Kate Schweigart to join Rare as my Deputy and Director of the Blended Finance team. When we informed Mr. Galvin of the selection he said that s. Schweigart was too emotional and "wonky," and did not believe she was going to be able to execute the tasks at hand.

July 2019, Laura Barassa, the Blended Finance Team Financial Analyst, was working from home, which I had approved. Mr. Galvin started loudly asking in our office (open space) about Ms. Barassa's whereabouts, questioning, again loudly, if she did any work at any time. Ms. Schweigart was present and she stated this was embarrassing and humiliating for Ms. Barassa.

During the summer of 2019 David Webb joined the Sustainable Finance team at Rare to lead Meloy. I interviewed Mr. Webb on the 29th of May 2019, I was not in favor of his hiring and did not think he was qualified. When I asked Mr. Galvin if he would be living in Jakarta, Mr. Galvin stated that he had made arrangements for Mr. Webb to live in Manila, there was "a better chance" for Mr. Webb to meet a Filipino woman that would "entrap" him and keep him there so he would not leave. I found this incredibly offensive and demeaning for our Rare colleagues in the Philippines. In August 2019 I decided to send Ms. Schweigart to negotiate some final details with our counterparts in Indonesia, since I would be travelling elsewhere at the same time. I wanted Ms. Schweigart to gain the experience and to meet face to face our partners in-country. Mr. Galvin questioned my decision saying he did not believe Mrs. Schweigart was capable to negotiate and he did not trust that she could deliver. He was concerned that she would not understand the cultural and political sensitivities. Ms, Schweigart came to Rare from USAID and had worked within a multicultural environment, and I trusted her completely. During the entire summer of 2019 Mr. Galvin questioned the capabilities of the women on the team. We had two part-time men who supported us as well and he never made comments about their performance.

In September 2019, Mr. Galvin called me while I was in Europe to tell that he wanted to pull Mrs. Barassa's work permit so she could not leave. I informed him that he could not threaten to do that and that her work permit had been granted by the World Bank, the institution where her husband worked and that she was soon going to join.

**Interrogatory No. 5:** **Identify and describe in as much detail as you can each instance that "Mr. Galvin bullied Ms. Ramundo Orlando in front of Mr. Jenks and accused her of putting too much pressure on her team," alleged in paragraph 27 of the Complaint. Include in your answer the date of each instance and a description of the behavior or actions.**

Response: On December 13-14, 2018, during a two day workshop with the Leadership Team, I asked Claudia Quintanilla to support the mediation and the conversation, and she was outstanding. Mr. Galvin did not trust she could handle the senior level management. During that meeting Mr. Jenks began telling me that he could not understand what I did, and the way I explained it was wrong , and that he needed to take control to make sure I would be able to deliver.  He did not trust I could. Mr. Galvin did not say anything. At the time I had brought a signed MOU and LOI respectively with the Ministry of Finance of the Philippines and the Ministry of Economic Development in Indonesia, and we were in conversation with UNDP for an MOU and a procurement. By the end of the Spring I had a contract with the Inter America Development bank. I did this with only part time staff no full time team member, but I was not trustworthy according to Mr. Jenks.

Mr. Jenks  began questioning all the communication that came from the team and when we had deliverables with a number of organizations and governments he decided that I was not able to manage this. This is after they had publicly praised the work I did, and he wanted me to be the face of Blended Finance for Rare. In the background he kept using disparaging terms to describe how I presented Blended Finance. The meetings began on February 13, 2019 and were referred to as Brett/Steve/Valeria/Dale re: Blended Finance Alignment Meetings. The first one was held while I was in Manila at 8.30pm in the Evening and after a full day of meetings with DENR and BLGF (Ministry of the Environment and Ministry of Finance respectively).

19

During one of these meetings on Friday March 22 at 1.30pm, Mr. Box was remote on audio speaker. Most likely the meeting was recorded by Mr. Jenks as he recorded most meetings. Mr. Galvin was sitting in the conference room with his back to the window, Mr. Jenks was sitting on the other side of the table, and I was in the corner. Mr. Jenks asked a question regarding to status and was not happy with our answers and gave us all a "failing grade." He said that we all got "an F." At that point Mr. Galvin said claimed no responsibility since I had not made him aware that we had not delivered what Mr. Jenks had asked for. That was not true, but I kept quiet. I later exchanged comments with Mr. Box and he confirmed that Mr. Galvin had thrown me under the bus in front of Mr. Jenks. I had returned to the US from a trip to Asia on March 19. Mr. Jenks was not interested in the work I had done or the meetings I had while in Asia which were relevant to the agenda items: MFA, SFA, ADB, Islamic DB. Instead, he wanted to know why he had not yet received slides explaining how Rare would issue a 200 Million Dollar Bond with Indonesia or the Philippines. The problem is that we were not working on that since Rare, a US not for profit, could not issue a 200 Million dollar bond, as Mr. Jenks had told the Board and others during his fundraising meetings. I could not deliver what Mr. Jenks wanted because I was not working on what he wanted. I was working on creating Blended Finance Vehicles in the countries. This had been agreed with Mr. Galvin and Mr. Box, but Mr. Jenks told me I was failing him and gave me an "F" anyway.

**Interrogatory No. 6**: **For each of the weekly presentations alleged in paragraph 29 of the Complaint, state the date of the presentation, the time of the presentation and were you were located during the presentation.**

Response:   The meetings began on February 13, 2019  and were referred to as Brett/Steve/Valeria/Dale re: Blended Finance Alignment Meetings. The first one was held while

**Interrogatory No. 19**: Identify and describe in as much detail as you can the factual basis for your Equal Pay Act claim in Count Three of the Complaint, including the identities of the male VP's with similar duties you allege were paid more than you, the amount paid to the VP's identified, the duties of the VP's identified, the education and experience of the VP's identified, and the amount you claim you should have been paid and the factual basis for the amount you claim you should have been paid.

Response:

**Manuel Bueno Vera** was a Senior Director in Rare within the same team I joined - Sustainable Finance. He is/was 11 years my junior, with a decade less experience, yet was paid the same amount as me by Rare. Mr. Bueno Vera earned a HBSC at the London School of Economics and a Master of Research in Business at Tilburg University, the Netherlands.

**Brian Ullmann** was hired two months before me and was paid more than I was, even though we were similar in age with same years of experience. Mr. Ullman was hired as the VP for Communications. Mr. Ullmann earned a Bachelor of Arts at the University of Maryland. He was an Associate VP of Marketing at the University of Maryland before joining Rare as a VP of Marketing and Communications, which was a promotion in title and in salary. Mr. Ullman was/is a friend of Mr. Galvin's. Their the daughters have gone to school together and are involved in extra curricular activities together, on the same sports team, etc.

**Gerald Miles** received a pay increase and promotion in title upon joining Rare. He was allowed to live in Australia instead of having to move to Arlington, Virginia, as I was required to do. Mr. Miles was a regional director with another conservation organization before being hired by Rare and being promoted to Vice President. He received a substantial pay increase upon being hired. Mr. Miles earned a Bachelor degree from Griffith University and a Master Degree in Environmental studies from the National University of Australia.

**Steve Box,** was hired as a VP in Rare then promoted to Senior VP and Managing
Director. Prior to joining Rare, Mr. Box was a Principal Investigator with the Smithsonian
Institution, and when he joined Rare he was given a promotion in title he was made part of the
leadership team.  Mr. Box received a significant salary increase from what he had been earning
at the Smithsonian Institution. Mr. Box has a PHD in Marine Biology.

**Esteban Chavarria** was a Lead Program Administrator at a conservation organization
before being hired at Rare as a Director, and then being promoted to a VP in October 2018, and
promoted to the Executive Management Committee.  Mr. Chavarria is my junior in both age and
experience and does not have a Master's degree.  Despite this, Mr. Chavarria is earning more
than I earned at Rare. Mr. Chavarria earned a Bachelor Degree from the University of Costa Rica
and a license in Accounting from the University of Costa Rica.

**David Webb** was hired to manage the Meloy Fund and was paid 40% more than I was
despite being more than 10 years my junior with less experience in Finance. Mr. Webb has a
degree from Dartmouth College, and a Masters from Columbia University in New York,
Columbia Climate School, Climate and Society.

**Interrogatory No. 20:  Identify all individuals with whom you have
discussed your termination from Rare and provide a summary of the
information discussed with each individual. This interrogatory does not seek
privileged communications with your attorney.**

Objection:  Plaintiff objects to this Interrogatory to the extent it seeks information that
may be work product protected.

Response:  Please see my response to Interrogatory No. 1.  I spoke to about my
separation from Rare are:

**Ms. Sack** and **Mr. Cunliffe** were made aware that I was filing a lawsuit against RARE
for gender discrimination and retaliation.  I did not share any details with them.  They were

33

**VERIFICATION**

I declare under penalty of perjury of law that the foregoing responses are true and correct to the best of my knowledge and belief.

Date: _9th November 2021_

Valeria Ramundo Orlando

42